**KRAFT, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

Nos. 804–86T, (1)804–86T.

United States Court of Federal Claims.

Jan. 28, 1994.

Don S. Harnack, Chicago, IL, for plaintiff. James L. Malone, II and Wade S. Leathers, of counsel.

David Gustafson, Washington, DC, with whom was Asst. Atty. Gen. Shirley D. Peterson, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

This is a suit for the refund of taxes in the amount of $94,702,599 paid by taxpayer following the disallowance of deductions by the Internal Revenue Service (IRS) for business losses arising out of the alleged abandonment of intangible assets in tax years 1972 through 1978. In the alternative taxpayer contends it is entitled to a capital loss if the court finds the disposition to have been a sale or exchange instead of an abandonment. Under Action (1)804–86T the complaint also contained counts for the refund of taxes for the alleged improper disallowance by the IRS of investment tax credits in the same tax years for films and videotapes of televised variety show specials. The Opinion in Action 804–86T resolves issues following trial. Action (1)804–86T was disposed of by summary judgment. The Opinion in (1)804–86T appears following that of 804–86T in this document. These two cases conclude all tax claims for the years in question. Taxpayer seeks interest on any amounts recovered, and costs pursuant to 28 U.S.C. § 1920.

\* \* \* \* \* \*

In the Matter of No. 804–86T Alleged Abandonment Of Intangible Assets

## FACTS

In the early 1920's, taxpayer's predecessor, the National Dairy Products Corporation, set out to establish a national dairy business to provide consumers with a regular supply of disease-free, grade A, fresh milk and related products. Taxpayer's strategy was two-fold. It sought to acquire one or more large operating dairies, referred to as "core" dairies and other smaller "non-core" dairies in selected geographic areas. Taxpayer acquired a number of product lines in its acquisitions but only three are at issue here: home (or retail) delivery of milk; wholesale milk; and ice cream. In its acquisition of core dairies, taxpayer sought out large, technically advanced dairies with surplus capacity that served a significant portion of a given market area. In addition to purchase of the tangible assets of a core dairy, taxpayer claimed it also acquired intangible assets that it identified as (1) Source of Supply—the value of a steady supply of disease-free milk at a favorable price; (2) Production Turnkey—the value of an up-and-running physical plant and assembled staff of trained employees and managers to operate the plant; (3) Distribution System—an assembled fleet of home-delivery vehicles and drivers who had "established relationships" with customers on their route; (4) Customer Base—the value of a constant and regenerating Customer Base; and (5) Trade Name—the value of the identity of the acquired company, including trademarks. The only intangible asset allegedly acquired from non-core dairies was the Customer Base that was integrated into the market's core dairy Customer Base. Non-core dairy plants were closed immediately after acquisition.

Taxpayer explained how large expanding dairy companies purchased raw milk and how processed milk and ice cream were sold and distributed in the 1920's and 1930's. Dairies were valued, bought, and sold on the basis of the volume of milk sold to regular customers. The volume was measured by a system of "points:" A point represented the volume of product sold. A single point was equal to one quart of milk delivered to a customer.

For all practical purposes the terms point and quart are used interchangeably. If a dairy delivered 1,000 quarts of milk a day for 200 days a year, the dairy would be credited with 200,000 points.

Most fluid milk in 1920 was sold in glass bottles by routemen driving horse-drawn milk carts on retail home delivery routes. Grocers carried small quantities of milk (wholesale) as an accommodation to their customers. Intense competition existed among a large number of relatively small independent milk processors and each wanted to enlarge its share of the profitable home delivery market. A dairy's ability to provide its customers with a regular supply of fresh, healthy, disease free, grade A milk was its most important asset in building a strong, loyal customer base. Because of the lack of home freezer units, ice cream was largely a summertime business in the 1920's and 1930's. Most ice cream was packaged in large commercial size containers and sold either on a cone or hand-packed by dealers; i.e., grocery and drug stores, restaurants, public and private institutions, and confectionery shops. Because ice cream had to be eaten soon after sale, business was dependent upon the whims of the ultimate consumer and the vagaries of the weather. Typical of the times, the "Eskimo Pie" and the "Good Humor Bar" were both invented between 1919 and 1924. The first Howard Johnson's, with its "famous 28 flavors" of ice cream, opened in 1925.

Even though there were a considerable number of naysayers, the captains of the dairy industry saw a once-in-a-lifetime opportunity to consolidate hundreds, if not thousands, of small independent dairies into a few large, well-organized, centrally-operated dairy companies. What emerged are the large multinational dairy companies that exist today. As a result of consolidation taxpayer reportedly became the nation's leading dairy company by 1928, the largest ice cream manufacturer in 1930, and controlled nearly ten percent of the entire commercial milk supply in the country by 1934. In some markets taxpayer controlled up to fifty percent of the milk and ice cream business. All of the emerging "super" dairies used the

acquisition of other dairies as a method of growth in the various market areas in which they were doing business; they did not view these acquisitions as passive investment opportunities. Taxpayer claimed that economy of scale, diversification, and greater market power motivated all of its acquisitions.

Economies of scale were possible in both production and distribution. Large dairies are able to afford and use modern technology more effectively than small, independent dairies that were generally undercapitalized or limited in growth by high competition and low sales. Due to lower unit costs and overhead costs, large dairies could also afford more advertising and greater merchandising efforts as well as increased expenditures for research and sales personnel. By increasing their size, dairies were also able to increase their market power. They became price leaders and were better able to resist the pressures to stop cut-throat market practices.

Internal growth reportedly would have been more costly, uncertain, slower, and difficult to finance. Acquisition of existing dairies with the requisite tangible and intangible assets was the answer. By acquiring a significant portion of the milk and ice cream business in a market, the acquiring dairy could improve the quality and quantity of supply, use its processing equipment more efficiently, improve costs, increase the number of customers, and make its name more dominant. All of which led to more control over its competitors in the market area.

Taxpayer related that between 1928 and 1932 it acquired 207 core and non-core dairy companies in eighteen different states. Of these, the court is asked to address 125 acquisitions acquired in 1923 through 1932 in fifteen markets. Taxpayer acquired both core and non-core dairies through three principal means; *i.e.,* (1) purchase of assets, (2) purchase of stock followed by an immediate transfer of assets to taxpayer, and (3) purchase of stock not immediately followed by a transfer of assets. In approximately 120 acquisitions, taxpayer purchased the assets of the company. In eighty-six acquisitions the assets were purchased directly by one of taxpayer's subsidiaries; in twenty-six in-

stances the assets were purchased by taxpayer and contemporaneously transferred to a subsidiary; and in eight acquisitions taxpayer purchased the stock followed by an immediate transfer of assets. In eight core dairy acquisitions taxpayer purchased the stock but the assets remained in the acquired corporation until the 1940's or 1950's, at which time those dairies were liquidated or merged with taxpayer along with the assets. It was stipulated that in the case of all but a few core dairies taxpayer paid approximately one hundred percent over the fair market value of the tangible assets for the dairies it acquired.

Taxpayer was not the only dairy company expanding in the early 1900's. Other dairy companies, such as Carnation, Pet Milk, and Beatrice Foods were emerging as nationwide dairy companies, and at times competed with taxpayer for the acquisition of core and non-core dairies in key market areas. As one of taxpayer's expert witnesses, Professor Sidney Davidson testified:

Q. Did National Dairy identify a particular city and just run rampant through that city or was there any competition for some of those dairies?

A. Oh, man, there had to be a lot of competition because of the tremendous differences that you have in the price at which those dairies sold for[,] and in the differences between what those dairies were worth as I calculated it[,] and what they actually ended up being sold for. So, there was intense competition in some markets.

Federal and state legislative and regulatory bodies were just beginning to oversee the operations of this intensely local industry. Laws requiring tuberculin inoculation of dairy cows and pasteurization of fluid milk had either just been enacted by state legislatures or were about to be enacted. As a result major dairies found it difficult to successfully compete with each other within a particular market area, though there were exceptions to the general rule. Too much competition within a particular market would prevent a newly-emerging nationwide dairy company from capturing enough of that market to realize the economy of scale and other

sought-after benefits that came only to large dominant dairies. Without those benefits, a dairy could not adapt to the rapidly changing technologies, market forces, and government price and quality standards coming to bear upon the industry, and remain competitive. According to several witnesses, the technological growth forced upon the dairy companies, not only by competition for customers but from all levels of government, was phenomenal. Higher quality sources of supply needed to be developed and retained. Cleanliness and quality of milk was all important; poor quality was the death-knell of a dairy. In the 1920's pasteurization was new and, even though some customers disliked its taste and favored their milk "straight from the cow," government laws and regulations forced many dairies to produce a higher quality product than had theretofore been the case. Pricing was often controlled by government milk orders that set the prices of various grades of milk and milk products. In effect, the government milk orders created an oligopolistic market; a market structure between a fully competitive market and a monopoly market. The expanding national dairy companies all sought to acquire local dairies with modern plants producing pasteurized grade A milk, with skilled workers, and underutilized capacity that could absorb the production requirements to service more customers. Taxpayer reiterated often that to have done otherwise would have been counter to its goals. The court notes that this large-scale nationwide acquisition effort ceased in the early 1930's as quickly as it had begun, as the result of antitrust investigations instituted in 1931 by the U.S. Department of Justice.

Following its acquisitions taxpayer began development of the "Sealtest System of Laboratory Protection" and introduced the "Sealtest" trade name on taxpayer's products in 1935. By 1957, taxpayer had formally liquidated its acquired subsidiary dairies into the Sealtest Division. During the 1930's through the 1950's, taxpayer operated at a profit but,

by the 1960's, experienced declining profits in its home delivery milk and ice cream businesses. Taxpayer attributed the decline to several factors including competition for sales from supermarkets, cooperative and chain stores who in the interim years had built their own processing plants, and increased mobility of consumers who were no longer dependent on home delivery.

In 1972 Mr. William Beers, Chairman of the Board of National Dairy Products Corporation and Chief Executive Officer, directed Mr. Kenneth Fishpaw, Vice President and Comptroller, to assess the prospects for restoring profitability to the home delivery milk and ice cream businesses. Mr. Fishpaw concluded that the prospects were slim to none, and despite several local attempts to reinvigorate these businesses, profits continued to decline rapidly. As a result, Mr. Beers ordered the immediate disposition by whatever means of many of its milk and ice cream businesses. Taxpayer asserted that it permanently abandoned intangible assets of the milk and ice cream businesses it had purchased over the preceding forty-five years and claimed an abandonment loss deduction pursuant to section 165(a) of the I.R.C. of 1954 in tax years 1972 through 1978.[1] Taxpayer filed timely tax returns, subsequently amended to reflect the alleged abandonment deductions. The complaint states that the amended returns, for the fiscal years shown, included the following deductions:

*Table I*

Increase in Other Deductions, Including Abandonment or Disposition of Intangibles.[2]

| Year | Amount Claimed in Amended Returns |
|------|-----------------------------------|
| 1972 | $90,000,000 |
| 1973 | 90,000,000 |
| 1974 | 90,000,000 |
| 1975 | 67,000,000 |
| 1976 | 67,000,000 |
| 1977 | 67,000,000 |
| 1978 | 67,000,000 |

1. "I.R.C. § 165(a) is the general rule for the allowance of a deduction for losses not compensated by insurance or by other means." *See* M.M. Van Brauman, *The Harmon Requirement for a Section 165 Loss Deduction for Oil and Gas Properties After Gulf and Phillips,* 46 Tax Lawyer 363 n. 1 (Winter 1993).

2. Taxpayer's description of the claimed deductions.

At the conclusion of each amended tax return taxpayer stated: "[i]t is impracticable to include the detail required in these schedules with the return. Complete information is retained by taxpayer in its files." Taxpayer did not clearly state as much, but the missing "detail" must have been at least part of the massive amount of evidence proffered in this case. To explain the change in the amended returns taxpayer stated the following in its 1974 amended return:

On December 30, 1973 taxpayer owned intangible assets, then utilized in its business, which had a remaining cost basis for income tax purposes of not less than $190,-000,000. Said intangible assets were acquired by the taxpayer or its predecessors by way of acquisition of the stock and/or assets of the companies and/or businesses at a cost as set out in [an attachment]. During the taxable year ended December 28, 1974, taxpayer disposed of a portion of said intangible assets by way of abandonment, which assets are identified [in another attachment], and which assets had a tax basis of $90,000,000. Taxpayer is entitled to an abandonment loss in the total amount of $90,000,000, or such other amount as may be abandoned during said taxable year. Such deduction is allowable pursuant to the provisions of Section 165 IRC (*sic*) and the authority of *Massey[–]Ferguson....*

59 T.C. 220, 1972 WL 2496 (1972), *acq.,* 1973–2 C.B. 2. Each amended return contained substantially the same language. The Internal Revenue Service disallowed the deductions because of lack of proof of abandonment of the intangible assets, and value. For the tax periods ending in 1975–1978 IRS disallowed the claimed increase in deductions for abandonment losses because "[y]ou have not established that any abandonment of assets occurred. In addition, if an abandonment occurred, you have not established the basis of the assets abandoned."

At trial defendant asserted that if taxpayer, in fact, ever acquired any intangible assets it retains them to this day, or disposed

of them in a manner that did not permit it to take a business loss because it could not prove the adjusted fair market value of each alleged loss.[3]

DISCUSSION

*General*

Section 165(a) of the Internal Revenue Code, 26 U.S.C. § 165(a), states the general rule to be: "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." The Treasury Regulations implementing 26 U.S.C. § 165 are found at § 1.165. Section 1.165–1 provides that

(a) ... in computing taxable income ... any loss actually sustained during the taxable year and not made good by insurance or some other form of compensation shall be allowed as a deduction subject to any provision of the internal revenue laws which prohibits or limits the amount of the deduction. This deduction for losses sustained shall be taken in accordance with section 165 and the regulations thereunder.

(b) Nature of loss allowable. To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in section 165(h) and § 1.165–11, relating to disaster losses, actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.

\* \* \* \* \* \*

(d) Year of deduction. (a) A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained....

Treas.Reg. § 1.165–2 provides specifically that

[a] loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the

---

**3.** Defendant did not present a separate case, but in agreement with plaintiff and the court to shorten the time of trial, did ask questions of a direct

nature of plaintiff's witnesses during its cross-examination.

usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained.

■ As a general rule taxpayers who purchase or create intangible assets have a right to deduct the fair market value of those assets under section 165(a) of the Internal Revenue Code of 1954 if the assets are abandoned and a provable loss occurs. *Parmelee Transp. Co. v. United States*, 351 F.2d 619, 173 Ct.Cl. 139 (1965); *Massey–Ferguson, Inc. v. Commissioner*, 59 T.C. 220, 230–31 (1972), *acq.*, 1973–2 C.B. 2. Defendant argued that in order to obtain a refund of overpaid taxes taxpayer must show that particular intangible assets were actually acquired, the adjusted objectively determined *pro rata* fair market value of each intangible asset, the assets had not been previously deducted, the intangible assets were permanently discarded; *i.e.*, neither sold nor retained, and the deductions were taken in the year of abandonment. *See UFE, Inc. v. Commissioner*, 92 T.C. 1314, 1989 WL 66542 (1989). In addition, to establish a loss taxpayer must show that the abandoned intangible assets had not been acquired as a minor incident in a composite transaction. *Domestic Management Bureau, Inc. v. United States*, 38 B.T.A. 640, 1938 WL 87 (1938).

Defendant challenged the very heart of taxpayer's case; *i.e.*, that there were no intangible assets acquired with the tangible assets: That it was nothing more than the "generalized undifferentiated goodwill of the dairies acquired—goodwill that remains with taxpayer today." In the alternative defendant argued that specific intangible assets might be deductible as abandonment losses before a taxpayer completely leaves its business but with the caveat that the intangible asset of "goodwill" cannot be lost or abandoned until its owner ceases to operate com-

pletely. Defendant most strongly challenged taxpayer's tax accounting methodology of assigning *pro rata* value to the individual intangible assets and argued that in the absence of an objective valuation methodology taxpayer could not prove the adjusted fair market value of any individual intangible asset so as to permit it to take an abandonment loss under the tax code, even if it did incur a loss. Taxpayer did not respond to all of the issues exactly as stated by defendant but did provide a plethora of testimony and documentary evidence that addressed the issues, and more.

*Prior Litigation*

This is not the first time that the parties have met in court over the tax treatment of assets arising out of these acquisitions. *See Kraft v. Commissioner*, 21 T.C. 513, 1954 WL 382 (1954), *acq.*, *1954–1 C.B. 5*, *rev'd on separate issue, Kraft Foods Co. v. Commissioner*, 232 F.2d 118 (2d Cir.1956) (*Kraft I* ). In 1952 taxpayer filed suit in the United States Tax Court seeking the refund of taxes under similar circumstances as here. Defendant proffered, and the parties stipulated in *Kraft I*, that the book value of taxpayer's tangible assets was the fair market value and that the maximum value of the intangible assets was the difference, or residual, between the total price paid less the book value of the tangible assets. The Tax Court accepted the stipulation, *Id.* at 573, thereby rendering that fact *res judicata.*[4] The parties to this action stipulated to the fair market values given the tangible assets by defendant's expert witnesses in *Kraft I*, and as outlined in Exhibit CV in that litigation. *Kraft I* addressed the determination of the fair market value of acquired patents and patent applications. The opinion is complex and extremely thorough in its analysis of the acquired assets. The testimony of the first of four witnesses "was to show the assets [of the seller] according to its books, both tangible and intangible, and finally the net tangible assets ..." *Id.* at 585. Taxpayer's expert witnesses testified, in their independent opinions, that the value of the patents and

---

4. Plaintiff argued that defendant was collaterally estopped from challenging the fair market value of the tangible assets of the core dairies because of its position in *Kraft I* and the holding of the Tax Court. Because defendant does not dispute those values, the collateral estoppel argument need not be addressed.

applications was $20 million. Following a thorough examination and analysis of the record the Tax Court rejected the expert valuation testimony and found that it could not conclude that taxpayer supplied adequate proof for the court to find that $20 million (twenty-five percent of the total compensation paid) was the fair market value of the patents and patent applications. The Tax Court nevertheless found that taxpayer had successfully refuted the presumption of correctness of the determination of taxes by the Commissioner, *see Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Young & Rubicam, Inc. v. United States,* 410 F.2d 1233, 1244, 187 Ct.Cl. 635 (1969); *Commissioner v. Riss,* 374 F.2d 161, 166 (8th Cir.1967), and undertook an analysis of the entire body of the evidence of record. The Tax Court concluded that taxpayer was not vitally interested in the patents and applications and that the fair market value of the asset was $8 million. The court did not proportionally allocate the $8 million to individual patents and applications because the adjusted tax basis of only one intangible asset was at issue, albeit from the acquisition of a number of dairies. The principle to be gleaned from *Kraft I* is that book value may, in the proper circumstances, be the fair market value of assets and, more importantly, the court may determine the fair market value other than through the traditional willing buyer—willing seller methodology. Defendant's Exhibit CV in *Kraft I,* adopted by the Tax Court, identified the cost of acquisition, book value of the tangible assets, and the residual amount. Of the fifty-four acquisitions listed in Exhibit CV, twenty-two are in issue here. Other data was provided in Exhibit CV but was not stipulated to by the parties. Exhibit CV, in part, contained the following pertinent information about the core dairies:

Table II

| Name | Total Cost | Tangible Value | Residual |
|---|---|---|---|
| Akron Pure Milk Co. | $ 3,974,132 | $ 1,516,371 | $ 2,457,760 |
| Arctic Dairy Products Co. | 8,570,672 | 4,577,987 | 1,624,312 |
| The Breyer Ice Companies | 22,840,865 | 7,175,051 | 16,610,622 |
| Bryant & Chapman Dairy | 1,868,636 | 596,400 | 1,272,235 |
| City Dairies, Inc. | 1,978,495 | 1,402,231 | 576,264 |
| Detroit Creamery Co. | 30,223,715 | 10,136,500 | 20,087,215 |
| Ebling Creamery Co. | 3,974,112 | 2,307,196 | 1,666,915 |
| D.H. Ewing Sons, Inc. | 1,423,757 | 706,925 | 716,832 |
| Franklin Ice Cream Corp. | 2,395,115 | 917,455 | 1,477,660 |
| Gray–Von Allman Dairy | 1,401,317 | 913,676 | 487,641 |
| Luick Ice Cream Co. | 1,955,390 | 1,117,289 | 838,101 |
| Mathews Selected Dairies | 955,750 | 385,284 | 570,466 |
| Muller Dairies, Inc. | 812,744 | 409,152 | 403,593 |
| Ohio Clover Leaf Dairy | 1,711,082 | 740,509 | 970,573 |
| Ohio–Toledo Ice Cream Co. | 1,082,022 | 490,415 | 591,606 |
| Reick–McJunkin Dairy Co. | 11,346,249 | 9,058,690 | 2,287,560 |
| J.D. Roszel Co. | 2,910,818 | 1,115,800 | 1,795,018 |
| Sanitary Milk Co. | 1,902,785 | 831,357 | 1,071,428 |
| Sheffield Farms & Subsidiaries | 37,459,686 | 21,987,857 | 15,471,829 |
| Supplee–Will Jones Milk Co. | 23,088,592 | 10,946,546 | 12,142,045 |
| Telling–Belle Vernon Co. | 11,691,694 | 9,193,777 | 2,497,917 |
| Trapp Bros. Dairy Co. | 614,609 | 527,165 | 87,444 |
| Western Maryland Dairy | 11,049,075 | 7,084,045 | 3,955,030 |
| Wisconsin Creameries, Inc. | 3,162,616 | 2,524,652 | 637,963 |
| Youngstown Sanitary Milk | 702,732 | 446,153 | 256,580 |

752

*Goodwill and the Severability of Intangible Assets*

■ The term "goodwill" has been used as an umbrella covering all intangible assets; the way the public perceives a business through rose-colored glasses. *Seneca Hotel Co. v. United States,* 42 F.2d 343, 344, 70 Ct.Cl. 316 (1930), *cf. Parmelee Transp. Co. v. United States,* 351 F.2d 619, 173 Ct.Cl. 139 (1965). It can mean every positive advantage acquired by the purchase of a business that is expected to result in greater than normal earning power. It can also be but one of several intangible assets. Over the years some commentators and courts have created confusion by questioning whether goodwill is severable and can be partially abandoned prior to taxpayer's total cessation of business. Modern judicial thought, including that of this court and the United States Court of Appeals for the Federal Circuit, considers the confusion a red herring. If there is an identifiable abandoned severable intangible asset whose fair market value can be proven through judicially accepted methodology, and which meets the other prerequisite standards, *UFE, Inc. v. Commissioner,* 92 T.C. 1314, 1989 WL 66542 (1989), the taxpayer is entitled to a loss deduction per I.R.C. § 165(a). *Meredith Broadcasting Co. v. United States,* 405 F.2d 1214, 186 Ct.Cl. 1 (1968); *see also Domestic Management Bureau, Inc. v. Commissioner,* 38 B.T.A. 640, 643, 1938 WL 87 (1938); *Miami Valley Broadcasting Corp. v. United States,* 499 F.2d 677, 204 Ct.Cl. 582 (1974). In *Meredith* the United States Court of Claims held that "it is clear the intangible value of a business is divisible into its identifiable constituent elements." *Meredith,* 405 F.2d at 1224, *see also Miller & Sons, Inc. v. United States,* 537 F.2d 446, 210 Ct.Cl. 431 (1976). This court is of the opinion that continuance of a business does not prevent recognition of an abandonment loss for a severable intangible asset which is proved by the taxpayer to have an ascertainable fair market value and where such recognition is otherwise proper. *Parmelee Trans.,* 42 F.2d 344; *see also Massey–Ferguson, Inc. v. Commissioner,* 59 T.C. 220, 1972 WL 2496 (1972), *acq.,* 1973–2 C.B. 2; *Metropolitan Laundry Co., Ltd. v. United States,* 100 F.Supp. 803 (N.D.Cal.1951).

Dr. Knutson, taxpayer's principal expert witness for identification and valuation of the alleged intangible assets, did not identify the five intangible assets at issue from contemporaneous documentation but from his knowledge of what emerging national dairy companies needed to acquire to be successful. He testified that all of the large dairy companies moving into nationwide sales did not acquire the five intangible assets of core dairies as ancillary to the tangible asset acquisitions but sought out only core dairies with those identified intangible assets. Taxpayer only purchased core dairies that owned not just the tangible assets that taxpayer needed to enter a geographic market area, but who also owned the intangible assets to make its entry into the market area a success. Dr. Knutson testified that in his opinion the premium paid by taxpayer over the book value of the tangible assets of each acquired core dairy was attributable without exception to the five intangible assets he identified. There is no evidence, nor was there any argument or claim that other intangible assets were acquired with the purchase of core dairies; but, if such was the case, they were abandoned immediately upon acquisition and are not the subject of this litigation.

*Integrated Transactions*

This part of the discussion addresses the eight core dairies of which taxpayer acquired the stock but not the assets until years later. Defendant argued that taxpayer's loss under I.R.C. § 165(a), for abandonment of an asset it received in liquidation of a subsidiary long after it was acquired is limited to the amount of the subsidiary's adjusted tax basis in the asset. Section 332(a) of the I.R.C. states, in part, that "[n]o gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation." Section 334 states, in part, "[i]f property is received by a corporation in a distribution in a complete liquidation to which section 332(a) applies, the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor." Defendant did not argue that the rule would apply to asset acquisitions or stock acquisitions fol-

lowed quickly by liquidation because the latter are considered asset acquisitions under *Kimbell–Diamond Milling Co. v. Commissioner*, 14 T.C. 74, 80, 1950 WL 118 (1950), *aff'd*, 187 F.2d 718 (5th Cir.1951), *cert. denied*, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951).

The parties agree correctly that the issue of taxpayer's entitlement to a deduction for the alleged abandonment of an asset at a rate different from the acquired dairy's basis in the asset is controlled by *Kimbell–Diamond Milling Co. v. United States, supra,* and that substance, not form, is determinative of the tax. Treas.Reg. § 1.165–1(b). Courts have consistently held that where a corporation intends to acquire the assets of another and through a series of intervening steps first acquires the stock, then dissolves the acquired corporation and distributes the assets to itself, the acquisition will be deemed to have been an asset acquisition. Defendant argued that *Kimbell–Diamond* applies only if the acquired corporation is dissolved and the assets transferred immediately, or shortly after, acquisition of the stock. Taxpayer countered that the dissolution need not be immediate as long as it can be proved that the original intent of the acquiring corporation was to acquire the assets. The issue was discussed in *Kanawha Gas & Utils. v. Commissioner*, 214 F.2d 685, 692 (5th Cir. 1954), and requires the court, using the principal of substance over form, to make its adjusted tax basis determination as of the date of the original stock acquisition. *Kanawha* stated "[t]o determine what basis provision [of the I.R.C.] applies, we must first ascertain the true nature of the transaction." *Id.* at 692. *Georgia Pac. Corp. v. United States,* 264 F.2d 161, 163 (5th Cir.1959), held that

> when stock in a corporation is purchased for the purpose and with the intent of acquiring its underlying assets and that purpose continues until the assets are taken over, no independent significance taxwise attaches to the several steps of a multiple step transaction. The final step is, therefore, viewed not as independent of the stock purchase but simply as one of the steps in a unitary transaction, the purchase of assets.

In *American Potash & Chem. Corp. v. United States,* 399 F.2d 194, 185 Ct.Cl. 161 (1968), *motion for reconsideration denied,* 402 F.2d 1000, 185 Ct.Cl. 161 (1968), the United States Court of Claims held:

> [I]f a taxpayer who is interested primarily in acquiring a corporation's assets first purchases stock and then liquidates the acquired corporation to reach the assets, the interim, purportedly separate steps taken to accomplish the primary objective will be disregarded and the steps considered a single transaction. Objectively, in form a purchase of stock has been accomplished; in substance the transaction is considered a purchase of [assets].

In *Knapp King–Size Corp. v. United States,* 527 F.2d 1392, 208 Ct.Cl. 533 (1975), the court compared the *Kimbell–Diamond* rule with Section 334(b)(2) of the Internal Revenue Code of 1954:

> *Kimbell–Diamond* ... holds that where one corporation purchases the stock of another with the intent of acquiring the latter's assets by liquidation of the acquired corporation, and in fact liquidates it, the intermediate steps may be disregarded and the entire transaction treated as a purchase of assets at the purchaser's cost of the stock, and such price shall be deemed the purchaser's basis of the assets for sale, depreciation and other purposes. Section 334(b)(2) differs in some respect from the *Kimbell–Diamond* rule. It ... does not depend upon the purchaser's subjective intent.

The issue is thus a question of fact to be decided by the court, based upon the preponderance of the evidence, looking to the substance of the issues. *Koppers Coal Co. v. Commissioner,* 6 T.C. 1209, 1218, 1946 WL 265 (1946); 83 A.L.R.2d 718, §§ 2, 3, 6. When the assets of a corporation whose stock has been acquired are immediately integrated into the acquiring company proof of the original intent to acquire the assets is obvious. After the passage of time between a stock acquisition, and dissolution coupled with acquisition of the assets, the question becomes more difficult.

Taxpayer purchased all or a controlling interest in the stock of the eight core dairies at issue here in the 1920's and 1930's but did not liquidate the dairies and transfer the assets, for the first time to taxpayer, for a period of years, even decades. Defendant identified the eight core dairies whose stock was purchased by taxpayer who held the stock for a period of years without liquidating and transferring the assets to itself.

Table III

| Dairy | Acquired | Liquidated | Years Held |
|---|---|---|---|
| Detroit Creamery [5] | 1929 | 1936 | 7 |
| Arctic Dairy Products [5] | 1928 | 1936 | 8 |
| Harding Ice Cream Co. [6] | 1926 | 1937 | 11 |
| Wisconsin Creameries [7] | 1929 | 1950 | 21 |
| Western Maryland | 1930 | 1956 | 26 |
| Telling–Belle–Vernon | 1928 | 1955 | 27 |
| Supplee–Wills–Jones | 1925 | 1956 | 31 |
| Reick–McJunkin | 1923 | 1956 | 33 |

Taxpayer's "explanation," that it operated some of the eight core dairies during the intervening years under their original names because it was advantageous to maintain their identity for reasons of customer loyalty in order to capitalize on the claimed intangible assets of Customer Base and Trade Name, is without merit. Taxpayer proved beyond doubt that its sole reason for acquiring core dairies was to create a large nationwide dairy business within which all of its products would be marketed and advertised under a common name. The only time it varied from that goal was when outside circumstances prevented immediate liquidation of an acquired dairy. The real reasons for the delay and the impact upon taxpayer's claim is discussed in other sections of this Opinion. Dr. Knutson's "tailor-made" for trial, inconsistent "explanation," that it wished to capitalize on some acquired dairies trade names and trademarks, damaged his credibility.

Defendant asked the court to find that taxpayer's basis of each intangible asset, for the purpose of determining taxpayer's business loss deductions under I.R.C. § 165(a), was the acquisition cost of the assets to the acquired dairy. Defendant stated that some acquired dairies owned valuable intangible assets but the books and records showed that the acquired dairies spent only a small fraction of what taxpayer paid to acquire those assets from them. According to defendant the tax basis is what an acquired dairy could have taken as a business loss deduction had the acquired dairy liquidated its assets in the 1920's and 1930's instead of selling its stock to taxpayer. Under I.R.C. § 334, the adjusted tax basis of the intangible assets in the mid–1950's to taxpayer would then be the

5. Taxpayer could not liquidate and transfer the assets of Arctic Dairy and Detroit Creamery immediately after purchase of their stock because of a minority shareholder dispute, and litigation. Upon completion of the litigation the dairies were liquidated and the assets transferred to taxpayer.

6. Shortly after acquisition the assets of Harding were transferred to a new company and controlled as an integral part of taxpayer's business. It should not have been included on the list.

7. The assets of Wisconsin Creameries milk business were transferred to Luick Dairy Company, a wholly-owned subsidiary of taxpayer as of July 23, 1929. The ice cream assets were transferred to Luick no later than January 1, 1946. All of Wisconsin Creameries assets were merged with Luick Dairy Company of Delaware in 1950.

same as that of the acquired dairies in the 1920's or 1930's, and taxpayer may only take a deduction for its inherited base value in the assets in question; *i.e.*, the carry-over value. Taxpayer launched a strong counter to defendant's argument premised in part upon the argument that in substance it always intended to purchase the assets, and actually acquired control of the assets of the challenged core dairies even though it owned only the stock.

Both parties cited pre-litigation statements of taxpayers to prove their theses. Defendant recalled a statement given by an officer of taxpayer to the Federal Trade Commission in 1926 that taxpayer was "merely a holding corporation owning the stock of its subsidiaries." Taxpayer's legal counsel explained its acquisition policy in a letter written in 1929 to a dairy that taxpayer intended to acquire:

> The new company continues to operate under the same management as before it was taken over, with a few members of [taxpayer's officers] on the Board of Directors. Some of the more mechanical details in connection with the operating and management of the business, such as keeping of books of accounts and records and the handling of the corporate records follow a uniform practice which the management will be expected to follow.

In connection with the 1931 antitrust investigation, taxpayer stated that the companies whose stock it acquired retained their identities. In conjunction with the antitrust investigation, the president and general manager of taxpayer's St. Louis subsidiary (not in litigation here) testified under oath that "[t]here is no national superintendent, ... we run our business from a local standpoint, controlled by the Board of Directors." Defendant concluded that this decentralization of management, control, and independence was so significant as to belie taxpayer's position that it acquired and maintained control

over the assets of the eight stock acquisitions.[8]

Taxpayer responded that the substance of its acquisition policy was to acquire the tangible and intangible assets of operating dairies and that the form of the acquisitions was dictated by the exigencies of the selling dairy and not by any investment or tax considerations. *See* 26 U.S.C. § 165; *Kimbell–Diamond*, 14 T.C. at 80. Each dairy acquired was intended to supplement the others as part of an integrated national dairy business. The assets of all acquired dairies were controlled as a unified business through direct lines of authority from taxpayer's home office. Testimony of several witnesses and a 1930 document entitled "Confidential Report to the President [of taxpayer]" described the elements of centralized control, as exacted by taxpayer over its operating divisions.

> Weekly reports of sales, weather and labor conditions were required. Each consolidated local business had to follow [taxpayer's] Manual of Accounting. Financial statements had to be prepared following [taxpayer's] prescribed format. Responses to governmental requests were to be handled by the home office. Uniform standards and rules of operation were imposed. Insurance for all operations was purchased by the home office. No funds could be borrowed except through the home office. All surplus funds were transferred to the home office. No acquisition or sale of businesses or properties could be undertaken without the direction and approval of the home office. All salary changes required home office approval.

Taxpayer also maintained centralized health and sanitation services to assure uniform quality of products, minimize health problems and assist in solving plant operating problems. Mr. McInnerney stated in taxpayer's 1926 annual report that

> [d]uring the year just closed, the management of your company has taken important

---

8. The court will not address the veracity of taxpayer's statements cited by defendant except to point out that they were generally inconsistent with the statements given by several witnesses at trial. It is not known under what circumstances and in what context the sixty to sixty-five year old statements were given but they appear in the first instance to be contrived to mollify the Department of Justice and, in the latter instance, owners of a dairy company about to be dismembered by an powerful predator.

steps in unifying the purchasing, accounting control, technical research and other aspects of the business of its subsidiaries with the resulting economies of operation and standardization of methods.

The 1936 annual report announced the formation of the Sealtest System of Laboratory Protection as "a further step in [taxpayer's] efforts to bring efficiencies and greater quality standards to its local dairy businesses:"

A significant step during the past year was the formation of the Sealtest System of Laboratory Protection. All the research, bacteriological and testing laboratories in the National Dairy organization, exceeding 100, together with the master laboratories at Baltimore and Chicago, have been merged into one centrally-directed laboratory system, the Sealtest System Laboratories, Inc.

\* \* \* \* \* \*

Although this laboratory organization was only organized as a separate division of your company in 1935, its inception occurred some eight years ago [in 1927] when National Dairy's first research laboratory was organized in Baltimore.

Witnesses for taxpayer agreed that senior local dairy and division managers operated with a set degree of autonomy premised on the principle that only responsible employees locally situated could efficiently operate a dairy. The purchase and sale price levels for milk and ice cream had to be based upon local market conditions. The local dairy negotiated with the local milk producers, or their cooperative, and competed with local competitors. Dr. Clarence Roberts, an employee of taxpayer from 1925, president of Sheffield Farms Dairy [acquired by taxpayer in 1925] from 1950 until 1960, and president of taxpayer's Sealtest Division from 1960 until his retirement in 1965, testified, that "only occurrences in the day-to-day operations would dictate when to add, change, or drop delivery routes." Another of taxpayer's witnesses explained "[w]e elect the boards of directors and change management if results are unsatisfactory."

Both parties cited and labeled as "consistent" and "inconsistent" prior statements that they opined best supported their positions, and a casual reading of the record could lead to an erroneous conclusion that the two positions were fundamentally inconsistent. Such is not the case. The court has carefully studied the voluminous record to identify how taxpayer met its avowed goals. In addition, the court had the benefit of observing the witnesses as they testified, and makes its findings with those observations in mind.

The court finds that taxpayer's delegations of operating authority were nothing more than an example of reasonable corporate management policy. It is true that local managers exercised a significant degree of local autonomy and that some witnesses referred to decentralized management. Nevertheless, it is clear from the record that taxpayer did not delegate to the acquired dairies or operating divisions any of the authority or control that taxpayer perceived it needed to retain in order to assure its growth in the industry nationwide. Taxpayer proved by a great preponderance of the evidence that to have done otherwise would have defeated the very purpose of the consolidations; *i.e.,* to gain the economic benefits of scale and big business. Taxpayer effectively controlled the business and assets of all core dairies it acquired, regardless of the form of acquisition, by establishing policies and standards and reserving to itself the authority to approve or disapprove all major activities undertaken by its subsidiaries not directly related to the local physical sale of fluid milk and ice cream. Taxpayer's management was certainly not hesitant about exercising its reserved right to make key policy decisions, to guide and direct local management, and to remove local management when it failed to meet or comply with taxpayer's policies and direction. Dr. Roberts said he could have cared less what form the acquisitions took; stock or asset. He testified that Mr. McInnerney was only interested in acquiring and controlling dairies that fit his grand plan and left the form of the transactions to his bankers and lawyers as long as the substance of the results met his goals.

Moreover, defendant previously had agreed in *Kraft I* that taxpayer always in-

tended to acquire the assets of the dairies it purchased regardless of the means of acquisition. In its 1950 brief to the Tax Court, defendant argued that taxpayer "absolutely controlled the subsidiary operations it acquired in the 1920's and 1930's." The Tax Court agreed and found that the consideration paid for each dairy, regardless of the form of acquisition, was for all of the tangible and intangible assets. Through the acquisition of stock and placement of taxpayer's officers on the boards of directors of the acquired dairies, taxpayer gained full control of the assets of those dairies. The dairies were, as the Tax Court found in *Kraft I,* "operated as 'divisions' of [taxpayer]." The fact that taxpayer left several of its dairies in their acquired corporate shells for a number of years, in the circumstances of this case, is not evidence of lack of control or an intent not to operate as an integrated or unified dairy business in its newly acquired market areas. *See KFOX, Inc. v. United States,* 510 F.2d 1365, 1378, 206 Ct.Cl. 143 (1975). The preponderance of the evidence supports taxpayer's position that in the circumstances of this case the means of acquisition was form, whereas taxpayer's intent and the result was the substance to which the court must look. Had a contemporaneous, formal, specific plan of acquisition and liquidation existed there would have been no question of taxpayer's intent. But the absence of such a plan is not presumptive evidence of the contrary. The law merely requires that taxpayer's intention be evident from all the available facts and circumstances. *Commissioner v. Ashland Oil & Ref. Co.,* 99 F.2d 588 (6th Cir.1938), *cert. denied,* 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); *Kimbell–Diamond Milling Co. v. Commissioner,* 14 T.C. 74, 1950 WL 118 (1950), *aff'd,* 187 F.2d 718 (5th Cir. 1951), *cert. denied,* 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1957); *American Potash & Chemical Corp. v. United States,* 399 F.2d 194, 185 Ct.Cl. 161 (1968).

The determination of whether taxpayer purchased the stock of the eight core dairies at issue without any view to acquiring the assets is not difficult in this case. The Tax Court found in *Kraft I,* and this court also finds, based upon its understanding of the milk industry and taxpayer's goals specifically, coupled with the evidence and testimony of a number of very credible witnesses, that in all instances taxpayer intended to, and did, acquire control of the assets of the core dairies that it purchased regardless of when they were dissolved and the assets transferred to taxpayer. Taxpayer conducted its business through a number of regional divisions that were controlled in accordance with instructions from its home office and subject to home office approval for numerous specific activities and actions. The fact that taxpayer did not immediately liquidate several core dairies and distribute the assets to itself does not change the fact that each acquisition was part of a single integrated unified transaction entitling taxpayer to treat each acquisition as the purchase of assets at taxpayer's cost of the stock. In attempting to prove the fair market value of the intangible assets of the eight core dairies that were not immediately dissolved taxpayer's business losses, if otherwise proved, are not limited to the carry-over value; *i.e.,* the cost of the assets to the acquired dairies. *American Potash, supra.* In substance the challenged eight core dairy stock acquisitions were integrated acquisitions of assets.

*Fair Market Value*

How fair market value is defined is a legal question; what constitutes fair market value in a particular case is a factual matter and the burden of proof is on the taxpayer. *Miller v. United States,* 620 F.2d 812, 825, 223 Ct.Cl. 352 (1980). That burden is, however, not absolute. In a tax refund case there is a strong presumption that the assessment of taxes determined by the Commissioner of Internal Revenue is correct. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Stubbs, Overbeck & Assoc. v. United States,* 445 F.2d 1142, 1148 (5th Cir.1971); *Young & Rubicam, Inc. v. United States,* 410 F.2d 1233, 1244, 187 Ct.Cl. 635 (1969); *Commissioner v. Riss,* 374 F.2d 161 (8th Cir.1967). The presumption can be overcome but taxpayer must prove by substantial evidence the wrongfulness of the Commissioner's determination. *Riss,* 374 F.2d at 166. If taxpayer meets its burden of proof the presumption disappears and the court is left to independently resolve

the question of the tax upon the basis of all of the evidence of record before it. *Meredith Broadcasting Co. v. United States,* 405 F.2d 1214, 186 Ct.Cl. 1 (1968); *Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Stubbs, Overbeck & Assoc., supra; Commissioner v. Riss, supra. Riss* held:

> The presumption of correctness rule is usually dispositive of a case in situations where the taxpayer offers no substantial evidence to overcome the presumption created by the Commissioner's determination. However, when the taxpayer has offered substantial evidence to support his position, the presumption disappears. The fact issue must then be resolved by the court upon the basis of the evidence before it. . . .

*Riss,* 374 F.2d at 166.

■ One of taxpayer's expert witnesses was Professor Sidney Davidson who testified in the main about "generally accepted accounting principles" (GAAP) in the 1920's and 1930's and how taxpayer accounted for its acquisitions. Professor Davidson testified that there was "no significant difference" between financial and tax accounting in the 1920's and 1930's. Professor Davidson also offered several definitions of intangible assets but prefaced his remarks with the statement: "[A]ccountants have had difficulty developing a precise definition of intangible assets." Referring to a book by Eric Kohler, *The Language of Business,*[9] Professor Davidson said that an intangible asset was

> a capital asset having no physical existence, its value being limited by the rights of . . . anticipative benefits that possession confers upon the owner. [Kohler] goes on to say, [i]ntangible assets appearing in published financial statements may include goodwill acquired in the purchase of a business, representing the excess of costs of investment in the partial or total equity of another organization, over its reported book value at the time of acquisition.

Professor Davidson testified that he has written: "Intangible assets are, or an intan-

gible asset is, a non-physical, non-current right that gives a firm an exclusive or preferred position in the marketplace." He continued, there are frequently listings of intangible assets that have no common characteristics that are frequently grouped together under the heading "goodwill." Professor Davidson identified two types of intangible assets. Those having an ascertainable life, such as patents, and those for which a reasonable life cannot be determined. The latter do not necessarily last forever but at the time of acquisition have no indication of limited life. Examples of such intangible assets are "going-concern," "trade names," "subscription lists," and "organization costs." If any life limit were put on them at the time of acquisition, it would be totally arbitrary. It is because no reasonably accurate life can be ascribed to the latter intangible assets that they cannot be amortized. *See Burnet v. Niagara Falls Brewing Co.,* 282 U.S. 648, 654–56, 51 S.Ct. 262, 264–265, 75 L.Ed. 594 (1931); *Manhattan Co. of Virginia, Inc.,* 50 T.C. 78, 96, 1968 WL 1494, *appeal dismissed* (4th Cir.1968), *acq.,* 1974–2 C.B. 3; *Cornish v. United States,* 348 F.2d 175, 185 (9th Cir.1965).

Professor Davidson justified his conclusion that taxpayer had purchased intangible assets because the purchase price, less book value of the tangible assets as identified in the annual financial statements and other related documents of a number of the acquired dairies, left a residual of about half the purchase price. Professor Davidson did not review the files for all acquisitions but upon the basis of representative review of the major acquisitions, taxpayer's litigation files, and *Kraft I,* concluded that the total residual for all 125 acquisitions was $175 million and concluded that taxpayer was "not stupid, and therefore, they must have acquired some intangibles." At least he "hope[d] so." He also testified that taxpayer charged the residual in the 1920's and 1930's to surplus, and later to profit and loss, but in any event the residual was written off and

---

**9.** Professor Davidson was apparently confused about the book to which he referred. Eric Kohler is a prolific author of "business" and "accounting" books, but never wrote a book entitled

*"The Language of Business."* Conversely, there are a number of books with that title, but Mr. Kohler was not the author of any.

never carried forward on taxpayer's annual financial statements.[10] Professor Davidson concluded that "[t]here was nothing left to write off because they [the intangible assets] had been written off to surplus at the date of acquisition." A short while later he testified "the intangible assets ... never got onto plaintiff's books and were never, therefore, available to be written off or deducted for tax purposes." [11]

Based upon Professor Davidson's highly credible testimony and its thorough review of the record, specifically taxpayer's returns during the period 1924 through 1978, the court found no evidence that taxpayer took prior deductions for, or any other favorable tax treatment of, the allegedly acquired intangible assets in issue. The court gave special consideration to taxpayer's returns for the years 1924 through 1932 seeking a pattern of deductions contemporaneous with the acquisitions. No "suspicious" deductions were found, neither was any pattern discovered in later returns from which the court could infer such tax treatment. The fact that eight consolidated tax returns during the 1930's were missing from the record does not detract from this finding. *See Massey–Ferguson, Inc. v. Commissioner,* 59 T.C. 220, 1972 WL 2496 (1972), *acq.,* 1973–2 C.B. 2. Parts of the eight consolidated tax returns were lost in the past sixty years but the available returns and Professor Davidson's testimony that the value of the intangible assets had been written-off at or near the time of acquisition support the finding. *Id.*

Taxpayer's intangible asset identification and valuation expert witness was Dr. Ronald Knutson, an individual with a depth of knowledge of the dairy industry matched by few. He prefaced his testimony with the unrefuted statement that the dairy industry was the most extensively studied industry in the United States.

Dr. Knutson testified that he had a "fair amount" of experience in valuing land to determine the effect a government program, or a company's proposed use, would have upon it in terms of dollars; *i.e.,* how economic forces affected values. As an example, Dr. Knutson stated that he could value a federal or local government's regulatory policy against a dairy's assets. He also testified that he knew how to establish the fair market value of an asset by capitalizing the asset. In the latter context, Dr. Knutson testified that he had valued tangible and intangible assets of companies to determine what an asset would be worth to a buyer or seller, but not necessarily what a buyer would pay for an asset or what a seller would sell it for. The latter, he contended, was a different issue than the former and to be found only through the process of negotiation. His valuation might or might not have been the final purchase price, and he opined, might or might not have been what the asset was worth on the open market "in a vacuum." Dr. Knutson stated that he was very familiar with the traditional open, or fair market, willing buyer—willing seller valuation methodology but could not use that method because the necessary comparative data was lacking.[12] He found no contempo-

---

10. Professor Davidson stated that as part of its regular financial accounting practice in the 1920's taxpayer followed a 1917 recommendation of the Federal Reserve Board to write off the excess consideration paid for assets it acquired against surplus.

11. To fully respond to defendant's challenge taxpayer would have to prove a negative; *i.e.,* that it did not take a tax advantage on the alleged assets between the time a dairy was acquired and disposed of. Hardly an enviable position and oftentimes impossible to prove. The court based its decision that taxpayer had taken no prior tax advantage(s) after a thorough review of the record. The court also notes, but did not base its decision upon the fact that taxpayer had been audited on a regular basis since the late 1920's and all of its tax returns and audit reports are in

the possession of the Internal Revenue Service. Taxpayer has the burden of proof but once proof was offered it became incumbent upon defendant to simply do more than state that the burden had not been met. At the very least some analysis or argument is required. This case was at least seven years in coming to trial and defendant offered no support for its suggestion that prior deductions or other tax advantages had been taken. No testimony, or even serious argument to that effect was proffered by defendant.

12. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas.Reg. § 1.170A–1(c)(2). In the absence of

raneous reported similar sales from which he could draw information for comparison purposes. As a result, Dr. Knutson determined what assets would have been of value to taxpayer, and the value of those assets to taxpayer.

Dr. Knutson did not use the residual method to determine the value of the intangible assets. He instead used what he characterized as the "reasoned value method" to suggest the fair market values of the individual intangible assets acquired from each dairy. In so doing, the sum of the values he found in each acquisition was in a few instances in excess of the residual values, but the parties stipulated that the maximum amount taxpayer could recover for each acquired dairy would be no greater than the residual value. Dr. Knutson also testified that in his opinion the intangible assets acquired from each dairy were permanently abandoned at the time taxpayer left the geographic market area.

Defendant charged that Dr. Knutson did not know how fair market value was calculated and, by his own admission, did not purport to do so. Defendant continued, that "[o]ne way of describing the main difference between [Dr.] Knutson's 'value' and 'fair market value,' is that the former is subjective to the purchaser;" that Dr. Knutson asked what an asset was worth to a particular buyer. That is, what taxpayer would have paid for the asset as opposed to its price on the open market, whereas "[v]alue must be determined objectively." *Travelers Ins. Co. v. Bullington,* 878 F.2d 354, 358 (11th Cir. 1989). Dr. Knutson admitted that his valuation might or might not be the fair market value; "[v]alue is not intended to be a reflection of what that asset might [realistically] sell for on the open market."

Taxpayer referred to *United States v. 564.54 Acres of Land,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979), for the proposi-tion that "fair market value does not include the special value of property to the owner arising from its adaptability to his particular use." The case does stand for the proposition asserted by taxpayer but has no relevance to the issues at bar. *United States v. 564.54 Acres of Land* was a case of condemnation of privately owned land under the Just Compensation requirement of the Fifth Amendment to the Constitution. The United States took land for a public purpose from a church that had used the land as nonprofit summer campsites. The United States offered $485,400 as the fair market value. The church refused the offer and demanded $5.8 million, the cost of developing functionally equivalent substitute facilities at a different site.[13] The Supreme Court rejected the equivalent substitute facilities cost as the fair market value of the land taken, and said

[b]ecause of serious practical difficulties in assessing the worth an individual places on particular property at a given time, we have recognized the need for a relatively objective working rule. *See United States v. Miller,* 317 U.S. 369, 374 [, 63 S.Ct. 276, 280, 87 L.Ed. 336] (1943), *United States v. Corps,* [sic] 337 U.S. 325, 332 [, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392] (1949). The Court therefore has employed the concept of fair market value to determine the condemnee's loss. Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking. *United States v. Miller, supra,* [317 U.S.] at 374 [, 63 S.Ct. at 280]; *accord, City of New York v. Sage,* 239 U.S. 57, 61 [, 36 S.Ct. 25, 26, 60 L.Ed. 143] (1915); *United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 633 [, 81 S.Ct. 784, 790, 5 L.Ed.2d 838] (1961); *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 474 [, 93 S.Ct. 791, 794, 35 L.Ed.2d 1] (1973).

\* \* \* \* \* \*

actual sale prices the fair market value of stock is to be determined by taking into consideration factors a willing buyer or seller would need to make an informed decision. *See also* Treas.Reg. § 20.2031–2(f); Treas.Reg. § 25.2512–2(f); *Krapf v. United States,* 977 F.2d 1454 (Fed.Cir.1992).

13. Because of the findings of the court, the issue of the propriety of measuring damages following a taking of property from a private landowner versus a public body by the "substitute facilities doctrine," need not be addressed. *See Board. of Co. Supr's of Prince Wm. Co. v. United States,* 27 Fed.Cl. 339, 341 (1992).

But while the indemnity principle must yield to some extent before the need for a practical general rule, [the Supreme] Court has refused to designate market value as the sole measure of just compensation. For there are situations where this standard is inappropriate. As we held in *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 [, 70 S.Ct. 547, 549, 94 L.Ed. 707] (1950): '[W]hen market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards ... Whatever the circumstances under which such constitutional question arise, the dominant consideration always remains the same: What compensation is 'just' both to an owner whose property is taken and to the public that must pay the bill?' *See also United States v. Corps,* [*sic* ] *supra,* [337 U.S.] at 332 [, 69 S.Ct. at 1090;] *United States v. Toronto, Hamilton & Buffalo Nav. Co., supra,* [338 U.S. 396] at 402 [, 70 S.Ct. 217 at 221, 94 L.Ed. 195]; *United States v. Miller, supra* [317 U.S.] at 374 [, 63 S.Ct. at 280]."

*United States v. 564.54 Acres of Land,* 441 U.S. at 511, 512, 99 S.Ct. at 1857, 1858. There is no disagreement that the measure of just compensation for property taken by the United States should be its fair market value, but that circumstances do arise where it is judicially acceptable to utilize a different measure. That is not, however, the case in tax accounting. Taxpayer has not cited, and after an exhaustive search the court is aware of no court that has adopted the proposition that the value of an intangible asset for tax purposes was not its fair market value.

One of defendant's principal contentions was that taxpayer could not prove a separate fair market value for each intangible asset. Taxpayer responded that the record for each of the 125 acquisitions in issue established, by the preponderance of the evidence, the fair market values of the intangible assets. Proof, taxpayer claimed, was in the record and included expert and factual testimony, stipulations of fact, contemporaneous audit reports, New York Stock Exchange Listing Applications, contemporaneous internal financial data, and Accounting Acquisition Cards, though not all of the listed forms of proof were present in each instance.

■ Defendant specifically challenged Dr. Knutson's use of taxpayer's Accounting Acquisition Cards for proof of the matters contained in the Cards; *i.e.,* corporate histories of acquired companies, mergers, liquidations, and transfers of assets. Defendant argued that the origin of the Accounting Acquisition Cards and the basis of the reported data was unknown. However, prior to trial taxpayer employed an expert document witness to review and verify the accuracy of the Accounting Acquisition Cards. Defendant deposed the document expert, and following the deposition, wrote taxpayer that

This is to confirm the statement that our trial attorney made to your partner, James Malone. For purposes of this case only, the Government does not dispute that the "Accounting Acquisition Cards" included on the exhibit lists attached to Kraft's first and second requests for admissions are authentic documents, the entries on which were made on or about the dates stated. (We do not hereby admit any facts that might be supported by reference to these cards. Our position here is directed only to the authenticity of the documents.)

Defendant's acceptance of the Accounting Acquisition Cards as authentic was with reference only to the Accounting Acquisition Cards for the Peoria, Northeastern Ohio, Kansas City, Toledo, and Omaha market areas. In the Peoria market area, for example, the parties stipulated that the Accounting Acquisition Cards were prepared by company employees principally during the period 1925 through 1935 and that contemporaneous additions were made to the Cards to reflect various corporate transactions after that time. Defendant offered no evidence that any of the data listed on the dozens of Accounting Acquisition Cards was inaccurate. Moreover, the Price, Waterhouse & Co. acquisition audit reports and New York Stock Exchange Listing Applications, with but a few exceptions, verified the information and data in the Accounting Acquisition Cards. Defendant separately stipulated that the Accounting Acquisition Cards for the Peoria,

Northeastern Ohio, Omaha, and Louisville market areas were authentic business records.

Defendant's implicit challenge to the Accounting Acquisition Cards was to their admissibility under the Hearsay Rule. Fed. R.Evid. 802. The Accounting Acquisition Cards are admissible pursuant to the "ancient document" exception. Fed.R.Evid. 803(16), to wit: "Statements in a document in existence 20 years or more whose authenticity is established [are admissible for the proof of the statements]." The "ancient documents" exception directs that the data or information contained therein be considered as true. Courts have traditionally relied on ancient documents because they antedate the present controversy and there is little that can be done to suggest that they were tailored to prove a point in the present controversy. *See George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir.1990). As noted by McCormick on Evidence, § 298, and referred to in the Notes of the Advisory Committee on the Federal Rules of Evidence, the "danger of mistake is minimized by the authentication requirements, and age affords assurance that the writing outdates the present controversy."

■ There is no question but that the Accounting Acquisition Cards that were admittedly authentic, or stipulated to, are admissible for the proof of what is stated in them. Because the history and circumstances surrounding the other Accounting Acquisition Cards is the same as those that were not challenged, the court finds that the authenticity of the remainder of the Accounting Acquisition Cards has been established and are likewise proof of what is stated in them.

■ The Accounting Acquisition Cards are also acceptable for the proof of what is stated in them pursuant to the exception to the Hearsay Rule for a record that is a regularly conducted business activity. Fed. R.Evid. 803(6).[14] It is indisputable that taxpayer's Accounting Acquisition Cards were kept in the course of a regularly conducted business activity. Once defendant stipulated that some of the Cards were authentic, it cannot, without proof, attempt to deny any "facts that might be supported by reference to these cards." Defendant's argument to exclude the Accounting Acquisition Cards from consideration by the court fails.

■ Defendant also challenged Dr. Knutson's use of the New York Stock Exchange Listing Applications as proof of product volume sales, financial information, and historical data. However, during the trial of *Kraft I*, defendant introduced the testimony and report of its expert witness, Mr. Haslam. Mr. Haslam testified in *Kraft I*, that he relied extensively on the NYSE Listing Applications in preparing his report and that he had found them reliable because "[t]he New York Stock Exchange required a listing application be adequate and that it state the true condition of the company being acquired." Mr. Haslam used the information contained in the NYSE Listing Applications to allocate the portions of the purchase prices for the fifty-four acquisitions he examined to the tangible assets acquired from each dairy. It is his conclusions that are set out in Table II, *supra.* Mr. Haslam also stated that

> [f]or purposes of this study, we proceeded on the assumption that any excess [residual] consideration paid over and above the tangible assets acquired, represented for all intents and purposes, the intangibles purchased.

■ The Tax Court accepted Mr. Haslam's suggested findings and conclusions. Defendant's use of the NYSE Listing Applications to prove the value of taxpayer's as-

---

14. Rule 803:

&ast; &ast; &ast; &ast; &ast; &ast;

**(6) Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness. . . .

sets in *Kraft I* is sufficient proof of their veracity at this time. "As a general rule the pleadings of a party made in another action ... are admissible as admissions of the pleading party to the facts alleged therein, assuming of course that the usual tests of relevancy are met." *Continental Ins. Co. of N.Y. v. Sherman*, 439 F.2d 1294, 1298 (5th Cir.1971). Such prior pleadings represent either an exception to the hearsay rule or, alternatively, meet the requirements for admissible hearsay. Defendant is bound by its earlier testimony in *Kraft I*.

■ An equally applicable doctrine to govern the effect given Mr. Haslam's testimony is that of "preclusion of inconsistent positions," or "judicial estoppel." While Moore refers to judicial estoppel as one of "rather vague outline," 1B J. Moore, *et al.*, *Moore's Federal Practice*, ¶ 0.405[8], at 239 (2d ed. 1991) [hereinafter 1B *Moore's Federal Practice*], the United States Court of Appeals for the Federal Circuit has dealt with this issue extensively, and has provided standards for the application of judicial estoppel. *See Water Technologies v. Calco, Ltd.*, 850 F.2d 660, 665–66 (Fed.Cir.1988); *Jackson Jordan, Inc. v. Plasser Am. Corp.*, 747 F.2d 1567, 1578–80 (Fed.Cir.1984).

■ Many jurisdictions have recognized that "a litigant is not completely free to argue whatever state of facts seems advantageous at a point in time, and a contradictory state [of facts] whenever self-interest may dictate a change." 1B *Moore's Federal Practice*, ¶ 0.405[8], at 240. The goal of "judicial estoppel" is to prevent litigants from "playing fast and loose" with the courts, to protect judicial integrity, *Scarano v. Central R.R. of New Jersey*, 203 F.2d 510, 513 (3d Cir.1953), and to "avoid unfair results and unseemliness." *Jackson Jordan*, 747 F.2d at 1579 (quoting Wright, *et al.*, *Federal Practice and Procedure: Jurisdiction*, § 4477, at 779 (1981)).[15] Unlike res judicata or collateral estoppel, preclusion by judicial estoppel "is not based upon [the] finality of judgments." 1B *Moore's Federal Practice*, ¶ 0.405[8], at 239.

The Federal Circuit has held that the application of judicial estoppel is unwarranted when the following seven factors are present: (1) no "judicial acceptance" of the previously asserted inconsistent position has taken place; (2) there is no risk of inconsistent results; (3) there is no effect of the pleading party's actions on the integrity of the judicial process; and (4) there is no perception that the court has been misled. *Water Technologies*, 850 F.2d at 665–66. The Federal Circuit also requires (5) reliance by the opposing party, and (6) prejudice to the opposing party's case as a result of the inconsistent position. *Jackson Jordan*, 747 F.2d at 1579–80. Most importantly, (7) the party against whom estoppel is invoked must have "received some benefit from the previously taken position; *i.e.*, [it] 'won' because of it...." *Id.* at 1579.

Pursuant to the standards adopted by the Federal Circuit, defendant is judicially estopped from denying the veracity of the NYSE Listing Applications. The Tax Court adopted Mr. Haslam's testimony and data, including his reliance on the NYSE Listing Applications, and if this court were to ignore defendant's prior pleading there could be an unnecessary risk of inconsistent results on the issue of the proof to be drawn from the Applications that could be misleading to this court. Dr. Knutson testified that he relied on the data in the NYSE Listing Applications and if the court were to deny the veracity of the evidence it could be at odds with the Tax Court and defendant's prior position on the same issue. Because the elements of judicial estoppel are present defendant is estopped from challenging the veracity of the very same data it successfully presented to the Tax Court in *Kraft I*.

■ The court is of the opinion that in tax accounting the determiner of fair market value need not be hampered with blinders; the value given an intangible asset by another methodology, or different data, can be the fair market value, even if different methodologies, or data, suggest different fair market

---

**15.** Thus, plaintiff in *Scarano*, who recovered $37,000 from his employer after alleging "total disability" as a result of a job related injury, was estopped from maintaining a suit for reinstatement less than a month later in which he alleged that he had made a physical recovery.

values. *See Massey–Ferguson v. United States,* 59 T.C. 220, 1972 WL 2496 (1972), *acq.,* 1973–2 C.B. 2. Dr. Knutson and counsel for taxpayer stated on several occasions throughout trial that taxpayer gave the court the best information and analyses available and it was the responsibility of the court to find if the result was the fair market value, and if not, what was.

The Tax Court in *Massey–Ferguson,* faced with this "duty" addressed a corporate taxpayer's claim that it had abandoned four intangible assets; *i.e.,* trade name, distributorship system, product line and going-concern, and took a tax deduction for the loss incurred. Defendant asserted that taxpayer failed to prove what intangible assets had been acquired, and the *pro rata* fair market value of each. The Tax Court found that intangible assets had been acquired, that some were abandoned in the proper tax year, and others were not. In determining the fair market value of each intangible asset, the Tax Court relied upon the testimony of two expert witnesses each of whom valued the trade names on the basis of the reputation of the seller's products in the light of the industrial products field; the general line distributorship on the basis of the buyer's sales which it made in the first part of 1957; the product line on the basis of reproduction costs; and going-concern value on the basis of the costs of moving and reestablishing the operations elsewhere. In valuing the trade name, the court concluded from a review of the entire record that it was the average of the two values reported by the two experts. In discussing the value of the general line distributorship system the court simply concluded that "both expert witnesses used reasonable, although somewhat different, methods . . . ." The court also found that "[t]heir reliance upon incomplete sales records [was] also reasonable. The records were sufficient to accurately determine total sales, and the incompleteness was due to the fact that some records had been lost when the [taxpayer's] corporate offices were moved."

The Tax Court found that the expert witnesses reasonably valued the seller's product line in terms of what it would have cost to establish a similar product line. However,

the Tax Court found the value of the going-concern intangible asset to have been improperly derived. "[G]oing-concern value has been defined as [the] value existing in a proven operating property, considered as an entity with business established, above that of a property complete and ready to operate but without business," Appraisal Terminology & Handbook 85 (4th ed. 1961). The expert witnesses suggested a value based on what it would cost to move and reestablish the operation at another site which was, in effect, the functionally equivalent substitute facilities valuation method condemned even in just compensation takings cases. *See United States v. 565.4 Acres of Land,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979).

The Tax Court also held that the expert witnesses had provided sufficient evidence in the record to enable it to determine the value of three of the four intangible assets in litigation and that the fair market value was, in the absence of evidence to the contrary, "the amount paid for each such intangible asset. . . ." *See United States v. Davis,* 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962). The court then concluded that it could independently determine the fair market value of the going-concern intangible asset, under the residual method, by subtracting the sum of the determined *pro rata* values of the three intangible assets from the total cost paid for the four intangible assets. *See Youngstown Sheet & Tube Co. v. Mahoning County Bd. of Revision,* 66 Ohio St.2d 398, 422 N.E.2d 846, 849 (1981), where the Supreme Court of Ohio found that the Board of Tax Appeals had made its value determination "after carefully considering the entire record," and that the Board was not required to adopt the appraisal method of any expert or witness. Thus, in *Massey–Ferguson,* the *pro rata* fair market value of all four intangible assets was found and the taxpayer was allowed the abandonment loss deductions. The Tax Court concluded that both methodologies used by the expert witnesses were judicially acceptable even though different values were suggested.

██ Reliance upon a methodology incorporating a "high degree of objectivity" to establish fair market value, as argued by

defendant, is not necessary especially where the seminal transactions from which the adjusted tax basis is claimed are ancient and there is a serious question of whether hypothetical willing buyers and willing sellers could be identified, or even existed. To paraphrase *Couzens v. Commissioner*, 11 B.T.A. 1040, 1928 WL 967 (1928), the court here must place itself in the acquisition years and, using whatever evidence is available, determine what an intelligent and reasonable buyer and seller would in their fairly mercenary interests find the fair market value of the assets to be, all the while attempting not to be unduly skeptical nor optimistic. Clearly opinions must differ.

> The method of valuation is in itself unimportant, so long as it gives due regard to all the facts and relevant evidence, and results in a value which has a reasonable relation thereto. There may be no slavish adherence to a formula, *Minnesota Rate Cases [v. Shepard ]*, 230 U.S. 352 [, 33 S.Ct. 729, 57 L.Ed. 1511] (1913); *Georgia Ry. Co. v. R.R. Comm.*, 262 U.S. 625 [, 43 S.Ct. 680, 67 L.Ed. 1144] (1923), and whether the method should proceed from a definite study of, say, original cost, *see Donaldson Iron Co. v. Commissioner*, 9 B.T.A. 1081 [, 1928 WL 1361] (1928), or cost of reproduction new less depreciation, *see Paducah Water Co. v. Commissioner*, 5 B.T.A. 1067 [, 1927 WL 1186] (1927), and *compare Appeal of the Rockford Malleable Iron Works*, 2 B.T.A. 817 [, 1925 WL 425] (1925), or from general opinions of qualified witnesses, or from book value, or from recognized market quotations or other data, must depend upon the nature of the property under consideration and the extent to which such evidence bears a relation to its value.

*Couzens*, 11 B.T.A. at 1162–3; *cf. United States v. Kales*, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941).

▮ *Couzens* was premised not upon an actual completed transaction involving the sale of property by a willing seller to a willing buyer but, rather, from an assumption using the known facts of a hypothetical transaction from which value was inferred. The principle that methodology is unimportant is of particular significance here because of the age of the transactions and the dearth of contemporaneous data. The court must recognize a rule of reason when determining the fair market value of assets in transactions, most of which are over sixty years old. The valuation process does not beget mathematical exactitude. *Chesapeake & Ohio Ry. v. Commissioner*, 64 T.C. 352, 1975 WL 3144 (1975) (*followed in Baltimore & Ohio Ry. v. United States*, 603 F.2d 165, 221 Ct.Cl. 16 (1979)). Taxpayer's cite to *Meredith* is apropos in instances where it is extremely difficult to determine the allocation of value among several intangible assets with any degree of exactitude. *Meredith Broadcasting Co. v. United States*, 405 F.2d 1214, 1217, 186 Ct.Cl. 1 (1968); *see also Miami Valley Broadcasting Corp. v. United States*, 499 F.2d 677, 687, 204 Ct.Cl. 582 (1974), which also found that mathematical precision was impossible. The valuation process is an "inexact science" requiring reasonable practical, and rational approximation, *Union Pac. v. United States*, 524 F.2d 1343, 1383, 208 Ct.Cl. 1 (1976), based upon all information before the court. *Chesapeake & Ohio Ry. v. Commissioner*, 64 T.C. 352, 1975 WL 3144 (1975). Taxpayer argued that Dr. Knutson more than met these standards in his valuation of the five intangible assets.

▮ It is the function of this court to review the thousands of documents comprising the written record, and the transcript, to determine if taxpayer's claimed valuations were reasonable, practical, and rational. If the court is not satisfied that taxpayer has properly allocated a value to an identified severable intangible asset, it is not *a fortiori* the duty of the court to determine that value, but the court may do so if the presumption of correctness of the Commissioner has been overcome by substantial evidence, *Massey–Ferguson v. United States*, 59 T.C. 220, 1972 WL 2496 (1972), *acq.*, 1973–2 C.B. 2; *Ferrell, et al. v. Commissioner*, 90 T.C. 1154, 1988 WL 59903 (1988), and if the value can be determined from a review of the record in its entirety. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Young & Rubicam, Inc. v. United States*, 410 F.2d 1233, 1244, 187 Ct.Cl. 635 (1969); *Com-*

*missioner v. Riss,* 374 F.2d 161 (8th Cir. 1967). Moreover, the court must conduct its review of the record with the understanding that the tax consequences of any particular transaction must be based upon economic realities—substance—as opposed to form. *Mobil Oil Corp. v. United States,* 8 Cl.Ct. 555 (1985). Fair market value must be determined objectively, but with the realization that "objectivity" is not static; it has fuzzy boundaries. If after examination of the record before it, the court can find substantial proof of severable intangible assets, abandonment, the fair market value of each intangible asset, no prior abandonment, and that abandonment occurred in the proper tax year, taxpayer will be allowed the claimed refunds; otherwise not.

■ In its attack upon taxpayer's valuation of the Customer Base assets allegedly acquired from the eighty-eight non-core dairies, defendant challenged taxpayer's valuation of the tangible assets as being equal to book value thereby precluding any determination of the fair market value by the residual method. *Hermes Consol., Inc. v. United States,* 14 Cl.Ct. 398, 411 (1988), held that "[w]hen making a fair market valuation for purposes of the tax code, book value is only one of three factors to be reviewed; a corporation's dividend yield and earnings must also be considered.... [B]ook value has consistently been held to have the least weight." *Hermes* relegation of book value to the bottom of the preferred method list may or may not be the law. For example the Tax Court has approved at least three methods of determining the fair market value of intangible assets, all equal in weight: (1) the parties' allocation of the values at the time of acquisition; (2) the residual, or gap, method; and (3) by capitalization. *See Citizens & Southern v. Commissioner,* 91 T.C. 463, 510, 1988 WL 90987 (1988); *Union Pac. v. United States,* 524 F.2d 1343, 1383, 208 Ct.Cl. 1 (1976).

The court finds after careful consideration of the applicable law, and in light of the age of the acquisitions compounded by a dearth of contemporaneous records of comparable acquisitions, that fair market value may be proved by a methodology other than that of the traditional willing buyer—willing seller comparable sales methodology. Some latitude must be permitted because of the very nature of the assets. The court must recognize that proof of the fair market value of an intangible asset cannot, by its very nature, be totally objective. Such methodology is an inexact science and, within limits, any reasonable and practical process may be found to be judicially acceptable. *Union Pac. v. United States,* 524 F.2d at 1383. Appraisers are capable of determining the fair market value of common tangible assets with a minimum of difficulty and a maximum of accuracy. It is more difficult to discover the fair market value of an intangible asset. A commercial ice cream machine has, for example, a known purchase price and life expectancy. For those very reasons there is enough objectively derived information to permit it to be depreciated under modern tax law. The intangible fair market value of a skilled operator of the ice cream machine is not so easily established. Other factors must enter into consideration in finding how and what any willing buyer and seller would value that person's skills. Nevertheless a value can be determined and the court need not reject the value simply because it is not a "hard" unquestionable figure. This was exemplified in *Massey–Ferguson v. United States,* 59 T.C. 220, 1972 WL 2496 (1972), *acq.,* 1973–2 C.B. 2, where the court found the fair market value of the trade name intangible asset to be the average of the two expert appraisers' suggested but different fair market values.

Dr. Knutson's testimony that there was a dearth of comparable sales data of intangible assets in the dairy industry occurring in the early years of the twentieth century caused him to resort to three different methodologies whereby he utilized what existing data was available to attempt to determine the value of each claimed intangible asset. Dr. Knutson asserted that his suggested values would be the same for the seller of the asset, or taxpayer, or for that matter, any buyer. In sum, Dr. Knutson applied what knowledge was available, including educated, expert assumptions, to his methodologies to arrive at a suggested fair market value for each intangible asset. Taking the circumstances in their totality, the court finds that in some instanc-

es Dr. Knutson used judicially acceptable valuation methodologies to determine fair market value that did not contain bias towards taxpayer's "selfish mercenary interests." *See Couzens v. Commissioner,* 11 B.T.A. at 1162–63, 1928 WL 967. The court must analyze the specific nature and accuracy of the data, how Dr. Knutson applied it to each intangible asset, and the reasonableness of the proof to the result. *Id.; Massey–Ferguson v. United States,* 59 T.C. 220, 1972 WL 2496 (1972), *acq.,* 1973–2 C.B. 2. In those instances where taxpayer's methodology is judicially acceptable and the underlying data and information reasonably interpreted, the court will find his suggested value to be the fair market value. In other instances the court, where it can, will draw its own conclusions from an examination of the record as a whole. *Id.* In several instances the court was able to do neither, as will be explained in detail in following sections of this Opinion. The court will be guided by the precept that

> [i]n the property valuation context, courts often express their discomfort with both positions [of expert witnesses] by choosing a value midway between the two alternatives. But the adversary system does not restrict courts to this unsatisfying state of affairs. By going behind the values to the assumptions, a court can make rational choices about the set of assumptions that a reasonable investor would adopt in setting a price for property. The court, like the investor, does not need an accounting degree. . . .[16]

The court must also address defendant's argument that the alleged assets overlapped, and that taxpayer's methodology for severing the assets and their respective fair market values did not take the overlaps into consideration. Dr. Knutson repeatedly asserted that all five alleged intangible assets were severable, having no overlap with each other or with generalized goodwill, with the exception of the Distribution System and Custom-

er Base assets for which he suggested a bifurcation methodology. The law, and common sense, dictate that if two or more allegedly severable intangible assets overlap, in fact, they must either be valued as one asset or as two or more, but if the latter, a factor must be included in the valuation methodology to separate the value of all from the others. Here, because the value of the Distribution System asset included the value of the Customer Base asset, taxpayer deducted the suggested value of the latter from the former to arrive at a suggested separate fair market value for each claimed asset.

Determining the value of a tangible or intangible asset involves the application of a high dosage of common sense and may be found by any of several acceptable methodologies so long as the chosen methodology is reasonably applied to the facts and available data. The value may be easily determined or it may be extremely difficult to find. The Court in *Cities Serv. v. United States,* 580 F.2d 433, 217 Ct.Cl. 590 (1978), *citing Commissioner v. Marshall,* 125 F.2d 943, 946 (2d Cir.1942), referred to the "eely and bewitching character of the word 'value.'"

### DISCUSSION OF TAXPAYER'S METHODOLOGIES

In his technical report and testimony, Dr. Knutson described how he identified the five alleged intangible assets and arrived at the value he suggested for each. He prefaced his Expert Witness Report[17] by stating:

> Documenting the value of intangible assets acquired in the 1920's and the 1930's requires a comprehensive knowledge of the milk and ice cream industry during that era. This knowledge base [was] supplied by an extensive number of university and U.S. Department of Agriculture studies of the milk industry. Two of these studies were particularly important to supplying this background. The first is a compre-

---

**16.** J.J.S. Brooks & R.J. Schultz, *Market Theory: An Approach to Real Property Valuation for State and Local Tax Purposes,* 45 Tax Lawyer 339–83 (Winter 1992).

**17.** In this section of the Opinion the court relied upon all of the evidence of record, including Dr. Knutson's Expert Witness Report. The Report was marked into evidence and referred to several times thereafter. When first offered by plaintiff, the court after hearing defendant's objections, took its admission under consideration. The court has since determined it proper to admit the Report into evidence.

hensive study of the economic conditions in the milk industry by Harvard University Professor John M. Cassels, *A Study of Fluid Milk Prices*, Harvard University Press, 1937. The second study is by University of Illinois Professor Roland W. Bartlett, *The Milk Industry*, Ronald Press, 1946.[18]

### Source of Supply

■ The companies acquired by taxpayer in the 1920's and 1930's did not own their own herds of dairy cows. Instead, they were dependent upon local independent farmers or on farmers who were members of milk cooperatives for a steady supply of high-quality raw milk. By agreeing to purchase all of the raw milk of a producer the producer could be induced to provide a higher quality product.

Cows produce more milk in the spring and early summer than they do in the fall and winter but Mother Nature's schedule does not match consumer demand. Milk consumption was relatively uniform throughout the year. Ice cream consumption is highest in the summer, but even in summer there is a wide variation in demand from day-to-day. Ice cream demand remained high in the fall school months, but shortages in milk supply occurred in the early fall. In the 1920's, the ability of a dairy to obtain a steady and adequate, but not excessive, supply of high-quality raw milk at a relatively low price was a critical factor of profitability. Failure to secure an adequate source of supply would force a dairy into the spot market where prices were high and quality uneven. Pasteurized, high quality, disease-free milk was the most important factor in a dairy's source of supply with favorable price running a close second.[19]

In 1923, when taxpayer began its program of dairy acquisitions, there were considerable differences between individual milk producers and cooperatives in terms of the proportion of local milk marketed, pricing strategies used, and services performed. The most sophisticated cooperatives controlled the sale of a large percentage of local milk production; typically, they priced milk on the basis of end-use by processors. Under this system, milk used by processors for bottling was the most costly while surplus milk used for manufacturing butter and cheese was the lowest. Cooperatives paid their producer-members an "average" or "blend" price, which reflected the actual use of their milk by local processors.

Dr. Knutson reported that in any local market area a large core dairy had a valuable leveraged advantage over its smaller competitors. As the dominant milk buyer in the market a core dairy could lure the largest producers away from the cooperative or smaller dairies. This market power reduced the core dairy's overall cost of milk procurement and gave it a relatively more stable source of supply. The value of the core dairy's source of supply advantage typically varied with the strength of the bargaining position of the local cooperative ranging from 7¢ to 10¢ per hundredweight (per cwt.) of milk, in markets where cooperatives were weak or non-existent, to 2¢ or 2½¢ per cwt. in markets where cooperatives were strong. In a market area with a weak cooperative, or high proportion of independent producers, a core dairy with a large fluid milk business was usually able to obtain its entire milk supply directly from the larger volume individual producers, thus avoiding the cooperative's classified pricing system altogether. In addition, through price incentives and seasonal pricing techniques, the core dairy in

---

18. Defendant challenged, in general, some of the data Dr. Knutson relied upon because they were derived from studies published after the acquisitions. The court finds no specific fault, except as mentioned in the text of this Opinion, because the studies contained apparently valid historical data. Presumably, but not necessarily, the closer the study to the acquisition, the better the data. However, the court also accepts Dr. Knutson's theory that "[h]istorical data was important to [his] study and, in fact, historical data from an economic standpoint, to the extent that it had

time to be verified ... may be more accurate than current primary data...."

19. Milk is a perfect medium for the growth of bacteria. Impure milk can carry tubercula bacillus, typhoid, dysentery, and a host of other diseases. Pasteurization is a method of destroying disease-producing bacteria and checking the activity of fermentation bacteria by heating the liquid to a prescribed temperature for a specific period of time.

this type of market could encourage local farmers to adopt herd management techniques which would yield an adequate, but not excessive, supply of milk year-round. In a market area where cooperatives existed but were not particularly strong, a core dairy could usually contract with a large, high quality independent producer for at least part of its supply requirements; this type of arrangement could have given the core dairy a price advantage of as much as 5¢ per cwt. for its raw milk needs.

Even when a large core dairy found it necessary to buy all of its milk from a strong cooperative under a classified pricing system, it could still negotiate for special services which effectively reduced the price paid, or otherwise increased profits. Examples of such special services were delivery of milk as it was needed which reduced the core dairy's storage expense, or delivery of milk from specified larger volume, less cyclical, high quality producers which permitted the core dairies to charge higher prices for their product, with the increased potential of increased profits. Moreover, a core dairy with an ice cream plant, or with a high proportion of home delivery retail milk sales as compared with bulk wholesale sales, could afford to pay more for raw milk. These factors ensured that the core dairy's requirements would be filled first when milk shortages arose.

Dr. Knutson valued the Source of Supply asset by (1) multiplying what he determined was the core dairy's Source of Supply price advantage per hundredweight by the number of hundredweight of milk processed annually and (2) capitalizing the price advantage at six percent.[20] Dr. Knutson used his "knowledge of the industry" and "own personal judgment [to derive] a price [advantage] per hundredweight associated with that milk supply that could be expected to be earned in the future." In his analyses of the acquired dairies, Dr. Knutson reviewed the relative strength of the producer's cooperative in each market, the data for which could often be found in contemporaneous studies, to guide his expertise. He then multiplied that by the number of hundredweight processed by each core dairy. Dr. Knutson stated that milk sold in the 1920's and 1930's "[g]enerally ... in the range of $2.50 to $3.00 a hundredweight." He determined that the prevailing interest rate in the 1920's and 1930's was between five and six percent; i.e., "prevailing returns that one would get if you put money in a bank or if you took out a loan from the bank at that point of time." Dr. Knutson favored the six percent capitalization rate because it properly reflected the true risk factors associated with acquiring a valuable raw milk Source of Supply price advantage in a market area. For each acquisition, determination of the Source of Supply price advantage was based on a consideration of producer milk prices, cooperative activity and research studies of cooperative impacts. See, e.g., R. Bartlett, *Cooperation in Marketing Dairy Products* (1931); R. Bartlett, *The Milk Industry* (1946); J. Cassels, *A Study of Fluid Milk Prices* (1937). Dr. Knutson found that Bartlett's 1931 study was useful because it analyzed the producer cooperative activities in the milk industry in most of the major markets within which taxpayer acquired dairies. The 1931 study was comprehensive and provided information on milk quality, including pasteurization ordinances, among other matters. Bartlett's 1937 study analyzed the milk markets and provided information about the number of quarts sold on a yearly basis, pricing in the industry, and an overview of the structure of the market. It permitted Dr. Knutson, for example, to determine which dairies were dominant and the place of each particular milk processor in its market area.

Defendant challenged Dr. Knutson's methodology as based upon a faulty premise; i.e., the price advantage would generate profit in perpetuity. Defendant argued that

> ... a dairy's source consisted of dairy farmers who sold them milk; these farmers sometimes defected to other dairies,

20. The number of hundredweight of milk processed annually by each core dairy was derived by applying a conversion factor of 2.15 to the core dairy's total milk sales in quarts. One quart of milk is equal to 2.15 pounds of milk. The hundred-weight of ice cream produced annually was determined by multiplying the quarts sold by 2.5, and that result by 3.43. One quart of ice cream is equal to 3.43 quarts of milk.

and [taxpayer's] core dairies had to work to replace them. Thus, even if 'source of supply' has no determinable useful life for tax or accounting purposes, a valuation of it cannot rest on the faulty factual premise that it will generate profit forever. It will not. It must be replaced.

The court does not agree with defendant's premise. Defendant cited no precedent for its position nor did it dispute taxpayer factually within the confines of this case. The Source of Supply intangible asset is, in tax vernacular, a mass asset; a self-perpetuating intangible asset. *Metropolitan Laundry Co. v. United States,* 100 F.Supp. 803 (N.D.Cal. 1951). Like the Customer Base intangible asset, it is never depleted or replaced. Producers, like customers, may be lost over time but the asset continuously replicates itself. As one producer or customer is lost another is added. The fact that taxpayer had to "work" to replace producers lost over the years does not negate the factual premise. Taxpayer's predominant position in the raw milk buying market within any given market area gave it an advantage each time it negotiated a purchase of raw milk regardless of the identity of the producer. At the most, the value may diminish over time, but diminution in value does not destroy the efficacy of a non-wasting asset to a point where it is of no value. *Id.* So long as the asset reasonably had even "potential value it cannot be said that the taxpayer's investment therein has been lost." *E.B. Elliott Co. v. Commissioner,* 2 T.C.M. (CCH) 444 (1943) (*citing Lawson v. Commissioner,* 42 B.T.A. 1103, 1940 WL 144 (1940)). Conversely, a taxpayer is not entitled to an abandonment loss for the discontinuance of use of a portion of an asset. *Golden State Towel & Linen Serv., Ltd. v. United States,* 373 F.2d 938, 179 Ct.Cl. 300 (1967).

The court finds the suggested six percent capitalization rate to be reasonable and proper. Based upon Dr. Knutson's knowledge and various studies of the milk industry, and taking into consideration the state of the market in the early years of taxpayer's growth, the court also finds Dr. Knutson's suggested methodology to be judicially acceptable for identifying the fair market value

of the Source of Supply asset, *see Chesapeake & Ohio Ry. v. Commissioner,* 64 T.C. 352, 1975 WL 3144 (1975); *Miami Valley Broadcasting Corp. v. United States,* 499 F.2d 677, 687, 204 Ct.Cl. 582 (1974); *Couzens v. Commissioner,* 11 B.T.A. 1040, 1928 WL 967 (1928), dependant only upon the propriety of the selected price advantage variable. The principal variable in the methodology used by Dr. Knutson is the price advantage factor that is dependant upon the bargaining position of the local milk producers, or producer cooperative, vis-a-vis taxpayer. The court finds Dr. Knutson's price advantage variable range of 2¢ to 10¢ per cwt. to be reasonable but reserves finding whether the suggested price advantage for each acquired dairy was proper in the circumstances of each acquisition. The court will address the proper specific price advantage in its discussion of each core dairy acquisition.

Defendant argued that taxpayer failed to prove that Source of Supply was a separate and distinct intangible asset in that it "overlapped" with the claimed Distribution System and Production Turnkey intangible assets, and was no more than part of general goodwill that taxpayer could not dispose of until it ceased to operate. The court finds that not to be the case. The Source of Supply asset measures or reflects the leveraged bargaining, or competitive, advantage that taxpayer had over the small local dairies in its acquisition of raw milk within each market area. The advantage permitted taxpayer to purchase a higher quality product at a lower price than its less-leveraged competitors. The Distribution System asset equally clearly was the organizational advantage taxpayer had over its competitors for the delivery of milk and ice cream at the other end of the processing spectrum. Production Turnkey purported to measure the value of skilled handling of raw milk following its delivery to the acquired dairy. Taxpayer demonstrated, with substantial documentary evidence and testimony, that the ability to acquire high quality milk on a regular schedule was important and would have been a sought after intangible asset, and not acquired as a minor incident in a composite transaction. It is clearly distinguishable from general goodwill and will be recognized as such by the court.

See Meredith, 405 F.2d at 1224; Miller & Sons, Inc. v. United States, 537 F.2d 446, 210 Ct.Cl. 431 (1976).

The court is satisfied that taxpayer provided substantial evidence in several acquisitions to overcome the strong presumption of correctness of the Commissioner's determination that taxpayer did not establish that abandonment occurred, or if an abandonment occurred, the basis of the asset abandoned. The court will therefore attempt to find the fair market value of the asset, where appropriate, upon consideration of all the evidence of record. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); Commissioner v. Riss, 374 F.2d 161, 166 (8th Cir.1967); Young & Rubicam, Inc. v. United States, 410 F.2d 1233, 1244, 187 Ct.Cl. 635 (1969); Meredith Broadcasting Co. v. United States, 405 F.2d 1214, 186 Ct.Cl. 1 (1968).

Production Turnkey

■ According to Dr. Knutson when taxpayer began its acquisition program in 1923, milk processing was well into the throes of industrialization. The asset represents the "in-house" procurement of milk, its processing, and distribution as an on-going, efficient process that reflects the value of a trained work force; the premium paid for superior management and labor at an acquired dairy.

Fifty years before, unprocessed milk from large milk cans had been sold directly to consumers, but following the invention of the glass milk bottle in 1878 hundreds of milk plants had sprung up across the country. Initially, plants were bottling facilities where raw milk was cooled and bottled, and glass bottles washed and refilled. By the 1920's pasteurization was becoming widespread and there was a serious concern with sanitary conditions and quality control. Milk was picked up from producers daily and delivered to the processing plant by railroad car, or truck or horse-drawn wagon, ordinarily in ten gallon cans. It was tested for cleanliness and quality, coded, standardized for desired butterfat content, and put in either storage or pasteurization vats. Certified milk was not pasteurized and was bottled directly from the storage tanks. If pasteurized, the milk was heated for a set period of time at a predetermined temperature to kill the bacteria, and returned to the cooling vats. The milk was then bottled in freshly washed and sterilized glass bottles. The typical milk processing plant contained an array of equipment including milk coolers, pasteurizers, bottling and capping machines, bottle washers and sterilizers, and a maze of piping and valves. Dr. Knutson testified that at each stage in the process trained personnel were needed to perform testing functions, monitor, load and unload the machines, scour, and maintain all equipment. According to Dr. Knutson "a trained high quality work force" was "absolutely critical." A dairy needed managers who understood that the product was "a very, very highly perishable, very fragile, product." The processes of pasteurization and certification were "highly technical phenomena" and had to be controlled by "a sophisticated set of managers." Trained labor was also needed. Skilled employees were needed to analyze the product as it came into the plant for its bacteria count in order to separate out spoiled milk and identify producers who delivered poor quality raw milk. Quality control required that the dairy be cleaned daily; to do so the equipment had to be completely dismantled and washed, including all of the piping and valves from the various vats, pasteurizers, coolers, bottling units, and other equipment.

The advent of the brine freezer in 1902 eliminated the dependence of the ice cream maker on natural ice and made possible the production of large quantities of ice cream in a much shorter time than the old crank method. Ice cream plants in the 1920's required extensive capital investment in compressors and freezers, as well as a well-trained work force to tend the massive engine rooms, maintain and monitor the freezers and mixers, and hand-package the finished product. Ice cream novelties were developing into a major business in the 1920's, and fancy molds, coloring and special packaging all required painstaking "hand" work.

Dr. Knutson testified that the expertise required to operate a milk or ice cream plant in an effective coordinated manner took time and money to develop. Buying a successful

plant already in operation saved taxpayer those costs. The Production Turnkey asset represents the profits that taxpayer would have foregone had it been required to assemble and train a new work force. By acquiring a trained management and employee work force with the tangible assets of a dairy, taxpayer's start-up costs were less, which would lead axiomatically, according to Dr. Knutson, to increased profits.

Taxpayer did not capitalize the Production Turnkey asset to determine its value. Instead, Dr. Knutson stated that studies made during the 1920's and 1930's demonstrated that the Production Turnkey asset could be properly valued as a variable percentage of the acquisition price with the variable dependent upon profit. He testified that he valued the asset at two percent of the acquisition price for plants with a relatively low profit level, and five percent of the acquisition price for plants with a relatively high profit level.[21] For those dairies that produced both milk and ice cream, Dr. Knutson allocated value between the two product lines on the basis of relative profits generated by each. His allocation reflected the fact that ice cream and milk were processed in separate, specialized facilities.

Dr. Knutson admitted to having difficulty valuing the Production Turnkey asset because of the lack of "solid information." It was apparent to the court that he was unsure of his testimony at trial. He testified that he would have preferred to have studied specific start-up costs for milk and ice cream plants at the time but could not locate contemporaneous studies of dairy start-up costs. Accordingly, he was left to an analysis of the complexity of each acquired plant, including the number of retail and wholesale routes, processing costs, and volume as an overall indicator of plant efficiency. Just "who" the managers and other key employees were would make a difference in efficiency; what skills were available to taxpayer post-acquisition would also enter into the equation. For example, if an acquired dairy employed a bacteriologist or a dynamic manager with intimate knowledge of the plant, who became an employee of taxpayer upon acquisition, taxpayer would not have to train or seek out an individual with those skills. All of the work force factors and variables considered by Dr. Knutson had an effect on efficiency, which he correlated directly to profit. However, without knowledge of specific plants and employees Dr. Knutson's methodology is speculative, at best. Accordingly, the court finds that the methodology used by Dr. Knutson to value the asset is not judicially acceptable.

It is clear from the record that by the time taxpayer began its expansion in 1923 pasteurization was a known art, as was the handling of certified milk, ice cream, and other products from the cow to the consumer. The skills to successfully operate a dairy were not scarce, and as time passed this became even more true. To bring the minimum degree of acceptability to the valuation process, information that Dr. Knutson could not find or develop himself became critically important. "Who" was acquired, and their skills, according to Dr. Knutson's testimony, made up the value of this asset. Neither taxpayer nor the court has a historical perspective, or access to any records, analysis, or studies from which to find that the managers and employees of acquired dairy stayed to work with taxpayer. Did all of the key workers stay, or a fraction? How long did they stay? If the key managers and employees who allegedly constitute the value of this asset left shortly after the acquisition, was the asset actually acquired, or did the value disappear? If so, the asset would not be a severable intangible asset that would entitle taxpayer to a deduction in the suit years. The court has no information that any, all, or none of taxpayer's dairies reduced their work force during the Great Depression. From the record we know that taxpayer thrived during that tragic period but how it did so is a complete unknown. In the context of this asset, the value of which was dependant upon the existence of skilled managers, workers,

---

21. Dr. Knutson claimed to have found support for his conclusions in a report prepared by C.L. Roadhouse and J.L. Henderson, *The Market Milk Industry* (1941). The court reviewed the report but could not find the support Dr. Knutson relied upon. Taxpayer later confirmed that the report did not contain the support initially ascribed to it.

and craftsmen, taxpayer offered no proof that any acquired dairy was staffed with skilled, competent persons.

■ The court recognizes a general relationship between efficiency and profit but the relationship is tenuous and was not developed by taxpayer to a point to permit the court to find that the only, or even a significant, factor affecting profit was efficiency. There are too many other unknown inchoate factors that affected any acquired dairy's profit factor, especially during the heyday of national expansion of the dairy industry sixty years ago, coupled with the economic conditions of the time. Profit is not a proper factor by which to measure the value of the asset.

■ Moreover, within reason taxpayer can identify and "name" intangible assets as it sees fit. It cannot, however, rename generally recognized assets in tax accounting and GAAP, so as to create confusion. In its review of the applicable law the court found no reference to an intangible asset under the name "Production Turnkey." Dr. Knutson's short definition of Production Turnkey was that it measured the value of skilled handling of milk in the plant. However, Dr. Knutson also repeatedly defined Production Turnkey to fit the accepted and recognized intangible asset called "going-concern." *Massey–Ferguson v. United States,* 59 T.C. at 230, citing to the *Appraisal Terminology & Handbook* 85 (4th ed. 1961), defined "going-concern" as "[t]he value existing in a proven operating property, considered as an entity with business established, above that of a property complete and ready to operate but without business." *VGS Corp. v. Commissioner,* 68 T.C. 563, 591, 1977 WL 3758 (1977), *acq.,* 1979–2 C.B. 2, held that going-concern, a nondepreciable intangible asset, is "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." It is manifested by "the ability of the acquired business to continue generating sales without interruption during and after acquisition." *Solitron Devices, Inc. v. Commissioner,* 80 T.C. 1, 20, 1983 WL 14785 (1983), *aff'd. without op.,* 744 F.2d 95 (11th Cir.1984); *Los Angeles Gas & Electric Corp. v. Ry. Comm.*

*of Cal., et al.,* 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180 (1933). Taxpayer's entire case is premised on the statement that it sought out and acquired core dairies that were proven operating properties with established businesses.

In *United States Alcohol Co. v. Helvering,* 137 F.2d 511, 513 (2d Cir.1943), supporting the Commissioner's contention, the court stated:

> [in] such an industry—for that matter—in any industry continuity of sales is a condition of continued existence; once they stop, it is extremely hard, if not impossible, to start up the business again. Therefore the power to sell over the period immediately after the business is taken over, insuring as it does against such a break, has a value quite independent of any profit that may be got from those particular sales.

By acquiring core plants in full operation taxpayer saved the considerable costs of hiring, assembling, and training a new work force to operate newly built or inoperative plants. In Dr. Knutson's premise, it is axiomatic that if taxpayer were to construct a new plant, or purchase a plant without business, it would not be in operation on the day taxpayer took possession and there would be no issue of the existence of a Production Turnkey asset because it would not be a going-concern. Had taxpayer built its own core dairies, a dairy upon completion would have been a property complete and ready to operate but with no business. Constructing its own dairy, or acquiring a non-operating dairy would have been counter to taxpayer's single avowed goal of acquiring operating dairies with business possessing the intangible assets in issue here. If the intangible asset taxpayer called Production Turnkey is in reality the asset "going-concern," and no other reasonable conclusion can be drawn from the record and the law, the values of the Customer Base and Distribution System assets must be severed from "going-concern," otherwise neither Production Turnkey, Customer Base, nor Distribution System can be valued as a severable intangible asset justifying separate favorable tax treatment. Production Turnkey by its very definition

includes Customer Base, and that asset includes the asset Distribution System. Taxpayer did not address the overlap of Customer Base and Distribution System with Production Turnkey, nor did it provide the court with evidence, or suggested a methodology by which it could sever and separately value the assets. In the absence of customers the "power to sell" factor described in *United States Alcohol Co.*, 137 F.2d at 513, cannot exist. In the face of this failure of proof the court must find that taxpayer did not offer substantial evidence to overcome the presumption of correctness of the determination of the Commissioner, that a Production Turnkey asset severable from generalized goodwill was not abandoned, or if abandoned, properly valued, *see Helvering v. Taylor*, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Commissioner v. Riss*, 374 F.2d 161, 166 (8th Cir.1967); *Young & Rubicam, Inc. v. United States*, 410 F.2d 1233, 1244, 187 Ct.Cl. 635 (1969); *Meredith Broadcasting Co. v. United States*, 405 F.2d 1214, 186 Ct.Cl. 1 (1968), much less proved by a preponderance of the evidence the value of the Production Turnkey intangible asset apart from its constituent assets; Customer Base and Distribution System.

In its analysis of each market the court will not consider Production Turnkey as an intangible asset to which taxpayer is entitled to a deduction for abandonment. Even had taxpayer proved that it acquired and abandoned the asset, the court, placing itself in the time frame of the acquisition and viewing it as would an informed and reasonable buyer and seller, would find that the evidence presented lacked any meaningful relationship to the value of the Production Turnkey asset to permit it to determine the fair market value of the asset. *Cf. Union Pac. v. United States*, 524 F.2d 1343, 1383, 208 Ct.Cl. 1 (1976).

*Customer Base*

■ Dr. Knutson's starting point for valuation of the Customer Base asset was an analysis of non-core dairy data. He testified that a non-core dairy had no value to taxpay-

er other than the value of its customers. "It was the only [asset] that really had the potential to generate profit." Dr. Knutson determined the Customer Base asset value by capitalizing the weighted average of the profit per point earned by non-core dairies in the market area and multiplying the result by the number of points retained after acquisition. As part of his valuation formula Dr. Knutson applied a discount factor to the total points sold for retail milk, wholesale milk, and ice cream.[22] If individual dairy records showed significant fluctuation in the pre-acquisition period, Dr. Knutson testified that he used an average of two or even three years' profits and sales; otherwise, his calculations were based on financial data for the year preceding acquisition.

For both core and non-core dairies, a five percent discount factor was applied to home service milk points sold to reflect the fact that, in Dr. Knutson's opinion, five percent of home delivery customer volume was typically lost at the time of acquisition. Dr. Knutson used the same discount factor for core and non-core dairies because the profitability of the home delivery milk business was so great that a considerable effort was made to retain both core and non-core home delivery milk customers. If core dairy home delivery service was known to be superior to that provided by a non-core dairy, former non-core customers could be expected to welcome the arrival of the new core dairy routeman. After a core dairy was acquired by taxpayer, the core dairy routemen typically continued to serve their former customers in addition to the new, former non-core dairy customers. Logic dictated to Dr. Knutson that a good existing customer/routeman relationship resulted in low customer loss but taxpayer did not address the possibility that the home delivery routeman from a non-core dairy might have had a better relationship with his customers than did the core dairy routeman and that the former non-core home delivery customers might not have seen the change as favorably as did he. The court does not accept as a given, as did taxpayer, that core dairies were in all instances more popular

---

**22.** There were no home delivery ice cream customers. Accordingly, Dr. Knutson valued the ice cream customers using the same factors as for wholesale milk customers.

with home delivery customers than were the non-core dairies. Dr. Knutson did not include a factor in his valuation for that probability. Without exception he viewed the core dairy routemen as existing in Dr. Pangloss' "best of all possible worlds."

In contrast with home delivery milk customers, wholesale milk and ice cream customers almost exclusively purchased dairy products on the basis of price. Hence, customer attrition would be greater. "[I]f you offered a wholesale customer a little bit lower price, you could lure [him or her] away. So, the risk was much higher of losing a wholesale customer. And that's reflected in my points retained. It is also reflected in the capitalization rate in this particular case." In fact, Dr. Knutson testified that the risk of losing wholesale milk or ice cream customers "was at least double the risk of losing home delivery milk points." For this reason he applied a twenty percent discount factor to core dairy wholesale milk and ice cream points, and a discount factor of thirty-five percent for non-core dairy wholesale and ice cream customers. In virtually the same breath Dr. Knutson testified that he applied the lower discount factor to core dairy wholesale milk and ice cream customers to reflect the relatively greater market power of a top quality product or a well-known brand name in the highly competitive wholesale milk and ice cream business, despite his oft-repeated testimony that wholesale customers were driven exclusively by price. Dr. Knutson stated that the wholesale discount factor was based on "his knowledge of the industry and what was reasonable." Dr. Knutson's inconsistent testimony on this critical point detracted from the credibility given his general expertise and knowledge of the history of the dairy industry.

In addition to the immediate loss of customers on acquisition, taxpayer knew it would experience a secondary customer loss in the years following the acquisition. The secondary attrition would be greater for wholesale milk and ice cream customers than for home delivery milk customers. Once again, this was because wholesale customers (whether milk or ice cream) dealt with the producer offering the lowest prices. In computing the capitalized value of profit per point, Dr. Knutson used a twelve percent capitalization rate for ice cream and wholesale milk and a six percent capitalization rate for home delivery milk. He chose to use six percent in the case of home delivery milk because "[o]nce you got [the points] transferred, you didn't have much risk associated with it." Dr. Knutson attributed the difference in capitalization rates to the greater likelihood of losing ice cream and wholesale milk customers in the year(s) following acquisition, as well as the greater risks associated with the wholesale milk business where profit margins were slim, and the ice cream business where the selling season was shorter and production risks greater.

To determine the weighted average profit per point for each non-core dairy, Dr. Knutson found it necessary to derive quart sales and profit data for home service milk, wholesale milk, and ice cream. He encountered two obstacles in calculating the weighted average profit per point for home delivery and wholesale milk that he claimed could be surmounted only because the milk industry in the 1920's and 1930's had been the focal point of extensive study by university agricultural economists. The first obstacle was that dairy records did not allocate total milk sales volume between home delivery and wholesale routes. The second was that dairy accounting systems had not advanced sufficiently in the 1920's and 1930's to separate profits earned on wholesale and home delivery sales. Such a separation required the use of sophisticated economic-engineering procedures that were just being developed at major universities. Dr. Knutson referred specifically to Cornell University agricultural economists who had studied the problem in the early 1930's at the request of the New York Legislature. *See* P.A. Pitcher, *et al., Report of the Joint Legislative Committee to Investigate the Milk Industry.*[23] Dr. Knutson used data identified in Table No. 58, page 204, of the *Pitcher Report* to separate wholesale and home delivery profits in a manner that per-

---

23. *Report of the Joint Legislative Committee to Investigate the Milk Industry,* Hon. Perley A. Pitcher, Chairman; Leg.Doc. (1933) No. 14, April 10, 1933 (Albany), p. 204.

mitted him to determine, through "a simple algebraic calculation," which came to be known at trial as the "Knutson formula," that home delivery profit per quart was 9.849 greater than wholesale profit per quart.

Table No. 58 of the *Pitcher Report* depicted the distribution costs, volumes, and net profit of grades of milk and milk products at retail and wholesale for distributors of milk ·in the New York City Metropolitan area.[24] However, the heading of Table No. 58 stated that it did not include data from "larger distributors." That phrase was neither defined in the report, nor in Dr. Knutson's testimony. Dr. Knutson used some, but not all, of the data reported for 1930 from Table No. 58. Taxpayer identified what data Dr. Knutson did use, and his results, in Exhibit 208, to wit:

### Table IV

| | Retail | | | Wholesale | | |
|---|---|---|---|---|---|---|
| | Profit/Qt. | Volume | Profit | Profit/Qt. | Volume | Profit |
| Grade A Milk | 0.0311 | 343,000 | $10,667.30 | 0.0007 | 351,000 | $ 245.70 |
| Grade B Milk | 0.0100 | 1,217,000 | 12,170.00 | (0.0059) | 1,494,000 | (8,814.6) |
| Bulk Wholesale | | | | 0.0014 | 10,002,000 | 1,002.800 |
| Cream | 0.0263 | 150,000 | 3,945.00 | 0.0081 | 3,680,000 | 29,808.00 |
| Bulk Cream | | | | 0.0008 | 13,363,000 | 10,690.40 |
| Total | 0.01566 | 1,710,000 | 26,782.3 | 0.00159 | 28,890,000 | 45,932.30 |

The row entitled, "Total," was not taken from Table No. 58. The "Total" figure in the retail and wholesale columns for "Profit/qt" is the weighted average profit per quart [or point] calculated by Dr. Knutson from the other numbers in the table. The "Total" numbers in the other columns are simply the mathematical sums of the columns. Dr. Knutson explained that the key number that he sought in this phase of his valuation was the weighted average profits per quart for retail and wholesale milk, though he did not explain how they were weighted either in his testimony or Expert Technical Report. The court, however, was able to determine how Dr. Knutson arrived at the weighted average profits per quart and verify, to the extent they were based upon Table No. 58 of the *Pitcher Report*, and Exhibit 208, that they were accurate.[25] Dr. Knutson then determined that the profit per quart for retail milk was 9.849 times the profit per quart for wholesale milk by simply dividing the weighted average profit per quart for wholesale milk of $0.00159 into the weighted average profit per quart for retail milk of $0.01566. He applied the 9.849:1 ratio to each acquired core and non-core dairy to determine the value of the Customer Base asset, and as a factor in his determination of the value of the Distribution System asset, *infra*, using the following formula:

---

24. It is clear from the context in which it was used that the editors of the *Pitcher Report* used the words "distributor" and "producer" interchangeably.

25. The weighted average retail and wholesale profits per quart were determined (1) by multiplying the profit per quart identified in Table 58 of the *Pitcher Report* by the percentage of each product's volume of the total volume, and (2) adding the products of that action. The two sums were the weighted average profits per quart of all the products of retail, and wholesale, sales.

$$9.849X_2V_1 + X_2V_2 = Y$$

Home Delivery Profit + Wholesale Profit = Total Profit

Where:

$X_2$ = Wholesale Profit per Quart
$V_1$ = Home Delivery Volume
$V_2$ = Wholesale Volume
$Y$ = Total Profit on Milk

The expression $9.849X_2 = X_1$ can be derived from the relationship between the weighted average profits per quart of retail and wholesale milk.

Dr. Knutson explained that $9.849X_2$ was equal to home delivery profit per quart because home delivery profit per quart $(X_1)$ is 9.849 times as large as wholesale profit per quart. If all terms are known except $X_2$ (wholesale profit per quart), $X_2$ can be calculated. If $X_2$ is known, $X_1$ can be calculated; i.e., home delivery profit per quart is found by multiplying 9.849 by $X_2$ (wholesale profit per quart) and wholesale profit per quart is found by dividing $X_1$ (home delivery profit per quart) by 9.849.

Dr. Knutson testified that he was aware of no other sources that reported the same historical data as did the *Pitcher Report.* Even though Table No. 58 identified data only from the New York City Metropolitan area market, Dr. Knutson concluded that in his opinion the data was without question consistent with competitive market and political forces, and cost conditions, operating throughout the milk industry in the 1920's and 1930's, and that the 9.849:1 ratio was applicable nationwide.

An example of the critical importance of the "Knutson formula" to taxpayer's claims is found in Dr. Knutson's discussion of the Zimmerman Dairy Company, a non-core dairy acquired in the Peoria market. Dr. Knutson testified that he obtained useful data about the Zimmerman Dairy Company from a Price, Waterhouse & Co. audit, a New York Stock Exchange Listing Application, taxpayer's contemporaneous Accounting Acquisition Card, the closing balance sheet, the Brown

Report,[26] and "those types of sources." Using this data Dr. Knutson was able to arrive at several conclusions about the Zimmerman Dairy Company.

The rest of the computation ... is basically a derivation of profits per quart and profits per point, returns on investment, and that type of information. I might say that the profit per quart is derived from the Knutson formula as taken from the *Pitcher Report.* So that is a crucial calculation in the process that was utilized [,] and utilized uniformly across the dairies unless there was other information available.

Because the weighted average profit per point of retail and wholesale milk and ice cream played such an important role in Dr. Knutson's valuation of the Customer Base asset the court must address the data contained in Table No. 58. The *Pitcher Report* evolved from a study created by the New York State Legislature to

investigate the causes of the decline of the price of milk to producers and the resultant effect of the low prices upon the dairy industry and the future supply of milk to the cities of the State; to investigate the cost of distribution of milk and its relation to prices paid to milk producers, to the end that the consumer may be assured of an adequate supply of milk at a reasonable price, both to producer and consumer.

*Pitcher Report, supra,* at 9. The *Pitcher Report* encompassed the "New York milkshed" which included the states of New York, New Jersey, Pennsylvania, Maryland, Massachusetts, Vermont, and Connecticut, though its only interest lay in bringing a sound milk industry back to the State of New York. The committee that conducted the study reviewed more than 100 detailed reports from milk distributors, heard testimony from 254 witnesses, and studied over 1,300 retail food stores in New York City.

The *Pitcher Report* found it "clear that in these abnormal times (1933) the economic law of supply and demand cannot be relied upon to ... insure the consumers of a contin-

26. C.A. Brown, *Costs and Margins and Other Related Factors in the Distribution of Fluid Milk in Four Illinois Market Areas,* University of Illinois Agricultural Experiment Station Bulletin 318 (1928). The Brown Report is cited only as an example of a source of data for Dr. Knutson.

uous and adequate supply of milk...." The study determined that the prices farmers received for their milk in 1932 were much below the costs of production. "After other costs were paid the producers had practically nothing left for their labor. The price received for milk in January, 1933, was little more than half the cost of production." Moreover, the demand for milk in New York was shrinking yearly because of the reduced purchasing power of consumers. The court notes in other market areas such as Peoria, the record shows significant yearly increases in milk and ice cream sales, and profits.

The court recognized Dr. Knutson's expertise as an economist and historian of the exceedingly complex milk industry, and the struggles encountered by the "super dairies," as they emerged in the first third of this century. However, as the court undertook its analysis of the record addressing taxpayer's valuation of the Customer Base asset it made a few discoveries that vitiated the weight the court might have given his testimony. Foremost is that the data used by Dr. Knutson from Table No. 58 of the *Pitcher Report*, included in Exhibit 208, and used in the "Knutson formula," cannot reasonably be construed to represent conditions in milk markets elsewhere in the United States, or even within the New York City Metropolitan area. It is true that the *Pitcher Report* was a detailed study of the milk market in New York State, rich with anecdotal stories and complex analyses of a very troubled industry crying for help from its elected and appointed government officials. Nonetheless, the data used by Dr. Knutson was only for the New York City Metropolitan area; it did not include data gathered from dairies statewide,

from other New York State cities, and from the larger NYC Metropolitan area dairies. The failure to include data from the larger dairies is significant. The *Pitcher Report* found that in 1931 about seventy-six percent of the milk "distributed in New York City was distributed by ten companies and their subsidiary or closely affiliated companies. The other 24 per cent of the business was divided among a large number of competing distributors...." *Pitcher Report, supra,* at 165. The *Report* found that less than two years later

[t]here [was] much less competition in the retail distribution than in the wholesale trade. Based on the data directly accumulated in the research program of this committee, it appears that more than 95 per cent of the retail sales of milk in the New York Metropolitan Area are made by five companies. A very high percentage of this retail volume is controlled by two companies and their affiliates: namely, Borden's Farm Products Company and the Sheffield Farms Company.[27]

Table No. 58 is included within the section of the *Pitcher Report* entitled "The Situation in the New York Metropolitan Area."[28] The section covering the New York Metropolitan area made passing reference to the purchase of raw milk, transportation, and other related activities outside of the Metropolitan area but the cost, price, and volume data reported in Table No. 58 referred only to dairies within the Metropolitan area of New York City.[29]

The very language of the *Pitcher Report* supports the court's conclusion that the New York Metropolitan area data does not reflect

---

**27.** By 1932 Sheffield Farms had been a subsidiary of taxpayer's for seven years.

**28.** Of further confusion is the preamble to the "Metropolitan area" section of the *Pitcher Report* which states:

[t]he data compiled by the committee's research staff for the New York Metropolitan area are based on detailed reports concerning the operations of thirty of the largest distributors in that market. The companies handle approximately 74 per cent of the milk and cream sold in the Metropolitan area. Their net sales in 1931 amounted to more that $190,-000,000.

Because the statement in the Preamble and other language in the *Pitcher Report* is contradictory the court disregards it as simply one more, of numerous, internal inconsistencies.

**29.** The *Pitcher Report* did identify data on milk market areas outside of the Metropolitan area in sections preceding and following the NYC Metropolitan area section. For example, beginning on page 225 is a section entitled "Sales, Costs and Profits of Distributors in Upstate Cities," that identifies some, but not all of the same data and information as in the New York City Metropolitan area section, and not in the same format as Table No. 58.

the economic conditions of other milk markets. For example,

■he of the factors causing higher costs of distribution in New York [City], as compared with other cities, is the physical layout of the market, necessitating the transfer of the major part of the milk from railway terminals to city pasteurizing plants in some cases a distance of several miles through dense traffic, and across the river by ferry.

*Pitcher Report, supra,* at 20.

Dr. H.A. Ross, of Cornell University, cited by Dr. Knutson as representing one institution that contributed to his analysis, was quoted by the committee as saying:

■f production exceeds the fluid milk demand the surplus is manufactured into less perishable products that find ready sale in world markets. The price obtained for this surplus milk, however, is usually less than that paid for fluid milk in city markets. This is particularly true in New York, where butter, cheese, and condensed milk produced under conditions of high cost, must compete in the open market with the same products from the cheaper producing regions of the mid-west.

Dr. Ross' publication referred to the New York State market but his comments support the conclusion that the *Pitcher Report* was not typical of the milk market in other geographic areas of the nation.[30] Further doubt is thrown upon the validity of the data reported in Table No. 58 in the section entitled "Channels of Distribution in New York."

In the New York [Metropolitan area] market, less than half of the milk is distributed by the traditional method of house to house delivery. In 1930, more than one-fourth of the milk supply of this market was distributed through grocery stores, dairy stores and other retail food shops. From a fifth to a fourth of the total was used in restaurants, soda fountains, public institutions and the like, where milk is consumed on the premises. (Table 37).

TABLE 37. ESTIMATED DAILY QUANTITIES OF BOTTLED MILK AND BULK MILK DISTRIBUTED THROUGH VARIOUS CHANNELS IN THE NEW YORK METROPOLITAN AREA, 1930.

| | Total Quarts | Percent of Total |
|---|---|---|
| Bottled, Retail | $1,764,378 | 46.9 |
| Bottled, Wholesale (Mostly To Stores) | 282,150 | 7.5 |
| Bulk, To Stores | 885,951 | 23.6 |
| Bulk, To Restaurants | 829,951 | 22.0 |

The data reported in Table No. 37 is inconsistent with that in Table No. 58. Table No. 58 shows that 1,710,000 quarts of milk and cream were sold at retail in the New York Metropolitan area, and 28,890,000 at wholesale. Retail sales only amounted to six percent of the total volume sales. Table No. 37 shows that retail sales accounted for slightly less than fifty percent of the volume sold. If the volumes reported in Table No. 37 were used to determine the weighted average profit per point ratio, using Table No. 58 figures, the "Knutson formula" ratio would be 7.121:1, not 9.849:1, a significant difference considering the large numbers of points acquired by taxpayer during its buying spree.

The foregoing proves the extremely tenuous nature of the "Knutson formula." As the numbers change so does the validity of the formula. Because the expression $9.849X_2 = X_1$ is derived from the relationship between the weighted average profits per quart of retail and wholesale milk, Dr. Knutson's formula, $9.849X_2V_1 + X_2V_2 = Y$, is accurate only as long as the weights given to individual product lines remain the same; *i.e.*, individual products continue to make the same contributions to total volume and total profit. If the profit margin or the share of total volume of an individual product line is different, the weight given to that product in determining the weighted average profit per quart changes significantly. The greater the change of any one element, the greater the change in the weighted average profit per quart, and thus, the profit per point ratio. Any change in the weight given an individual product line results in a different weighted average thereby changing the relationship, or ratio, between the weighted average profit

---

30. Ross, H.A., *The Demand Side of the New York Milk Market,* Bul. 459, Cornell University Agri-

cultural Experiment Station, 3–4 (1927).

per quart of retail and wholesale milk. Even within the State of New York vastly different reported product sale figures render the efficacy of the Knutson formula meaningless. For example, in Rochester, New York, nearly three-quarters of the bottled milk sold was home delivery milk and only twenty-five percent wholesale; vastly different from the retail and wholesale volumes reported in Table Nos. 58, and even 37, for the NYC Metropolitan area.

A more egregious example involved the Youngstown, Ohio market. Dr. Knutson found data in the Price, Waterhouse & Co. audit report that permitted him to determine that the profit per point ratio for a core dairy, Youngstown Sanitary Milk Company, was approximately 2:1. In his Expert Report Dr. Knutson valued the intangible assets using the 2:1 ratio of retail to wholesale sales even though he had professed serious doubts about the validity of the data. He testified that the audit data was, at the least flawed, and at best unique to that market and could not be extended to other market areas, including nearby markets also in the Northeastern Ohio area served by the same plants and under common management.[31]

Dr. Knutson provided the court with no specific facts or reasoning to support his conclusory statements that the conditions in New York City were expressive of all other markets in this litigation; not even one of the most obvious criterion, population densities, reportedly a factor of critical importance in planning distribution routes and sales. No traits common to any of the markets were identified. *See Gravley v. United States*, 44 B.T.A. 722, 727, 1941 WL 361 (1941). Accordingly, the court finds no support for, and rejects, Dr. Knutson's unsupported conclusion that the New York City milk market sales and conditions existed in any of the other market areas so as to validate the Knutson formula that distilled the weighted average profit per point ratio for application nationwide.

For all of the reasons stated above, the court found that the *Pitcher Report* identified no data from which taxpayer could reasonably extract a weighted average profit per quart ratio applicable to the other market areas in this litigation, or even the New York City Metropolitan area itself. Dr. Knutson's formula was based upon suspicious data for the New York City Metropolitan area that was confusing and inconsistent, even within that area, thus rendering his weighted average profit per quart ratio inappropriate for application nationwide.

Based upon the partial nature of Dr. Knutson's testimony, his use of inaccurate data to prove this key element of taxpayer's claim, and the nature of the evidence of record, the court finds that Dr. Knutson's methodology by which he hoped to determine taxpayer's weighted average profit per quart of retail to wholesale milk ratio, to find the value of the Customer Base asset, lacked credibility. Thus, the court gave his testimony and Expert Report on this issue little weight. *See,* Fed.R.Evid.P. 702, and Notes of the Advisory Committee, citing 7 Wigmore § 1918, "[w]hen [expert] opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time." *See Publix Supermarkets, Inc. v. United States*, 26 Cl.Ct. 161 (1992) (*citing Piggly–Wiggly Southern v. C.I.R.*, 84 T.C. 739, 1985 WL 15341 *aff'd*, 803 F.2d 1572 (11th Cir.1986), *nonacq.*, 1988–2 C.B. 1; *Albertson's, Inc. v. Commissioner*, 57 Tax Ct.Mem. (P–H) para. 88,582, 1988 WL 137121 (1988)). In those cases expert witnesses were found not to be credible and their testimony given little or no weight by the trier of fact. In the absence of a valid weighted average profit per quart ratio, or any other methodology, the court finds that the values of the core and non-core dairy Customer Base assets suggested by Dr. Knutson were not determined by a judicially acceptable standard. *Cf. Massey–Ferguson v. United States*, 59 T.C. 220, 1972 WL 2496 (1972), *acq.*, 1973–2 C.B. 2.

**31.** After a thorough review of the record, including specifically the cited Price, Waterhouse & Company audit, the court agrees with Dr. Knutson that the sales data for Youngstown Sanitary Milk Company that he used in his valuation of the intangible assets was flawed and could not be extrapolated for use in other market areas. The court, however, finds it so flawed as to preclude its use even in valuing the assets of the Youngstown Sanitary Milk Company.

A Customer Base clearly can be a severable element of goodwill with an asset value of its own, *Commissioner v. Seaboard Fin. Co.,* 367 F.2d 646 (9th Cir.1966), but for the reasons stated above taxpayer failed to overcome the strong presumption of correctness of the determination of the Commissioner that taxpayer did not establish that abandonment occurred, or if abandonment occurred the basis of the asset abandoned within the fairly liberal confines of judicially acceptable methodology. *Cf. Union Pac. v. United States,* 524 F.2d 1343, 1383, 208 Ct.Cl. 1 (1976); *Meredith Broadcasting Co. v. United States,* 405 F.2d 1214, 186 Ct.Cl. 1 (1968). Moreover, in its discussion of taxpayer's methodology to suggest a value for the Production Turnkey asset, *supra,* the court found that taxpayer did not sever or separately value the Customer Base and Production Turnkey assets so as to justify favorable tax treatment for the Customer Base.

In its analysis of the individual claims the court will not consider loss of the Customer Base as an intangible asset for which taxpayer is entitled to a refund pursuant to I.R.C. § 165. *See Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Commissioner v. Riss,* 374 F.2d 161, 166 (8th Cir.1967); *Young & Rubicam, Inc. v. United States,* 410 F.2d 1233, 1244, 187 Ct.Cl. 635 (1969); *Commissioner v. Riss,* 374 F.2d 161 (8th Cir.1967).

*Distribution System*

■■■ Once milk or ice cream is processed or packaged, it has to be transported from the cooling or hardening room to the ultimate consumer. In the 1920's, ice cream was primarily sold in 2½ gallon packages to small retail stores and ice cream shops, while milk was delivered daily in quart or pint glass bottles on home delivery routes. In most market areas, separate wholesale milk routes served commercial or institutional customers such as bakeries, hospitals, schools and restaurants, although it was not unusual for smaller dairies to serve wholesale customers from retail milk routes.

If a large core dairy processed both milk and ice cream, it had essentially three separate delivery systems: home delivery milk, wholesale milk and ice cream. Each type of distribution system had its own characteristics and profit profile. Wholesale customers bought on the basis of price and received price concessions because they purchased in bulk. Costs on wholesale milk routes were higher than on the home delivery routes due to high packaging costs, high product losses due to spoilage, and special service costs such as refrigeration cases for product storage. As a result, profitability on wholesale milk routes was low in comparison with profitability on retail milk routes.

In contrast with wholesale milk sales, a good ice cream distribution system was a pathway to profit. In the 1920's ice cream trucks and store freezers were in their infancy and relatively few dairies had mastered the art of keeping ice cream in a firm, frozen state from the dairy hardening room to the consumer. A core dairy with a modern fleet of vehicles and refrigeration equipment that could hold ice cream in its frozen state from freezer to consumer had a substantial competitive advantage and could enjoy higher profits because of decreased transportation costs, less waste, and a high level of consumer acceptance.

Profitability for any dairy acquired by taxpayer was defined by Dr. Knutson as capitalized profit per point multiplied by annual points retained after acquisition. For these reasons, Dr. Knutson found the value of a particular core dairy's home delivery milk, wholesale milk and ice cream distribution system to taxpayer to be best expressed as the excess of the core dairy's profitability for that product over the average profitability for that product of all non-core dairies acquired by taxpayer in the same market area. In determining values he used a weighted average of the profitability of all non-core dairies acquired by taxpayer for market areas where more than one non-core dairy was acquired by taxpayer. For market areas where taxpayer acquired a core dairy, but no non-core dairy, his analysis used profitability data from non-core dairies located in market areas with "comparable" demographic and competitive conditions. In all cases, the value of the Distribution System asset is defined as the excess of capitalized profit per product

point for the core dairy over capitalized average profit per product point for non-core dairies, multiplied by total product points retained by taxpayer after acquisition of the core dairy.

Dr. Knutson defined "points retained" as "points before acquisition" minus the customer volume that the dairy could normally expect to lose immediately after acquisition. As in the discussion of the Customer Base asset, he found that industry experience indicated an acquired core dairy could expect to lose 5 percent of its home delivery milk customer volume and 20 percent of its wholesale milk and ice cream customer volume. A non-core dairy could expect to lose 5 percent of its home delivery milk customer volume and 35 percent of its wholesale milk and ice cream customer volume.

After the adjustment for loss of customers on acquisition, Dr. Knutson applied a capitalization rate of 6 percent to home delivery milk profit per point and a capitalization rate of 12 percent to wholesale milk and ice cream profit per point. He used different capitalization rates to reflect the greater risks and long-term customer attrition inherent in the wholesale milk and ice cream business.

As defined, the Distribution System asset overlaps with the Customer Base and Production Turnkey assets. Dr. Knutson recognized the overlap with the Customer Base asset and attempted to separate the two in order to find the adjusted fair market values of each by subtracting the value of the Customer Base asset in each acquisition from that of the Distribution System asset. However, because taxpayer failed to prove the fair market values of the Customer Base assets, it could not perform this calculation.

Moreover, profit may have a role in determining the fair market value of an asset but the role is far from self-explanatory and was not addressed by taxpayer so as to permit the court to find that it was a factor affecting the value of the Distribution System asset. There are too many other unknown inchoate factors that affected any acquired dairy's profit factor, especially during the heyday of

national expansion of the dairy industry sixty years ago, coupled with the economic conditions of the time. In these circumstances profit is not a proper factor by which to measure the value of the asset.

The court must conclude that taxpayer's methodology was deficient. A Distribution System may be a severable element of goodwill with an asset value of its own, *Commissioner v. Seaboard Fin. Co.*, 367 F.2d 646 (9th Cir.1966), but for the reasons stated above taxpayer failed to overcome the strong presumption of correctness of the determination of the Commissioner that it did not establish that abandonment occurred, or if an abandonment occurred the basis of the asset abandoned within the fairly liberal confines of judicially acceptable methodology. *Cf. Union Pac. v. United States,* 524 F.2d 1343, 1383, 208 Ct.Cl. 1 (1976); *Meredith Broadcasting Co. v. United States,* 405 F.2d 1214, 186 Ct.Cl. 1 (1968). Neither did taxpayer even attempt to sever the Production Turnkey asset, *supra,* from the Distribution System.

In its analysis of the individual claims the court will not consider loss of the Distribution System as an intangible asset to which taxpayer is entitled to a refund pursuant to I.R.C. § 165. *See Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Commissioner v. Riss,* 374 F.2d 161, 166 (8th Cir.1967); *Young & Rubicam, Inc. v. United States,* 410 F.2d 1233, 1244, 187 Ct.Cl. 635 (1969).

*Trade Name*

■ Dr. Knutson testified that the core dairies acquired by taxpayer had spent years building reputations as reliable suppliers of high quality milk products and that their Trade Names and Trademarks were severable assets and had separate values from the other intangible assets.[32] Company names were painted on delivery trucks or wagons, stitched on the route man's uniform, displayed on retail ice cream cabinets, and printed on ice cream wrappers and milk bot-

---

**32.** Taxpayer included Trademarks within the Trade Name asset, and, at times, used the terms interchangeably.

tles. Consumers identified the dairy's milk or ice cream with the name of the dairy. Dr. Knutson acknowledged that some customer loyalty to the core dairy names persisted into the 1940's. Even so, his analysis suggested that a well-established dominant market share contributed more to profitability than name identity. Taxpayer argued that "[t]he name intangible assets, which Dr. Knutson valued in the pre-acquisition context, [were] generally somewhat local organizations with local product distribution and not nationally known." Dairies, before being acquired by taxpayer, arguably spent relatively little for advertising. What advertising there was, was naturally local because their product was only sold locally. Accordingly, "Trade Names were the least valuable of the allegedly acquired intangible assets."

According to Dr. Knutson and other knowledgeable witnesses for taxpayer, there were no national dairy trade names in the 1920's and 1930's and taxpayer could not market or advertise a product nationally "until a name like Sealtest was adopted." Taxpayer's witnesses testified repeatedly that taxpayer's paramount, even sole, purpose was to develop national recognition

> because what you were interested in doing was developing an integrated system on a multi-market basis, with nationwide name recognition brought about, at the least in part, by national advertising. That was the whole concept of National Dairy Products and Bordens and Carnation and Beatrice ... to get a national system going in the dairy industry.

For purposes of his analysis Dr. Knutson determined that the pre-acquisition advertising budgets of each dairy were "very small," though he did not know whether the amount of advertising was uniform among the acquired dairies. Based upon his expertise and historical knowledge of the industry Dr. Knutson determined that the replacement cost of duplicating the intangible value created by each dairy's minimal advertising would not have been substantial in relation to the other intangible assets acquired. Accordingly, he valued the Trade Name asset at a flat two percent of the total acquisition cost of each dairy. He asked the court to find his valuation methodology judicially acceptable because it was based upon his demonstrated knowledge of the core dairy acquisitions, and the history and economics of the dairy industry in the 1920's.

Defendant argued that a flat two percent valuation for all Trade Names was patently unreasonable because different acquired dairies spent widely divergent amounts on advertising their local milk products. Defendant elicited testimony that the acquired Trade Names may have been worth considerably more in some markets than the minimal values ascribed to them by Dr. Knutson. Moreover, while trade names generally were abandoned soon after acquisition, in a few instances taxpayer used some of the Trade Names acquired from core dairies for decades, but abandoned or otherwise disposed of them in non-suit years. The principal thrust of defendant's argument was that taxpayer did not, and could not, have proved the adjusted fair market value of the Trade Name asset which may have had great value to one dairy, but not another, by evaluating all at a flat two percent of the acquisition price.

Taxpayer did not present a cohesive or persuasive case that tradenames were of any significant value to it. While trade names and trademarks created by taxpayer such as Sealtest, Kraft, Brookstone, and Sugar Creek had great value, they are not in issue here, "[a]nd that does not establish material value for the Trade Names acquired by plaintiff in the 1920's and abandoned shortly thereafter in favor of plaintiff's noted 'Sealtest' brand name." Taxpayer did not specifically identify what acquired trade names it used and maintained, though it is clear from the record that as late as 1945 at least some of the Trade Names of taxpayer's core dairies were still in use; Breyer's is in use to this day.

The court is of the opinion that neither party reached the real issue and that taxpayer did not argue the correct rule of law. Taxpayer bears the substantial burden of proving the Commissioner's determination that the alleged Trade Name asset was not abandoned, and if it were, the valuation was correct, and unsubstantiated conclusions will not suffice for the absence of proof. Moreover, the use of other dairy Trade Names

runs totally counter to taxpayer's single-minded goal of creating a national name and business. The parties fussed about eight dairies that were left in their acquired corporate shells, at a few instances for decades, but there was no proof whether all, some, or none of the Trade Names associated with those acquisitions were maintained, or also abandoned in non-suit years with other trade names. Dr. Knutson testified that the Trade Name asset was of value only in the transition period between acquisition and the time when "a national Sealtest Trademark could be established[,] and that the names were abandoned at that point in time and was not used anymore." He concluded that "the local names vanished from the scenes very rapidly" because taxpayer wanted to promptly "establish a national brand." Taxpayer's briefs and testimony infer that some were used, but, again, inferences are no substitute for proof.

Notwithstanding taxpayer's arguments, it is exceedingly clear from the record that taxpayer abandoned all acquired trade names and trademarks in 1956 in favor of its Sealtest trade name and trademark—the long sought "national" goal. Taxpayer, in its Objections to Defendant's Requested Findings of Fact 31 stated:

Substantially all the trade names and trademarks purchased by NDPC which are the subject of this case were abandoned by plaintiff long before its abandonment of the other intangible assets here in suit.

In short, taxpayer has presented no evidence that it sought to acquire Trade Names. Even though taxpayer argued that the Trade Names it acquired had some intrinsic value, that value was nonexistent to taxpayer. The court finds that taxpayer had no interest in acquiring Trade Names because their use would not have brought taxpayer any closer to its goal of creating a national brand name. Taxpayer did use some Trade Names until it could liquidate the acquired dairies but that use was, for all practical purposes, forced upon taxpayer by the exigencies of each situation, and does not obviate the finding that taxpayer was never interested in, or sought out, Trade Names for use post-acquisition.

The fact that a trade name or trademark may have been included in the assets acquired from a core dairy is a matter of the form of the acquisition. In substance, taxpayer never sought to purchase Trade Names because it had no use for those names and marks.

In some circumstances a purchased Trade Name can be a valuable asset but here, Mr. McInnerney and his successors were driven to eliminate local businesses and move swiftly to a national, and ultimately international, company, selling products under well-advertised trade names and trademarks that it invented [or acquired but never abandoned]. In these circumstances the court finds that taxpayer never intended to perpetuate local names thereby depriving itself of the ability to grow into a large and powerful unified dairy, advertised to consumers as a source of high quality milk products. Dr. Knutson was incorrect in stating that taxpayer "had to acquire trade names in order to achieve its goals." Taxpayer was not interested in, and did not intend to acquire trade names and Trademarks from the dairies at issue here. *See Gravley v. Commissioner*, 44 B.T.A. 722, 27, 1941 WL 361 (1941).

■ There was even less proof that Trademarks were acquired or used after acquisition. Trademarks are not perpetual; they must be registered and renewed periodically, and actually used, or the owner loses its exclusive right to the trademark and it becomes valueless.

It is actual use of a symbol as a 'trademark' in the sale of goods which creates and builds up rights in a mark. Therefore, lack of actual usage of a symbol as a 'trademark' can result in a loss of legal rights. The loss is known as 'abandonment.' Trademark rights can be abandoned through a period of nonuse, from which the inference of intent to abandon can be made.

McCarthy, *Trademarks and Unfair Competition*, § 17.6, 2d Ed. Taxpayer proffered no proof that acquired trademarks were ever registered, timely renewed, or regularly used; or, if used, for how long, though it is clear that all allegedly acquired trademarks

disappeared in 1956 with the allegedly acquired trade names.

It is clear from the record that trade names and trademarks that taxpayer acquired from the core dairies it purchased were acquired as a minor incident in a composite transaction. *Domestic Management Bureau, Inc. v. United States*, 38 B.T.A. 640, 1938 WL 87 (1938). There is clear evidence that tradenames acquired in the mid–1920's to 1930's were abandoned or otherwise surrendered prior to 1957, in non-suit years, thereby depriving taxpayer of favorable tax treatment for abandonment at this time. *Id.;* Treas.Reg. § 1.165–1(d). The court finds no intent by taxpayer to acquire or preserve the asset. *Cf. Hazeltine Corp. v. United States*, 145 Ct.Cl. 138 (1959).

■ A Trade Name or Trademark may be a severable element of goodwill with an asset value of its own, *Commissioner v. Seaboard Fin. Co.*, 367 F.2d 646 (9th Cir. 1966), but for the reasons stated above taxpayer failed to prove by a preponderance of the evidence that it acquired the claimed Trade Names, *Koppers Coal Co. v. Commissioner*, 6 T.C. 1209, 1946 WL 265 (1946), and *a fortiori*, to overcome the strong presumption of correctness of the determination of the Commissioner that it did not establish that abandonment occurred. *Cf. Union Pac. v. United States*, 524 F.2d 1343, 1383, 208 Ct.Cl. 1 (1976); *Meredith Broadcasting Co. v. United States*, 405 F.2d 1214, 186 Ct.Cl. 1 (1968). "A taxpayer 'seeking a deduction must be able to point to an applicable statute and show that he comes within its terms.'" *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348 (1934); *Gravley v. Commissioner*, 44 B.T.A. 722, 1941 WL 361 (1941). Taxpayer has failed to do so here and in its following analysis of the core dairies the court will not consider the Trade Name asset as an intangible asset to which taxpayer is entitled to an abandonment loss deduction pursuant to I.R.C. § 165 in this litigation.

## ABANDONMENT

■ Abandonment of an asset in tax law is defined as a permanent disposition, not sold, never to be used again and not retrieved for sale, exchange, or other disposition. Treas. Reg. §§ 1.167(a)–1.168(a)(4). It does not have to mean that real or personal tangible property is simply closed or left to fall into disrepair, and never disposed of by sale or exchanged for some form of consideration. Whether a property is abandoned is a question of fact that must be determined by the trier of fact from a review of the record to find the taxpayer's intent. Substance governs the ultimate finding, not form and taxpayer's intent must be evident from all the available facts and circumstances. *Commissioner v. Ashland Oil & Ref. Co.*, 99 F.2d 588 (6th Cir.1938), *cert. denied*, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); *American Potash & Chem. Corp. v. United States*, 399 F.2d 194, 185 Ct.Cl. 161 (1968); *Kimbell–Diamond Milling Co. v. Commissioner*, 14 T.C. 74, 1950 WL 118 (1950), *aff'd*, 187 F.2d 718 (5th Cir.1951), *cert. denied*, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951).

Defendant argued that taxpayer sold rather than abandoned certain intangible assets in nine market areas. As evidence of taxpayer's intent, defendant urged the court to find that once taxpayer decided to discontinue its milk and ice cream business in a market area taxpayer preferred to sell the business rather than abandon it. Mr. Arthur Messerschmidt, who was first employed by taxpayer in 1952, became Mid–West Regional Comptroller in 1971 and Assistant Treasurer in 1973, testified that taxpayer would have preferred to have sold the intangible assets, as it did some tangible assets as a means of "getting something out of [the business] before we phased out completely." Taxpayer admittedly attempted in several instances to directly sell all or a part of its business, and did "abandon [some assets] in the direction of another dairy." [33] In a few of those markets taxpayer also sought to have the recipient dairy collect its accounts receivable. Taxpayer also sought to help its former drivers find employment with the recipient dairy. In

---

**33.** Defendant asked Mr. Crocker what it meant to abandon something "in the direction of some-

body else." Mr. Crocker replied, "[h]and him your customer lists."

a few instances taxpayer's contemporaneous records indicate a belief that it could receive an unidentified financial advantage by helping another dairy acquire their former customers. Recipient dairies obviously viewed the transfer of customer lists as a relatively inexpensive opportunity to acquire new customers. However, it is also true that if the local dairies simply waited for taxpayer to leave the market area they could acquire taxpayer's former home delivery customers for the asking. There was no incentive to buy taxpayer's customer lists. It must also be borne in mind that the routes were for most purposes worthless. Taxpayer tried to make the routes profitable in the 1970's but without success. Competitor dairies were faced with the same phenomenon and were far from anxious to add more red ink to their books. For example, in a memorandum of October 6, 1972 addressed to Mr. Arthur Messerschmidt, Comptroller of Sealtest Foods Division Headquarters in Chicago, Mr. T.C. Fulcher, in Sealtest's Central Division–Peoria, suggested that taxpayer abandon the home delivery market service in Peoria immediately. Mr. Fulcher explained that he had tried unsuccessfully to sell the home delivery routes and accounts receivable to a competitor, Producers Dairy.

On October 3, 1972, the Peoria District Zone Sales Manager and myself (sic) met with Producers Dairy to try and negotiate a sale of the routes and receivables connected with Home Service. They would not pay anything for the business nor would they assume and pay for receivables. Producers is a local dairy and are in the process of being bought out by another dairy. It appeared that Producers also was considering cutting back in the Home Service area and consequently, did not want to expand at this time by taking on our business. Producers is the only other Home Service operation in the Peoria area.

 The fact that tangible assets are sold does not *a fortiori* mean and a deduction may not be taken for abandonment. In *S.S. White Dental Mfg. Co. v. United States* the court allowed an abandonment loss on tangible assets sold because the sale occurred *after* the owner abandoned its old plant to move to a new plant. *S.S. White Dental Mfg. Co. v. United States,* 55 F.Supp. 117, 102 Ct.Cl. 115 (1944). The new plant was complete, and all business moved to the new plant *before* the old plant was sold. The owner claimed an abandonment loss under the Treasury Regulations then in effect and the Court of Claims found that the owners did not enter into a contract to sell the old plant before they made the decision to abandon it, and did not have a contract to sell the old plant before it was vacated. Had the owners intended to vacate the plant before the move the court opined that

their loss would have been a loss on the sale, which they chose to make because they preferred the price to the [new] plant. But here they first abandoned the plant, taking their chances as to whether and for how much they could sell it. When one discards capital assets, he hopes to sell the discard, and has an opinion or a hope as to how much he will get for it. When and if he sells, he is not selling a current capital asset, but is salvaging a discarded capital asset.

*S.S. White,* 55 F.Supp. 117, 102 Ct.Cl. at 125. Taxpayer here argued that it is clear that the only intent was to abandon the five intangible assets. The fact that it chose to reduce its economic loss by selling or disposing of some tangible assets, including accounts receivable is of no consequence to its entitlement to a deduction for its intangible asset losses. As in *S.S. White,* taxpayer did sell some of its tangible assets after vacating a market, and transferred other tangible assets to one or more of its other divisions. The court agrees that taxpayer's disposal of tangible assets in vacated markets has no consequence on the question of the character of the disposition of its intangible assets.

In *Tanforan Co. v. United States,* 313 F.Supp. 796 (N.D.Cal.1970), *aff'd,* 462 F.2d 605 (9th Cir.1972), the court held that a deduction for abandonment of a racetrack was not precluded by the subsequent sale of the land. For business reasons Tanforan Company, Ltd. closed its racetrack and leased newer facilities at other racetracks. At the close of its 1963 season Tanforan terminated all racing, discharged its employ-

ees, and discontinued maintenance. Tanforan deducted the entire undepreciated costs of the racetrack assets in 1963, including an amount allocated to an intangible asset, its racing franchise. In 1964 Tanforan sold the racetrack land to an unrelated party. The government argued that Tanforan's loss resulted not from the termination of the track's useful life but from the sale of the land. The court rejected the government's argument and held that the sale of the land was entirely independent of Tanforan's decision to terminate racing at the track, and in no way precluded an abandonment loss deduction in 1963.

> The evidence shows that the sale was a fortuitous event and that obsolescence, retirement, and abandonment would have occurred in 1963, even if Tanforan had never heard of [the buyer]. It is clear that the land became available for sale only after the racetrack assets were no longer useful to Tanforan.

> If anything can be said of the significance of the sale, the conclusion is inescapable that the factors causing termination of the useful life of the racetrack led to the sale ... rather than that the sale led to the abandonment of racing. Once racing was ended at the Tanforan track, the company obviously had a disposable asset—its land—which it had a duty to its stockholders to sell, develop, or hold for appreciation. It chose to sell because of lack of any other concrete plan. Its choice to sell should not result in a different conclusion than if one of the other alternatives had been adopted.... The sale of the land [was] immaterial. A subsequent lease of the land, or any other disposition of the land, would have been equally immaterial.

*Tanforan*, 313 F.Supp. at 806. The Sixth Circuit reached a similar conclusion in *Yates Motor Co. v. Commissioner*, 561 F.2d 15 (6th Cir.1977):

> the building involved was built for a specific purpose and ... its use for that purpose was abandoned by the owner by an economic event not of his making. It had

> become as worthless as if it had been destroyed by fire or other casualty loss.

*Yates*, 561 F.2d at 18.

██ It is undisputed that there was a significant economic upheaval in the dairy business in the 1970's leaving taxpayer with no responsible alternative to its stockholders but to vacate the fifteen milk markets in issue here as quickly as possible. Those very same changes effectively precluded taxpayer's sale of its intangible assets to competitors who experienced the same losses. Mr. William Beers, Chairman of the Board and Chief Executive Officer of taxpayer at the time simply ordered the unprofitable markets "closed down." It is amply clear that Mr. Beers' order "to get out of a market" was not contingent upon any sale or other means of disposing of assets, though other means, such as by sale, were not prohibited. Defendant correctly asserted that Mr. Crocker testified that taxpayer would have preferred to have sold its businesses instead of abandoning them but the assertion is of no moment. Mr. Crocker, on cross-examination, stated that "[t]he company never had made the decision to do anything but get out. In other words, to abandon these markets. If they could be sold, so much the better." He continued, "[i]t's very costly to go out of business like we did in '72.... And, if you can [get] anything for [the assets], you try and reduce the cost of going out of these markets in any way possible."

The testimony of all of the witnesses was that taxpayer received no consideration for giving its customer lists to other dairies. Consideration for sale of the accounts receivable is found in the sale price of that tangible asset and was not consideration for customer lists. Counsel for taxpayer, in examining Mr. Crocker, asked, "[i]f a company transferred a customer list, did the company get anything back for it?" Mr. Crocker responded: "No." Mr. Crocker went on to explain that it was fairly common to transfer customer lists to another dairy "when you left the market," and that there was no instance when taxpayer sold any part of its business when it left a market, except for some tangible assets such as inventory at salvage value. Leaving a market "smoothly" cannot be con-

sidered consideration for the customer lists in the circumstances of this case. There was no evidence that taxpayer had any intent other than to abandon its business losses and that attempts to sell the tangible assets that were sold were not begun until after the decision to abandon the market had been made. *Tanforan,* 313 F.Supp. at 806; *Yates Motor Co.,* 561 F.2d at 18. Attempts by taxpayer to transfer its customer list actually reinforced the argument that taxpayer abandoned those markets and businesses for all time. Clearly taxpayer would not have given a competitor its customer list if it ever intended to return to the market. The court finds that taxpayer did not anticipate or realize a profit when it made its decision to abandon its business in a market, nor did taxpayer realize a profit or tax advantage in the few instances in which it transferred its customer lists to other dairies.

 Defendant did not specifically allege that taxpayer sold or exchanged its Source of Supply intangible asset, probably, the court surmises, because of the nature of the asset. Source of Supply is intertwined tightly with the processing of milk and production of ice cream. To prove abandonment of the Source of Supply asset in a particular market area taxpayer must show that the purchase of raw milk actually and permanently ceased in that market. The strongest proof of the abandonment of the Source of Supply asset is evidence that the plant(s) closed and there is no inference that the plant(s) continued to process milk and produce ice cream for taxpayer in a neighboring market area, or for any other dairy under a franchise or other arrangement. It is not enough for taxpayer to prove that all or part of the local customers and distribution system were abandoned. An example would be where the production and delivery of Sealtest continued in a market even though the processing and delivery of retail and wholesale milk had been abandoned. If taxpayer fails to prove, for any reason, that it did not cease purchasing raw milk within a market it is axiomatic that taxpayer had not relinquished its Source of Supply price advantage, even though it might have diminished in value. However, diminishment in value of an intangible asset is not the same as abandonment

and does not entitle taxpayer to a refund under I.R.C. § 165. So long as the asset reasonably had even "potential value" it cannot be said that the taxpayer's investment therein has been lost. *E.B. Elliott Co. v. Commissioner,* 2 T.C.M. (CCH) 444 (1943) (*citing Lawson v. Commissioner,* 42 B.T.A. 1103, 1940 WL 144 (1940)); *Golden State Towel & Linen Serv., Ltd. v. United States,* 373 F.2d 938, 179 Ct.Cl. 300 (1967). Every time taxpayer purchased raw milk it exercised the advantage; *e.g.,* the value of the asset. The court will consider these issues in its following discussion of the Source of Supply asset in the fifteen market areas.

## VALUATION OF THE SOURCE OF SUPPLY INTANGIBLE ASSET IN THE FIFTEEN MARKET AREAS

In the preceding sections of this Opinion the court found that taxpayer offered substantial evidence to overcome the presumption of correctness of the assessment of taxes by the Commissioner of Internal Revenue as to the Source of Supply intangible asset but failed to overcome that presumption for the other four claimed intangible assets. *See Commissioner v. Riss,* 374 F.2d 161, 166 (8th Cir.1967). Because the presumption of correctness was overcome for the Source of Supply intangible asset the court will address the factual issues of the fair market value of that asset and make its findings and conclusion based upon the preponderance of the evidence of the entirety of the record. *See Id.; see also Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1932); *Miller v. United States,* 620 F.2d 812, 223 Ct.Cl. 352 (1980); *Young & Rubicam, Inc. v. United States,* 410 F.2d 1233, 187 Ct.Cl. 635 (1969). In no instances do tax refunds allowed exceed the stipulated *Kraft I* residual.

### Peoria

Taxpayer acquired the business and assets of the J.D. Roszell Company in 1928 and made it the core dairy in the Peoria market area. In March 1928 taxpayer organized the J.D. Roszell Company in Delaware (DE) and on April 2, 1928, by agreement with taxpay-

er, the J.D. Roszell Company (IL) changed its name to Dairies, Inc. The original J.D. Roszell Company and Dairies, Inc. were both Illinois corporations. Three weeks later, on April 24, 1928, taxpayer purchased the entire property and assets of Dairies, Inc. for $2.9 million, *Kraft I*.[34] In exchange for the business and assets of Dairies, Inc. taxpayer assumed the disclosed liabilities of Dairies, Inc., transferred 17,400 shares of its common stock having a market value of $2.3 million to Dairies, Inc.'s stockholders, and transferred $250,000 principal amount of its 5¼ percent Gold Mortgage Debentures due in 1948. Upon acquisition, taxpayer immediately transferred all of Dairies, Inc.'s property and assets to taxpayer's wholly-owned Delaware corporation, J.D. Roszell Company (DE).

### Abandonment

At the time of its acquisition Dairies, Inc. operated a combination milk and ice cream plant on Washington Street, in Peoria. Thereafter, on December 31, 1956 taxpayer merged the J.D. Roszell Company (DE) into itself and transferred the tangible and intangible assets to its Sealtest Central Division–Peoria. In 1967 taxpayer constructed a new milk plant on North University Street in Peoria and transferred milk procurement and processing from the old combination milk and ice cream plant to the new plant. The old plant continued as an ice cream manufacturing plant. From 1928 until 1972 taxpayer continuously delivered milk on home delivery and wholesale routes in Peoria.

Abandonment of the home delivery service in Peoria was approved by taxpayer's Administrative Committee on October 30, 1972. The milk bottling plant had ceased purchasing raw milk on October 2, 1972, and permanently closed its doors. Taxpayer claimed that it abandoned its home service milk routes in 1972 but continued to deliver milk to its wholesale customers until 1974. Because all raw milk procurement was done through the North University Street milk plant that was closed in 1972 taxpayer claimed it abandoned its Source of Supply asset in 1972. Mr. Robert Grobeck, who was operations manager for the Peoria and Mil-

waukee ice cream plants from 1973 through 1978, and responsible for closing the Peoria milk plant, testified that milk for taxpayer's continued wholesale distribution was shipped in from its St. Louis Sealtest plant. Mr. Grobeck also testified that taxpayer retained "some" ice cream routes in Peoria, and shipped ice cream *to* Milwaukee until some time in 1975, clearly evidencing that the ice cream plant remained open after the milk plant closed in 1972.

Whether a property is abandoned is a question of fact that must be determined by the trier of fact from a review of the record to find taxpayer's intent. As is generally the case in tax law, substance governs the ultimate finding, not form. Treas.Reg. § 1.165–1(a); *Kimbell–Diamond Milling Co. v. Commissioner*, 14 T.C. 74, 80, 1950 WL 118 (1950), *aff'd*, 187 F.2d 718 (5th Cir.1951), *cert. denied*, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951). The law requires that taxpayer's intent be evident from all the available facts and circumstances. *Id.; Commissioner v. Ashland Oil & Ref. Co.*, 99 F.2d 588 (6th Cir.1938), *cert. denied*, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); *American Potash & Chemical Corp. v. United States*, 399 F.2d 194, 185 Ct.Cl. 161 (1968). Even though the asset may have diminished in 1972 when home delivery ceased and the milk processing plant closed, diminishment in value of an intangible asset is not the same as abandonment. So long as the asset reasonably had even "potential value it cannot be said that the taxpayer's investment therein has been lost." *E.B. Elliott Co. v. Commissioner*, 2 T.C.M. (CCH) 444 (1943) (*citing Edward C. Lawson v. Commissioner*, 42 B.T.A. 1103, 1940 WL 144 (1940)); *Golden State Towel & Linen Serv., Ltd. v. United States*, 373 F.2d 938, 179 Ct.Cl. 300 (1967). To prove abandonment of the Source of Supply asset taxpayer must prove by a preponderance of the evidence that the purchase of raw milk actually an d permanently ceased in that market. It is not enough for taxpayer to simply prove that all or parts of the Source of Supply, Customer Base, or Distribution System were abandoned. If raw milk continued to be

---

**34.** The total acquisition cost of each diary discussed in this section of the Opinion was either stipulated or, except as noted, taken from Exhibit CV, *Kraft I*, (See Table II).

purchased within the Peoria market, quite simply, taxpayer had not completely disposed of its Source of Supply price advantage in any manner.

■■■ The record is devoid of any evidence when the ice cream plant ceased purchasing raw milk, and closed. An article in the Dairymen's Digest, dated November, 1972, reported that taxpayer "banged its doors shut in its Peoria, Ill. bottling plant on October 3," of that year. The article, however, discussed only taxpayer's home delivery milk business and made no reference to ice cream production. As long as taxpayer continued to purchase raw milk for the production of ice cream in the Peoria market the Source of Supply asset advantage continued to exist. Each and every time taxpayer purchased raw milk it exercised the Source of Supply advantage it acquired in 1928. The parties stipulated, and the record confirms, that taxpayer abandoned only its Peoria milk business. In the absence of proof of permanent abandonment of the entire asset taxpayer is not entitled to a refund of taxes for abandonment of that asset. Taxpayer did not overcome the presumption of correctness of the determination of the Commissioner that it failed to establish that any abandonment occurred, or if an abandonment occurred, the basis of the asset. Taxpayer is not entitled to a refund pursuant to I.R.C. § 165(a). *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Commissioner v. Riss,* 374 F.2d 161, 166 (8th Cir.1967); *Young & Rubicam, Inc. v. United States,* 410 F.2d 1233, 1244, 187 Ct.Cl. 635 (1969).

### Detroit

Dr. Knutson testified that the Detroit milk market was very large and complex; a large number of dairies served many customers in Detroit and surrounding cities. Taxpayer acquired a total of nine dairies in 1928 and 1929 in the Detroit market, including three core dairies; Arctic Dairy Products Company, the Detroit Creamery Company, and Ebling Dairy. All three core dairies were consolidated and eventually merged with taxpayer's newly-created, wholly-owned Delaware corporations. At different times the

books of the original core dairies, the merged dairies, and the consolidated dairies were closed. The parties did not stipulate to any facts about the Detroit market, therefore, all data and information discussed below is derived from the court's review of the entire record.

Taxpayer's efforts to acquire the actual ownership of the business and assets of the Detroit Creamery Company and Arctic Dairy Products Company was delayed from 1929 until 1936. During the interim there is no question but that taxpayer controlled the business and assets of the two dairies through taxpayer's nominees to the boards of directors. At a March 1930 meeting of the Detroit Creamery Company (MI) the new Executive Committee was chaired by the president and general manager of the Detroit Creamery Company (MI), and included another officer of the Detroit Creamery Company (MI), Mr. Ebling of Ebling Creamery Company, and a Mr. McDonald of Arctic Dairy Products Company. The Executive Committee governed taxpayer's businesses in Michigan. As of March 1930, if not before, taxpayer exercised control of the assets of the core dairies. Mr. McDonald became president of the Detroit Creamery Company (MI) prior to April 7, 1931 and remained until April 28, 1932. By April 28, 1935 Mr. Ebling was president of the Detroit Creamery Company (MI).

The record reveals that shortly before February 6, 1930 a dissident minority shareholder of the Detroit Creamery Company (MI) filed suit in the Michigan Circuit Court of Wayne County challenging taxpayer's right to control the company. Taxpayer operated its Detroit acquisitions as a unit but was frustrated in its intent to combine the operations of the Detroit Creamery Company and Arctic Dairy Products Company by reason of the shareholder litigation. Taxpayer prevailed in the litigation, *Voight v. Remick,* 260 Mich. 198, 244 N.W. 446 (1932), *cert. denied,* 289 U.S. 756, 53 S.Ct. 787, 77 L.Ed. 1500 (1933), and completed its purchase of the remaining outstanding stock in 1936.

On December 30, 1936 taxpayer incorporated a new Detroit Creamery Company under the laws of Michigan. Twenty-eight

days later taxpayer consolidated Arctic Dairy Products Company (MI) with the new Detroit Creamery Company (MI). A new Arctic Dairy Company (MI) was incorporated by the new Detroit Creamery Company (MI) on January 25, 1937 as a "[n]ominal company; to protect the name." Subsequently, on May 1, 1940, the new Detroit Creamery Company (MI) acquired certain assets of the Ohio Clover Leaf Dairy, a Delaware corporation, located in Toledo, Ohio. In 1955 Ohio Clover Leaf Dairy (DE) changed its name to the Detroit Creamery Company (DE). The new Detroit Creamery Company (MI) and Ebling Creamery Company were merged into the Detroit Creamery Company (DE). The name of the surviving company was Detroit Creamery Company (MI). On December 31, 1955 the Detroit Creamery Company (MI) was merged into Detroit Creamery Company (DE). The Detroit Creamery Company (DE) was merged with taxpayer and its property and assets transferred to the Detroit Creamery Division of taxpayer in 1956. The new Arctic Dairy Products Company was dissolved November 1, 1956. The Detroit Creamery Division of taxpayer was dissolved December 12, 1958 and its property and assets transferred to the Sealtest Foods Division (Great Lakes Division).

The record is sparse but is sufficient to permit the court to find that taxpayer consolidated the business and assets of the original Ebling Creamery Company (MI) with a new Ebling Creamery Company (MI) on the date the original dairy was acquired, March 31, 1929. The original Ebling Creamery Company (MI) was merged into Detroit Creamery Company (DE) and the new Ebling Creamery Company (MI) dissolved November 1, 1956.

*Abandonment*

■ Taxpayer's two Detroit milk plants were located for many years on Holden Avenue and Tilman Avenue. In 1960 taxpayer opened a new milk plant on Greenfield Road and closed the Holden Avenue and Tilman Avenue plants. Taxpayer's sole ice cream manufacturing plant for the Detroit market area was the old Arctic Dairy Products plant located on Grand River Avenue which served the Detroit market area from 1928 until pro-

duction ceased and it was permanently closed in 1972. Taxpayer continued to deliver ice cream in the Detroit market for approximately six more months. The ice cream that was delivered was produced at taxpayer's plant in Indiana and trucked to the Grand River Avenue reefer that remained open until later in 1972, when all delivery ceased.

In 1956 taxpayer tried unsuccessfully to reinvigorate its home delivery sales by offering to sell the routes to its routemen. The routemen rejected the offer as being not economically beneficial to them. In a second attempt, in 1959, taxpayer irrevocably assigned the routes and accounts receivable to the routemen. After the assignment taxpayer maintained significant control over the routemen and routes until the fall of 1971, when taxpayer ceased processing milk and permanently closed its Greenfield Road milk processing plant. Thereafter, taxpayer entered into a "processing agreement" with a competitor, Risdon Brothers Dairy Company, whereby Risdon produced milk purchased from its own suppliers of raw milk, and bottled the milk under the Sealtest label. Taxpayer continued to deliver retail and wholesale milk processed by Risdon for approximately six months, until the spring of 1972. Taxpayer continued to deliver wholesale milk in the Detroit market using milk processed in its Lansing, Michigan plant until 1976. There was no evidence that the Source of Supply asset was transferred to Lansing.

■ The court finds that taxpayer permanently abandoned the Source of Supply intangible asset acquired from Arctic Dairy Products Company, the Detroit Creamery Company, and Ebling Dairy in 1972, when it ceased processing ice cream. The value of the asset diminished when taxpayer ceased producing milk in 1971, a non-suit year, but that fact does not effect the time of abandonment of the entire asset in 1972. *See E.B. Elliott Co. v. Commissioner*, 2 T.C.M. (CCH) 444 (1943) (*citing Lawson v. Commissioner*, 42 B.T.A. 1103, 1940 WL 144 (1940)); *Metropolitan Laundry Co. v. Commissioner*, 100 F.Supp. 803 (N.D.Cal.1951). A taxpayer is not entitled to an abandonment loss for the discontinuance of use of a portion of an asset.

*Golden State Towel & Linen Serv. v. United States,* 373 F.2d 938, 179 Ct.Cl. 300 (1967).

*Valuation Variable*

■ In suggesting a valuation for the asset Dr. Knutson testified that the Detroit market was highly competitive and almost totally controlled by the milk producers cooperative. The Michigan Milk Producers Association was and is one of the leading milk cooperatives in the United States. In his Expert Report Dr. Knutson stated that

[i]n the 1920's the Detroit milk market was a large, complex milk market served by approximately 37 creameries, a much larger number of independent peddlers and a well-organized milk collection system managed by a large cooperative. The supply of milk in Detroit was controlled by those firms which had sufficient capital to equip a plant for pasteurizing, bottling, bottle-washing, cooling and with other modern machinery.

Based upon the foregoing the court finds Dr. Knutson's suggested valuation variable of two cents to be reasonable. The court will discuss the dairies separately.

*Valuation*

*Arctic Dairy Products Company.* At the time of its acquisition Arctic Dairy Products Company processed and delivered milk but was the largest, and probably the most profitable, manufacturer of ice cream in the Detroit Market area. Between the time taxpayer acquired control of Arctic Dairy Products Company in 1929, and consolidated it with the Detroit Creamery (MI), taxpayer acquired a number of non-core dairies and merged the Customer Bases into that of Arctic Dairy Products Company.

According to NYSE Listing Application A–8318, December 6, 1928, taxpayer acquired the stock and assets of Arctic Dairy Products Company, a Michigan corporation, on December 31, 1928, by the exchange of shares of taxpayer's common stock without par value for shares of common stock of $10.00 par value of Arctic Dairy Products Company in the ratio of 2.75 shares of Arctic Dairy Products Company stock for one share of taxpayer's. The total compensation was $8,570,672.

Arctic Dairy Products Company principally produced ice cream though it also sold significant volumes of liquid milk. A few years before its acquisition by taxpayer Arctic Dairy Products Company left the milk business but had started to come back into the market just prior to acquisition. As a result its milk sales volumes over the full three-year period preceding acquisition were skewed. Between 1926 and 1928 Arctic Dairy Products Company's milk sales almost quadrupled. The ice cream sales volumes were relatively unchanged during the same period. For this reason the court averaged the milk sales volume over the three years preceding acquisition but used the ice cream sales volume reported for calendar year 1928 only. The November 22, 1928, Price, Waterhouse and Co. audit of Arctic Dairy Products Company revealed that Arctic Dairy Products Company sold 1,609,536 gallons of ice cream in the first eight months of 1928. It did not identify the volume of milk sold. NYSE Listing Application A–8318 reported that Arctic Dairy Products Company sold 1,683,036 gallons of ice cream in the same period. The court took the average of the two reported sales figures and annualized the sum to determine the reasonable volume of ice cream sold in calendar year 1928 to be 2,469,429 gallons. The court believes this to be appropriate. As discussed in the section entitled *"Customer Base," supra,* Dr. Knutson testified that if individual dairy records showed significant profit or sales fluctuation in the pre-acquisition period he would have used an average of two or even three years of data to fairly value the asset. The concept is sound and if taxpayer found it applicable to fluctuation of profits and sales to suggest an adjusted fair market value of the claimed Customer Base asset the court finds no reason why it should not be equally applicable to volume fluctuation in determining the value of the Source of Supply asset. *See Massey–Ferguson v. United States,* 59 T.C. 220, 1972 WL 2496 (1972), *acq.,* 1973–2 C.B. 2, where the Tax Court, after finding the presumption of correctness of the Commissioner to have been overcome, and upon review of the record in its entirety, found the fair market value of the asset to be different than that

suggested by two expert witnesses. *See also Publix Supermarkets, Inc. v. United States,* 26 Cl.Ct. 161 (1992) (*citing Piggly–Wiggly Southern,* 84 T.C. at 739, 1985 WL 15341, *aff'd* 803 F.2d 1572 (1986)); *cf. Massey–Ferguson, Inc. v. Commissioner,* 59 T.C. 220, 1972 WL 2496 (1972), *acq.,* 1973–2 C.B. 2; *Kraft I.* The NYSE Listing Application reported milk sales in the period 1926–1928 as follows:

Milk, Cream & Buttermilk Sales (Gallons)

| | |
|---|---|
| 1926 | 454,878 |
| 1927 | 905,783 |
| 1928 | 1,960,699 |
| Average | 1,107,120 |

Dr. Knutson's suggested methodology, which the court accepts as a reasonable means of determining the adjusted fair market value in the circumstances reveals the following results: [35]

1. 4,428,480 qts. × 2.15 = 9,521,232 pounds of milk
2. 9,877,716 qts. × 2.15 × 3.43 = 72,843,217 pounds of ice cream
3. Total pounds of product (# 1 + # 2) = 82,364,449
4. Divided by 100 to derive hundredweight (# 3 ÷ 100) = 823,644
5. Source of Supply advantage of two cents (# 4 × .02) = $16,473
6. Capitalized at six percent (# 5 ÷ 6%) = $274,548

Using the volumes determined by the court, Dr. Knutson's methodology, and the two cent price advantage per cwt., the court concludes that the adjusted fair market value of the Arctic Dairy Products Company Source of Supply asset inuring to taxpayer to be $274,548. Dr. Knutson arrived at a fair market value of $240,611 using only the volume sold for 1927. The court believes that its calculations more accurately reflect the volume of liquid milk sold for determining the adjusted fair market value.

*Ebling Creamery Company.* Taxpayer purchased the Ebling Creamery Company on March 31, 1929 through an exchange of stock stipulated to be worth $3,974,112. Dr. Knutson reported that Ebling Creamery Compa-

ny was a mid-sized dairy with unusually high profits because it sold highly sought-after "All Jersey" milk, rich in butterfat and cream. "If you held it up to the light it was yellow in color and very easy to recognize from less rich milk." Ebling Creamery Company produced only milk and was acquired as part of a corporate package with City Dairies, Inc., a non-core dairy, with which it had interlocking stockholders and directors. After acquisition the two dairies were operated as a single unit. The court will not consider the assets of City Dairies, Inc., a non-core dairy, in its calculations because it was acquired for its Customer Base only.

Taxpayer stated in NYSE Listing Application A–8516, March 7, 1929, that it had acquired all 1,500 outstanding capital shares of stock of Ebling Creamery Company, with a par value of $100 each, by an exchange of 16,939 full-paid and non-assessable shares without par value of taxpayer's common stock. Notwithstanding that Ebling Creamery Company was acquired in 1929 Dr. Knutson used the data reported in the NYSE Listing Application for 1927 to value the asset, even though the Listing Application does contain pertinent data for 1926 and for 1927, the calendar years immediately preceding acquisition. The court incorporated the data for all three years in its calculations, and because the volume of sales grew fifty-four percent in that time period, averaged the volumes for the three years. The reported volume sales and average per year were,

Milk and Cream Sales (Gallons)

| | |
|---|---|
| 1926 | 2,457,925 |
| 1927 | 2,734,761 |
| 1928 | 3,743,664 |
| Average | 2,978,783 |

Ebling Creamery Company sold 11,915,133 quarts of milk on the average in each of the three years preceding acquisition by taxpayer. Using the volumes determined by the court from an examination of the record as a whole, the two cent price advantage per cwt.,

---

**35.** The court will address the valuation process including the methodology suggested by Dr. Knutson in its discussion of the Source of Supply intangible asset acquired from the Arctic Dairy Products Company in the Detroit market. The valuation methodology is the same for all dairies and need not be separately expressed for each instance where a refund is allowed.

and Dr. Knutson's suggested methodology, the adjusted fair market value of the Source of Supply asset of Ebling Creamery Company is $85,392.

*Detroit Creamery Company.* Dr. Knutson described Detroit Creamery Company as the "premier acquisition" of taxpayer; "[i]t was a very very large company with a broad product mix, and was very profitable—it appeared to be a very efficient operation." He believed that Borden wanted the Detroit Creamery Company, as well, and that competition to acquire the dairy was keen.

The March 7, 1929 NYSE Listing Application revealed that taxpayer purchased a controlling stock interest in Detroit Creamery Company, a Michigan corporation, in exchange for shares of taxpayer's common stock, without par, for shares of capital stock of $10 par value of Detroit Creamery Company in the ratio of 2½ shares of the dairy for one of taxpayer's shares and the assumption of disclosed liabilities. As of August 1, 1929 taxpayer owned a controlling interest of the stock of the Detroit Creamery Company. It was stipulated that the acquisition price was $30,223,715. Taxpayer completed acquisition of the stock on July 31, 1936.

 Dr. Knutson also testified that the dairy had been "thoroughly" audited by Price, Waterhouse & Company and that "the reported data required very little in terms of judgement to [analyze]." The court does not agree with the latter statement. Dr. Knutson explained in his Expert Report how he valued the Source of Supply asset. He found from the July 12, 1929 audit and NYSE Listing Application A–8857, July 31, 1929 that sales for the year ending December 31, 1928 were $20,351,860. He determined net sales of milk to be $13,397,325 by adding the "Product" figures from the audit and "uniformly" reducing the sum by a "factor of 0.9983347 to reflect net sales as a percent of

total sales. Dr. Knutson did not explain how he derived the "uniform factor," or even what it was. The court also notes that this is the only instance in which taxpayer used a "net sales factor." The audit also contained, as Attachment No. 31, a "Comparative Summary of Sales by Quantities as Taken from [Detroit Creamery Company] Records," except for the Carlisle Branch.[36] The Summary identified the quantities of six types of milk sold per month by gallons, quarts, pints, ten ounces, and half-pints, for 1927, 1928, and the first five months of 1929, but did not indicate the volumes sold at wholesale or retail; nor produced as ice cream. It was at this point in his computations that Dr. Knutson had to rely on several assumptions, and therein lies the problem. Dr. Knutson converted the sales volumes reported in Attachment No. 31 of the audit for calendar year 1928 into quarts and concluded that the Detroit Creamery Company sold 91,762,500 quarts of milk, and 13,741,945 quarts of ice cream, that year.[37] The volume of quarts sold was derived by dividing dollar sales by price per quart. Home delivery milk dollar sales was the price per quart multiplied by the number of quarts sold. To allocate the sales volumes between retail and wholesale Dr. Knutson assumed that fifty-two percent of the milk was retail and forty-eight percent wholesale. Dr. Knutson reported that these two figures were taken from J.T. Horner's report, *The Detroit Milk Market.*[38] The court does not accept Dr. Knutson's interpretation of Horner's conclusions. Dr. Knutson's assumption of the retail to wholesale price ratio stems from a single paragraph in Horner's report entitled "Price Cutting." However, the court believes that what Horner actually said invalidates Dr. Knutson's assumptions. Horner stated that

[t]heoretically, the retail price of milk in the city of Detroit is 14 cents per quart and that to grocers is 12 cents. Actually, however, the price varies not a little de-

36. Nowhere in the record was the court able to find any further reference to the "Carlisle Branch." No witness made mention of it.

37. Based upon his determination that the Detroit Creamery Company "purchased 2,986,293 cwt[.] of milk annually, [Dr. Knutson also suggested that the dairy] yielded a total capitalized Source of Supply value of $995,431, of which $657,631

was attributable to milk and $337,800 to ice cream."

38. J.T. Horner, *The Detroit Milk Market,* Special Bulletin No. 170, Agricultural Experiment Station, Michigan State College of Agriculture and Applied Science, Economics Section (Mar. 1930).

pending upon the conditions which prevail. Much milk is, in fact, sold to the homes of customers at 13 cents per quart and to the retail grocery at less than 12 cents. The per gallon wholesale price on bulk milk to restaurants and hotels is nominally 42 cents. Practically none, however, brings this price since competition has brought the sum down to 36 cents or even less in some instances. Competitive conditions in the wholesale trade to grocers and large users of bulk milk are indeed such that milk is sold at almost any price. That much of the wholesale business is being conducted at a loss would have little significance to the public were it not for the fact that a higher retail price consequently must be charged the householder.[*] The losses of the wholesale business in other words is balanced by the higher retail price of milk to the house to house trade.

Horner stated, in his footnote:

[*] Because of the methods of keeping records and deliveries of wholesale and retail milk by some companies on the same wagons, it is difficult to determine accurately the percentage of wholesale and retail business. However, some figures have been obtained. During the two weeks of March 11 to 24, 1923, sales of dealers handling about 75% of the milk in Detroit was wholesale 48% and retail 52%. In 1915 the percentages were wholesale 40.1 and retail 59.9.

*Id.* at 24.

To find the adjusted fair market value of the Source of Supply advantage the court must know the volumes of milk and ice cream sold in the preceding calendar year(s). In its analyses of the Source of Supply price advantage in other market areas the court has been able to verify Dr. Knutson's data, or itself ascertain those volumes with a reasonably acceptable degree of accuracy. *Cf. Union Pac. v. United States,* 524 F.2d 1343, 1383, 208 Ct.Cl. 1 (1976); *Chesapeake & Ohio Ry. Co. v. Commissioner,* 64 T.C. 552, 1975 WL 3083 (1975) *(followed in Baltimore & Ohio Ry v. United States,* 603 F.2d 165, 221 Ct.Cl. 16 (1979)). Such is not the case here. Horner admits difficulty in determining the accuracy of the average volume ratio be-

tween retail and wholesale milk and provides information for only a two week period in 1923, six years prior to taxpayer's acquisition of the Detroit Creamery Company. The figures provided by Horner might have a place in some analyses for other purposes, but not in a determination of fair market value. As evidence, Horner's data is not relevant, and cannot beget a reasonably related value. The relationship of the proof to any derived value is far too tenuous. *See Commissioner v. Ashland Oil & Ref. Co.,* 99 F.2d 588 (6th Cir.1938), *cert. denied,* 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939). Nor can the court derive a substitute methodology or source of acceptable data. The proof is simply lacking. Likewise, the fourteen cent average per quart retail sales price cited by Dr. Knutson is itself too tenuous to support a methodology purporting to find fair market value. *Kimbell–Diamond Milling Co. v. Commissioner,* 14 T.C. 74, 1950 WL 118 (1950), *aff'd,* 187 F.2d 718 (5th Cir.1951), *cert. denied,* 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1957). Horner reported that the per quart price "varied not a little depending upon the conditions that prevail." Finally, the average wholesale prices in Detroit show a loss. The wholesale loss skewed the average retail price, according to Horner to counter the loss, none of which is reflected in the records of the Detroit Creamery Company, or addressed by taxpayer.

To find the adjusted fair market value of the Source of Supply intangible asset the court must give due regard to all the facts and relevant evidence to arrive at a reasonably related value, *Minnesota Rate Cases,* 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511 (1913), with a degree of objectivity, but not expecting mathematical precision. *Chesapeake & Ohio Ry. v. Commissioner,* 64 T.C. 352, 1975 WL 3144 (1975) *(followed in Baltimore & Ohio Ry. v. United States,* 603 F.2d 165, 221 Ct.Cl. 16 (1979)); *Miami Valley Broadcasting Corp. v. United States,* 499 F.2d 677, 204 Ct.Cl. 582 (1974); *Meredith Broadcasting Co. v. United States,* 405 F.2d 1214, 186 Ct.Cl. 1 (1969). Substance governs the ultimate finding, not form, and the law requires that taxpayer's intent be evident from all the available facts and circum-

stances. *Commissioner v. Ashland Oil & Ref. Co.,* 99 F.2d 588 (6th Cir.1938), *cert. denied,* 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); *American Potash & Chem. Corp. v. United States,* 399 F.2d 194, 185 Ct.Cl. 161 (1968).

The court finds that taxpayer permanently abandoned the Source of Supply intangible asset that it acquired from its acquisition of Arctic Dairy Products Company and the Ebling Creamery Company and that the fair market value of the asset can be proved through judicially accepted methodology. Taxpayer is entitled to a refund of taxes pursuant to I.R.C. § 165 for abandonment of the Source of Supply asset acquired from the two dairies. However, the court concludes from a review of the record in its entirety, that taxpayer did not overcome the presumption of correctness of the determination of the Commissioner that it failed to establish that any abandonment occurred, or if an abandonment occurred, the basis of the asset acquired from the Detroit Creamery Company. Taxpayer is not entitled to a refund pursuant to I.R.C. § 165(a) for the abandonment of the Source of Supply asset acquired from Detroit Creamery Company.

### Kansas City, Missouri

Taxpayer acquired the stock of two large dairies in the Kansas City market; the Franklin Ice Cream Company on December 11, 1925, and Chapman Dairy Company on July 24, 1930. Both became core dairies. Franklin Ice Cream Company was, as its name suggests, a manufacturer of ice cream, and sold no milk. Chapman Dairy Company complemented the acquisition. It sold milk, but not ice cream.

Originally all raw milk was delivered to a Butler, Mississippi milk plant and from there transported downtown to the Chapman Dairy Company for processing. Raw milk for ice cream was delivered to a Tonganoxie, Kansas plant where it was processed and then transported downtown to the Franklin Ice Cream Company where the ice cream was produced. On December 11, 1951 Franklin Ice Cream Company (DE) sold its Tonganoxie ice cream manufacturing plant to a company not owned by taxpayer. In either 1944 or 1945 taxpayer built a new milk processing plant on prop-

erty adjoining Franklin Ice Cream Corporation's facility. In 1966 taxpayer constructed a second new milk processing plant in Kansas City, and a new ice cream storage facility on the same grounds from which it stored and distributed ice cream not produced by taxpayer. On December 31, 1956 Franklin Dairy Company (DE) and Chapman Dairy Company (DE) were merged with taxpayer and all assets were transferred to the Sealtest Central Division–Kansas City.

Mr. Clifford Cantrell, a long time employee of taxpayer testified that ice cream production by taxpayer ceased in Kansas City in 1960. Mr. Cantrell also confirmed that taxpayer sold its home service retail routes effective March 1, 1968, and its milk processing plant in 1970 to Fairmont Foods of Kansas City, Missouri. A Processing Agreement was executed with Fairmont Foods September 10, 1970 whereby Fairmont Foods processed milk for wholesale delivery by taxpayer. The Processing Agreement, and a proposed Franchise Agreement, were explained in a memorandum of October 18, 1972 from Mr. Messerschmidt to Mr. Crocker. It stated in part:

> We are hereby requesting approval to consummate a franchise agreement with Fairmont Foods for the Kansas City milk market. As you know, Fairmont Foods is currently processing milk products for us [since 1970] for our distribution in the Kansas City milk market.

The Processing Agreement was terminated effective November 12, 1972, in favor of the Franchise Agreement, and in a "NOTICE TO ALL SEALTEST MILK DISTRIBUTORS," dated November 9, 1972:

> Sealtest announces a new system of dairy products distribution in the Mid–West which will enable us to supply your needs of Sealtest products more effectively.

> On November 13, 1972, Fairmont Foods will assume the distribution and billing responsibilities for Sealtest dairy products. There will be no change of drivers or time of delivery. . . .

A few weeks later, on November 27, 1972, Mr. Messerschmidt formally recommended

"Liquidation of the Kansas City Ice Cream Market".

Mr. Cantrell verified that taxpayer terminated the wholesale milk Processing Agreement with Fairmont Foods in 1972 and that taxpayer and Fairmont Foods then entered into the short-lived royalty agreement whereby Fairmont Foods agreed to bottle and deliver Sealtest milk and ice cream to taxpayer's former wholesale customers, and collect accounts receivable.

■■■ Based on the foregoing analysis the court finds that taxpayer ceased producing ice cream in 1960 and sold its milk processing plant in 1970, to Fairmont Foods, but continued, until 1972, to distribute wholesale milk and ice cream in the Kansas City market that was processed in another market area. The court has found that taxpayer's Source of Supply is inextricably intertwined with the processing of milk and production of ice cream. When processing and production ceases there is no reason to continue to purchase raw milk, and the Source of Supply intangible asset is lost. When taxpayer ceased producing ice cream in 1960 the Source of Supply asset diminished in value but taxpayer did not become entitled to an abandonment loss for discontinuing use of a portion of the asset. Diminishment in value of an intangible asset is not the same as abandonment. So long as the asset reasonably had even "potential value it cannot be said that the taxpayer's investment therein has been lost." *E.B. Elliott Co. v. Commissioner*, 2 T.C.M. (CCH) 444 (1943) (*citing Edward C. Lawson v. Commissioner*, 42 B.T.A. 1103, 1940 WL 144 (1940)). *See also Golden State Towel & Linen Serv., Ltd. v. United States*, 373 F.2d 938, 179 Ct.Cl. 300 (1967). Whether a property is abandoned is a question of fact to be determined from a review of the record to find taxpayer's intent. Substance governs the finding, not form. *Commissioner v. Ashland Oil & Refining Co.*, 99 F.2d 588 (6th Cir.1938), *cert. denied*, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); *American Potash & Chemical Corp. v. United States*, 399 F.2d 194, 185 Ct.Cl. 161 (1968); *Kimbell–Diamond Milling Co. v.*

*Commissioner*, 14 T.C. 74, 1950 WL 118 (1950), *aff'd*, 187 F.2d 718 (5th Cir.1951), *cert. denied*, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1957). In this instance taxpayer completed the sale of the advantageous source of milk supply asset that it acquired from the Chapman Dairy Company to Fairmont Foods when it sold the milk processing plant in 1970, a non-suit year.

Because taxpayer sold the Source of Supply intangible asset in Kansas City, in a non-suit year, it is not entitled to a refund of taxes for an abandonment loss pursuant to I.R.C. § 165(a). *Cf. S.S. White Dental Mfg. Co. v. United States*, 55 F.Supp. 117, 102 Ct.Cl. 115 (1944); Treas.Reg. §§ 1.167(a)–1.168(a)(4). Taxpayer did not overcome the presumption of correctness of the determination of the Commissioner that it failed to establish that any abandonment occurred, or if an abandonment occurred, the basis of the asset. Taxpayer is not entitled to a refund pursuant to I.R.C. § 165(a).

### Northeast Ohio

■■■ The Northeastern Ohio market, like the Detroit market, was complex. It was treated as one market even though it included four cities and their environs, without an overlap in service. Dr. Knutson stated that he treated it as one market because the federal milk order system so treated it, and a source of information used by Dr. Knutson analyzed it as a single market.[39] Cleveland was unique in that it had a pre-existing sanitary regulation that prohibited the transportation of milk for over two hours. The effect of the regulation insulated Cleveland from Youngstown and Canton because they were more than two hours distant by transportation available at the time of acquisition and for some years thereafter. Taxpayer acquired four core dairies in northeastern Ohio between 1928 and 1930; Telling–Belle Vernon Company in Cleveland, Sanitary Milk Company in Canton, Youngstown Sanitary Milk Company in Youngstown, and Akron Pure Milk Company in Akron. Following a series of mergers, acquisitions, consolidations, and liquidations between the 1930's and 1950's all of the business and assets of

**39.** C.G. McBride, *Development of Market Milk Areas in Northeastern Ohio*, Ohio Agricultural Experiment Station, Wooster, Bulletin 469 (Nov. 1930).

the four Northeastern Ohio dairies were acquired by taxpayer's Telling–Belle Vernon Company (DE), that was dissolved June 30, 1957, and its assets transferred to taxpayer.

*Abandonment*

Originally each plant had its own milk procurement, production, and distribution functions but three of the plants were closed in 1960 and all assets, including the Source of Supply intangible asset, were transferred to the central Cleveland Carnegie Avenue plant. Home delivery ceased in 1975. In 1976 all milk and ice cream production permanently ceased at the Carnegie Avenue plant and the plant was closed. Because raw milk procurement in the Northeastern Ohio market area ceased in 1976 the court finds that taxpayer permanently abandoned the Source of Supply intangible asset in that year. No attempts were made in the Northeastern Ohio market area to find a buyer for any of the businesses or assets prior to taxpayer's abandonment of the market area. The court finds that taxpayer identified and permanently abandoned the Source of Supply intangible asset that it acquired from its acquisition of the core dairies in the Northeastern Ohio market area and that the fair market value of the asset can be proved through judicially accepted methodology.

*Valuation Variable*

■ Dr. Knutson reported that McBride provided "useful insights" into the market, especially its "supply and cooperative dimensions" with which the court is interested. McBride reported that in the late 1920's the population of northeastern Ohio was rapidly expanding and dairies had to struggle to maintain an adequate source of supply. County-wide cooperatives existed but there was no state-wide cooperative. As a result, county cooperatives were in sharp competition with each other on a local basis and large dairies encouraged the competition by purchasing raw milk across county lines and by offering very good prices to nonmembers. Dr. Knutson reported that "Ohio cooperatives did not become well organized until the early 1970's" and, accordingly, suggested a five cent per cwt. advantage to the Source of Supply asset in the northeastern Ohio milk

market. The court finds the five cent price advantage, in the circumstances, reasonable. The parties stipulated to the necessary facts to permit the court to determine the adjusted fair market value of the Source of Supply intangible asset.

*Valuation*

*The Telling–Belle Vernon Company.* This dairy, located in Cleveland, was the largest milk and ice cream processor in the entire Northeastern Ohio Market area and the largest dairy in the state. The April 26, 1928 Agreement of Sale, taxpayer's contemporaneous Accounting Acquisition Cards, and NYSE Listing Application A–8042, June 8, 1929 revealed that taxpayer acquired the stock of the Telling–Belle Vernon Company by an exchange of stock in the ratio of seventy-eight shares of common stock without par value of Telling–Belle Vernon Company for fifty shares of common stock of taxpayer. As discussed above, taxpayer intended to, and did acquire control of the business and assets of the Telling–Belle Vernon Company (OH) following its acquisition on June 30, 1928 through its representatives on the board of directors. The total consideration for purchase of the Telling–Belle Vernon Company (OH) was $11,691,694.

On December 31, 1949 the Telling–Belle Vernon Company (OH) changed its name to the Belle Vernon Company (OH). The Belle Vernon Company (OH) then conveyed all of the property and assets of its ice cream business to the Telling Ice Cream Company (OH), the new name of a non-core dairy acquired by taxpayer on March 31, 1949. Telling Ice Cream Company (OH) subsequently reincorporated in Delaware and changed its name, on September 21, 1955 to the Telling–Belle Vernon Company (DE). Taxpayer then transferred, except for automotive equipment, the business and assets of the Akron Pure Milk Company (DE), the new Sanitary Milk Company (OH), Youngstown Sanitary Milk Company (DE), and the remaining assets of the Belle Vernon Company (OH) to the Telling–Belle Vernon Company (DE). On October 31, 1955 the shares of Telling–Belle Vernon Company (DE) were transferred to taxpayer in partial liquidation

of the Belle Vernon Company (OH). The new Sanitary Milk Company (OH) and Youngstown Sanitary Milk Company were merged into the Telling–Belle Vernon Company (DE) on March 31, 1956. Pursuant to a plan of liquidation the Telling–Belle Vernon Company (DE) distributed all of its business and assets, except automotive equipment, to taxpayer between December 31, 1956 and June 30, 1957.

It was stipulated that in 1927 Telling–Belle Vernon Company sold 10,788,752 quarts of ice cream and 39,290,516 quarts of milk and cream.[40] Using the stipulated volumes, a five cent per cwt. advantage, and Dr. Knutson's suggested methodology the court finds the adjusted fair market value of the Source of Supply asset acquired from Telling–Belle Vernon Company to be $1,366,969.

*The Sanitary Milk Company.* Dr. Knutson described the Sanitary Milk Company as a highly profitable milk and ice cream processor serving the Canton, Ohio area. It was acquired by taxpayer on December 31, 1928 at a stipulated purchase price of $1,902,785. NYSE Listing Application A–8419, January 4, 1929 revealed that taxpayer acquired all of the property, assets, and liabilities of the dairy for $400,000 of taxpayer's 5¼ percent gold debentures due in 1948, and certificates for 10,600 full-paid and non-assessable shares without par value.

On February 4, 1929 the Sanitary Milk Company (OH) changed its name to the Schuback Milk Company (OH). On the same day taxpayer incorporated a new wholly-owned corporation also called the Sanitary Milk Company (OH) and transferred the business and assets of Schuback Milk Company (OH) to the new Sanitary Milk Company (OH).

In 1927 the original Sanitary Milk Company (OH) sold 6,486,660 quarts of milk and 1,071,672 quarts of ice cream. The volumes reported for 1928, through August 31, were annualized: 6,628,524 quarts of milk were sold, and 1,150,632 quarts of ice cream. The stipulated annualized average number of quarts of milk and ice cream sold, respective-ly, in 1927 and 1928 was 6,557,592, and 1,111,-152.

Using the stipulated volumes, the five cent Source of Supply advantage, and Dr. Knutson's suggested methodology, the court finds the adjusted fair market value of the Source of Supply acquired from original The Sanitary Milk Company (OH) to be $185,775.

*The Youngstown Sanitary Milk Company.* W.R. Ruhlman & Son, a partnership, and Ohio Pure Milk Company (OH) were subsidiaries of Youngstown Sanitary Milk Company (OH) that had been purchased by Youngstown Sanitary Milk Company (OH) shortly before its acquisition by taxpayer. For unexplained reasons the three dairies, which constituted one core dairy to taxpayer, were acquired as three separate entities. W.R. Ruhlman and Son and Ohio Pure Milk Company processed only milk whereas Youngstown Sanitary Milk Company processed milk and produced ice cream.

The April 13, 1929 Agreement to Sell and NYSE Listing Application A–8787, June 27, 1929 described the three dairies and the terms of acquisition. Briefly, W.R. Ruhlman & Son distributed milk and cream in the Youngstown market. On July 23, 1928 W.R. Ruhlman and Company (OH) was incorporated as the successor in business of W.R. Ruhlman & Son. On August 1, 1928, the partnership was succeeded by the corporation. On the same day the entire outstanding capital stock of W.R. Ruhlman & Co., Inc. was acquired by the Youngstown Sanitary Milk Company (OH). Youngstown Sanitary Milk Company (OH) then acquired the entire outstanding capital stock of the Ohio Pure Milk Company (OH). Taxpayer acquired the "entire property and assets" of Youngstown Sanitary Milk Company (OH) and its subsidiaries, W.R. Ruhlman and Company (OH), and Ohio Pure Milk Company (OH) in return for assumption of the disclosed liabilities of the three dairies, issuance of certificates for 8,616 full-paid and nonassessable shares without par value of taxpayer's common stock. The stipulated value of the purchase price was $702,732.

---

**40.** In his Expert's Report Dr. Knutson claimed that the dairy sold 42,259,432 quarts of milk in

**1927.** The court will use the stipulated volume in its calculations.

On September 26, 1929 taxpayer formed a wholly owned corporation known as Youngstown Sanitary Milk Company (DE). Youngstown Sanitary Milk Company (OH) changed its name to Youngstown Dairy Products, Inc. (OH) on October 8, 1929 and W.R. Ruhlman and Company (OH) changed its name to Evergreen Dairy Products (OH) on October 9, 1929. Taxpayer conveyed the property and assets of Youngstown Dairy Products, Inc. (OH) and Evergreen Dairy Products (OH) to Youngstown Sanitary Milk Company (DE) on October 9, 1929. Taxpayer created another Delaware corporation, Ohio Pure Milk Company (DE) on October 3, 1929. Ohio Pure Milk Co. (OH) changed its name to Mahoning Valley Dairy Products (OH) on October 8, 1929 and taxpayer conveyed the business and assets of Mahoning Valley Dairy Products (OH) to Ohio Pure Milk Company (DE) on October 9, 1929. On January 16, 1930 Youngstown Sanitary Milk Company (DE) acquired the business and assets of Ohio Pure Milk Company (DE) and on October 17, 1936 Ohio Pure Milk Company (DE) dissolved.

The May 21, 1929 Price, Waterhouse & Co. audit, and the NYSE Listing Application identified the volume of milk and ice cream sold in 1927 and 1928 for Youngstown Sanitary Milk Company, the volume of milk sold by Ohio Pure Milk Company (OH) for the same two year period, and the volume of milk sold by the W.R. Ruhlman and Son partnership for the last five months of calendar year 1928. The parties stipulated that Youngstown Sanitary Milk Company, and subsidiaries, sold 6,698,968 quarts of milk and 552,724 quarts of ice cream in 1927. In 1928 the dairies sold 7,291,740 quarts of milk and 587,888 quarts of ice cream. W.R. Ruhlman and Son's 1928 volume was determined by annualizing its reported volume sales for the first five months of the year. Youngstown Sanitary Milk Company's average annual milk volume sales for 1927 and 1928 was 6,504,542 quarts. An average of 570,306 quarts of ice cream was sold during the same period.

Applying the stipulated volumes and the five cent per cwt. advantage to Dr. Knutson's suggested methodology the court finds the adjusted fair market value of the Source of Supply price advantage to taxpayer to be $151,588.

*The Akron Pure Milk Company.* At the time of its acquisition on December 31, 1928, Dr. Knutson reported that The Akron Pure Milk Company was probably the largest milk processor in the City. It did not sell ice cream. NYSE Listing Application A–8419, January 4, 1929 (the same application as for the Sanitary Milk Company, Canton) provided the information that taxpayer acquired "the entire properties and assets" of the dairy in exchange for assumption of its disclosed liabilities, $700,000 from taxpayer's 5¼ percent gold bond due in 1948, and certificates for 22,000 full-paid nonassessable common stock shares without par value. The stipulated purchase price was $3,974,132.

The NYSE Listing Application revealed that Akron Pure Milk Company sold 7,335,708 gallons of milk, cream, and buttermilk in 1927 and 6,848,754 gallons in the first ten months of 1928, and the parties so stipulated. In converting the gallons to quarts the ten month volume was annualized to indicate calendar year 1928 volume sales of 32,874,019 quarts. In 1927 the dairy sold 29,342,832 quarts. The average volume sales for 1927 and 1928 was 31,108,426 quarts of milk.

Using the stipulated volume, the five cent price advantage, and Dr. Knutson's methodology, the court finds the adjusted fair market value of the Source of Supply asset acquired from the Akron Pure Milk Company to be $557,359.

The methodology used to determine the adjusted fair market values judicially acceptable, gave due regard to the evidence of record, and resulted in a reasonably related value. The price advantage per cwt. was reasonable and the adjusted fair market value found is less than the residual amount stipulated in *Kraft I*. Taxpayer overcame the presumption of correctness of the Commissioner and is therefore entitled to a refund of taxes for abandonment of the Source of Supply asset pursuant to I.R.C. § 165.

### Toledo

■ On June 3, 1929 taxpayer acquired two core dairies in the Toledo market area: Ohio Clover Leaf Dairy and Ohio–Toledo Ice

Cream Company. On June 3, 1929 taxpayer conveyed to its Ohio–Toledo Ice Cream Company (DE) the property and assets it acquired from Ohio–Toledo Ice Cream Company (OH). In 1955 taxpayer merged its Ohio–Toledo Ice Cream Company (DE) into its Ohio Clover Leaf Dairy Company (DE). On December 20, 1955 taxpayer changed the corporate name of Ohio Clover Leaf Dairy Company (DE) to Detroit Creamery Company (DE). Shortly thereafter, on December 31, 1955 the assets of Detroit Creamery Company (MI) and Ebling Creamery Company (MI) were merged by taxpayer into the Detroit Creamery Company (DE). [See above, in the court's the discussion of the "Detroit" market]. On July 31, 1956 Detroit creamery Company (DE) was merged into taxpayer and the assets transferred to taxpayer's Detroit Creamery Division.

### Abandonment

Taxpayer ceased home delivery of milk, and delivery of ice cream, in the Toledo market in early 1973, and its wholesale delivery of milk in 1976. There is no evidence in the record of the closing of any plant in Toledo, or the cessation of raw milk acquisition. Mr. Donald Crocker, Vice–President and Comptroller of taxpayer's Sealtest Division from 1965 until his retirement in 1979 testified that at the end of 1972 there was a "branch" in Toledo that "sold milk and ice cream and ice cream was delivered." A short time later counsel for taxpayer inquired:

Q. When you say a branch, what do you mean?

A. A free standing building of storage for milk and ice ream.

Q. No processing or manufacturing of ice cream?

A. No, there was no processing of any kind of ice cream at that time [1972].

Q. Or milk?

A. Or milk.

Q. Where did the milk and ice cream come from?

A. Detroit.

Q. Was Toledo a part of the Detroit operation by that time?

A. Yes. [In] '72 it came from Lansing for here. The bread and egg Company of Detroit.

It is clear that by 1972 there was no processing of milk or production of ice cream in the Toledo market area and the Toledo core dairies were operating under the name Detroit Creamery Company (DE). From the court's discussion of the Detroit market, *supra*, it is known that milk and ice cream for that company came from Lansing after 1972, just as it apparently did in Toledo. But, unlike the Detroit market area, the court cannot discern when the acquisition of raw milk and milk processing and ice cream production ceased in the Toledo market, though it would appear that it did so prior to 1972, in a non-suit year. There was no evidence that the Source of Supply asset was transferred to Lansing when Lansing began supplying milk and ice cream for Toledo, or that the Lansing plant purchased raw milk in the Toledo market area. All that is known is that taxpayer continued to deliver ice cream and milk from Lansing to its Toledo retail customers until early 1973, and wholesale milk until early 1976. There was no proof of when the processing of milk and production of ice cream ceased, and the Source of Supply advantage abandoned, if it ever was abandoned. Taxpayer did not overcome the presumption of correctness of the determination of the Commissioner that it failed to establish that any abandonment occurred, or if an abandonment occurred, the basis of the asset. Taxpayer is not entitled to a refund pursuant to I.R.C. § 165(a).

### Omaha

*Harding Cream Company.* Taxpayer acquired one core dairy in the Omaha market, the Harding Cream Company, a producer of ice cream only with a distribution system extending throughout much of Nebraska. At the date of acquisition Harding Cream Company (NE) produced ice cream at its plant on Harney Street.

By agreement between the stockholders of Harding Cream Company (NE) and taxpayer the stockholders organized a Delaware corporation, the Harding Cream Corporation (DE) and exchanged the common stock of Harding Cream Company (NE) for that of

and Harding Cream Corporation (DE). A majority of the shares of Harding Cream Corporation (DE) were then transferred to taxpayer on March 31, 1926. The parties stipulated that the date of acquisition of Harding Cream Company (NE) by taxpayer was March 21, 1926. In consideration for the outstanding common stock of Harding Cream Company (NE) taxpayer transferred 21,180 shares of its common stock with an aggregate current market value of $1,442,848, and paid $526,751 for Harding Cream Company (NE)'s First Preferred Stock, and assumed its disclosed liabilities. Taxpayer acquired the assets of Harding Cream Corporation (DE) in August 1930 but it is clear from the complete record that taxpayer exercised direct control over the business and assets of Harding Cream Company (NE) from the date of the first acquisition of stock. As of March 21, 1929 taxpayer controlled the business of Harding Cream Corporation (DE) through its control of the board of directors. The total consideration paid was $2,068,684.

By December 1928, taxpayer and Harding Cream Corporation (DE) owned all of the outstanding stock of Harding Cream Company (NE). Taxpayer acquired the property and assets of Harding Cream Company (DE) on August 29, 1930 by assuming all of the outstanding liabilities of Harding Cream Company (DE) and surrendering for cancellation and retirement all of the authorized and issued Second Preferred Stock and common stock of Harding Cream Company (DE). On October 14, 1930 Harding Cream Company (DE) was dissolved. On March 4, 1937, taxpayer incorporated the Harding Company (MD), under the laws of the state of Maryland to take over the ice cream business and related property and assets of Harding Cream Company (NE). In consideration for the transfer the stock of the Harding Cream Company (MD) was issued to taxpayer. On June 30, 1937, Harding Cream Company (NE) was dissolved. On December 31, 1956 Harding Cream Company (MD) merged with taxpayer. The tangible and intangible assets received by taxpayer were transferred to the Sealtest Central Division–Omaha.

*Abandonment*

Taxpayer opened a new ice cream plant in Omaha in 1950 and simultaneously closed the original Harney Avenue plant. Ice cream was produced at the new plant until December 15, 1972, when it was closed, and taxpayer permanently abandoned the Omaha ice cream market. When the ice cream plant closed, the acquisition of raw milk ceased, and the Source of Supply intangible asset was abandoned. Taxpayer entered into an agreement with Fairmont Foods to collect Sealtest accounts receivable but made no attempt to transfer its Omaha ice cream business to Fairmont Foods.

The court finds that taxpayer identified and permanently abandoned the Source of Supply intangible asset that it acquired from its acquisition of the Harding Cream Company and that the fair market value of the asset was proved through judicially accepted methodology. Taxpayer is therefore entitled to a refund of taxes pursuant to I.R.C. § 165(a).

*Valuation Variable*

Dr. Knutson reported that at the time producers in the Omaha market, "as in most markets west of the Mississippi, had not yet formed the strong cooperatives which characterized market areas such as Detroit." Dr. Knutson found no studies of the Omaha ice cream market but urged that a good alternate source was a 1923 Kansas State University study of several milk markets in Kansas.[41] Dr. Knutson stated that "[t]he Omaha market can be assumed to be comparable to the six Kansas markets...." He reported that at the time of the acquisition producers in the Omaha market had not formed a strong cooperative and that with little producer organization producers had no effective representation in the marketplace. This, Dr. Knutson concluded, gave processors a substantial advantage in purchasing milk. Harding Cream Company (NE) was a major purchaser of sweet cream for its butter and ice cream businesses. Its relative size and strong market position enabled Harding Cream Company (NE) to use the best

---

41. F.L. Thomsen, *Milk Marketing in Six Cities of Kansas,* Kansas Agricultural Experiment Station Bulletin 230 (Nov. 1923).

quality cream for ice cream and the lesser quality cream for butter. Based on his studies and analyses Dr. Knutson recommended that the Source of Supply advantage should be seven and one-half cents per cwt. In the circumstances the court finds the valuation variable reasonable.

*Valuation*

The parties stipulated that Harding Cream Company sold 413,264 gallons of ice cream in calendar year 1925, the year preceding the year of acquisition. Using the stipulated volume, the seven and one-half cent advantage per cwt., and Dr. Knutson's suggested methodology, the court finds that the adjusted fair market value of the Source of Supply asset is $152,381.

### Louisville

Taxpayer acquired two core dairies in the Louisville market. D.H. Ewing's Sons, Inc. became the core dairy for milk and National Ice Cream Company the ice cream core dairy. The parties stipulated to some facts but not enough to permit the court to make the necessary findings without a review of the record in its entirety.

*D.H. Ewing's Sons, Inc.* The parties stipulated that taxpayer acquired the entire property and assets of D.H. Ewing's Sons, Inc., a Kentucky corporation, on December 31, 1929 in exchange for the assumption of disclosed liabilities, $413,606 in cash, and 17,330 shares of taxpayer's common stock with a current market value of $856,752 for a total consideration of $1,423,757.

On March 11, 1930 taxpayer organized a new Delaware corporation called the D.H. Ewing's Sons, Inc. (DE). Taxpayer then changed D.H. Ewing's Sons, Inc. (KY) to David Henry, Inc. (KY) on March 14, 1930 and several days later transferred the property and assets of David Henry, Inc. (KY) to D.H. Ewing's Sons, Inc. (DE). On March 27, 1930 taxpayer organized the Gray–Von Allmen Sanitary Milk Company (DE). Taxpayer then acquired the property and assets of Gray–Von Allmen Sanitary Milk Company (KY) on May 1, 1930. On April 29, 1930 Gray–Von Allmen Sanitary Milk Company (KY) changed its name to the John Boss Company (KY) and taxpayer conveyed the business and assets of the John Boss Company (KY) to Gray–Von Allmen Sanitary Milk Company (DE) on May 1, 1930. On January 16, 1931 D.H. Ewing's Sons, Inc. (DE) merged itself into Gray–Von Allmen Sanitary Milk Company (DE) and the new company, Ewing–Von Allmen Dairy Company (DE), received all of the property and assets of D.H. Ewing's Sons, Inc. (DE).

*National Ice Cream Company.* The parties stipulated that taxpayer acquired the entire issued and outstanding capital stock of National Ice Cream Company on September 1, 1929 in exchange for 6,500 shares of taxpayer's capital stock to the stockholders of National Ice Cream Company. The total consideration was $498,875.

On December 31, 1935, pursuant to an agreement between taxpayer, Ewing–Von Allmen Dairy Company (DE), and National Ice Cream Company (KY), taxpayer transferred the property and assets of National Ice Cream Company (KY) to Ewing–Von Allmen Dairy Company (DE), in return for which Ewing–Von Allmen Dairy Company (KY) issued 1,000 shares of its capital stock to taxpayer and taxpayer surrendered for cancellation 1,000 shares of National Ice Cream Company (KY) stock it acquired in 1929. Ewing–Von Allmen Dairy Company (DE) merged into taxpayer on December 31, 1956. Following the merger the property and assets were transferred to the Sealtest Central Division–Louisville of National Dairy Products Corporation.

*Abandonment*

At some undisclosed time taxpayer entered into a processing agreement with Oscar Ewing, Inc. (not owned by taxpayer) under which taxpayer processed 12.5 million points of milk annually for distribution in the Louisville market by Oscar Ewing, Inc. In an interoffice memorandum, dated November 13, 1972, Mr. Messerschmidt recommended to Mr. Crocker that taxpayer sell its retail home delivery business to Oscar Ewing, Inc. One factor in the recommended sale would be that "Home Service volume would [continue to] be custom bottled in the Sealtest plant for distribution and sale by Oscar Ewing[, Inc.]." It is clear from the record that tax-

payer's home delivery business was not sold to Oscar Ewing, Inc., but it is equally not clear when, or if, taxpayer ceased processing milk for Oscar Ewing, Inc. Mr. Messerschmidt and others testified that taxpayer had no home service business in Louisville at the end of 1972 but there is no evidence in the record that the Louisville wholesale milk and ice cream business was abandoned, or that the plants were closed. In taxpayer's Requested Findings of Fact for Louisville it asked only that the court find that it abandoned the home delivery milk business and related Distribution System and Customer Base intangible assets. In the absence of proof of when, or if, taxpayer ceased processing milk and producing ice cream in the Louisville market the court cannot find that taxpayer abandoned the Source of Supply intangible asset, or if it did in the proper tax year. Taxpayer's "Ultimate Requested Finding of Fact: Louisville", No. 75, stated, "[i]n 1972 plaintiff abandoned intangible assets associated with its Louisville home delivery milk business having a tax base of $907,653." The latter figure is the amount taxpayer specifically claimed for abandonment of its Distribution System and Customer Base intangible assets. There was no evidence or requested finding that taxpayer abandoned its Source of Supply advantage.

Accordingly, the court finds that taxpayer failed to overcome the presumption of correctness of the determination of the Commissioner of Internal Revenue that it did not abandon the Source of Supply intangible asset, or if it was abandoned, that taxpayer did not established the basis of the asset. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Commissioner v. Riss,* 374 F.2d 161, 166 (8th Cir.1967); *Young & Rubicam, Inc. v. United States,* 410 F.2d 1233, 1244, 187 Ct.Cl. 635 (1969). In the absence of evidence of when the purchase of raw milk ceased in the Louisville market area, the court cannot find that the Source of Supply asset was abandoned. It obviously continued in use by taxpayer until some unknown time. In the absence of such proof, or the adjusted fair market value of the asset, taxpayer is not entitled to a refund pursuant to I.R.C. § 165(a).

### Hartford

Taxpayer acquired two core dairies in the Hartford, Connecticut milk market: the Bryant and Chapman Company, in 1929, and R.G. Miller & Sons, Inc., in 1930. The parties stipulated to sufficient facts to permit the court to analyze the acquisitions of both core dairies in the Hartford market.

*The Bryant & Chapman Company.* Taxpayer acquired the entire property and assets of Bryant & Chapman Company, a Connecticut corporation, on August 25, 1929, in consideration for which taxpayer assumed the disclosed liabilities and issued 20,000 shares of its own common stock with a current market value of $1,686,250. The total consideration was stipulated to be $1,868,636. The dairy processed milk at its Woodland Street plant, but did not manufacture ice cream.

Taxpayer had acquired the entire outstanding stock of a Schenectady, New York company, General Ice Cream Corporation (NY), on December 31, 1928. General Ice Cream Corporation (GICC) became an operating subsidiary and core dairy of taxpayer's. On August 20, 1929 taxpayer organized a wholly-owned corporation in Delaware called Bryant & Chapman Company (DE). The Bryant & Chapman Company (CT) changed its name to the Bigelow & Derway Company (CT) on August 27, 1929. The business and assets of the Bigelow & Derway Company (CT) were purchased from taxpayer by Bryant & Chapman Company (DE) on August 28, 1929. GICC acquired the business and assets of Bryant & Chapman Company (DE) from taxpayer on December 10, 1929. The Bryant & Chapman Company (DE) reacquired the property and assets used in connection with the Hartford dairy business from GICC on the same day they were sold, December 10, 1929. Subsequently, The Bryant & Chapman Company (DE) merged with GICC effective April 28, 1943. GICC merged with taxpayer in 1972.

*R.G. Miller & Sons, Inc.* Pursuant to an agreement with taxpayer the stockholders of R.G. Miller & Sons, Inc., a Connecticut corporation, changed its name to the Earl Street Corporation on October 27, 1930. Five days later, on November 1, 1930, taxpayer ac-

quired the entire property and assets of the Earl Street Corporation in consideration for assuming its disclosed liabilities; $151,000 aggregate principal amount of taxpayer's 5¼ percent gold debentures; 7,220 share of common stock then worth $310,460; and $52.00 cash. The total consideration was $612,250. Prior to its change of name and acquisition by taxpayer R.G. Miller & Sons, Inc. sold milk, specialty items, and cream, but not ice cream from its plant on Earl Street in Hartford.

On November 5, 1930, after acquisition, taxpayer formed a wholly-owned Connecticut corporation called R.G. Miller & Sons, Inc. (New). On November 6, 1930 GICC acquired the property and assets of the Earl Street Corporation. R.G. Miller & Sons, Inc. (New) purchased all of the property and assets used in connection with the Hartford dairy business from GICC on March 1, 1932. As of April 4, 1932 GICC held the entire issued and outstanding stock of R.G. Miller & Sons, Inc. (New). On April 1, 1943 all of the assets of R.G. Miller & Sons, Inc. (New) were transferred to GICC, and the dairy dissolved April 29, 1943. From 1957 until 1972, when GICC was merged into taxpayer, the Northeastern Division of Sealtest Food continued the Hartford retail and wholesale milk businesses formerly handled by Bryant & Chapman Company (DE) and R.G. Miller & Sons, Inc. (New) and their successor companies.

### Abandonment

In 1972 taxpayer ceased home delivery of milk and gave its Hartford home delivery business to a competitor dairy for no consideration. There is, however, no evidence in the record that taxpayer ever ceased purchasing raw milk using the advantage of the Source of Supply asset, processing milk for wholesale distribution, or closed either of the milk processing plants. In its Complaint, App. V., taxpayer claimed that it abandoned only its retail milk business in 1972. Taxpayer did not overcome the presumption of correctness of the determination of the Commissioner that it failed to establish that any abandonment occurred, or if an abandonment occurred, the basis of the asset. Without evidence of when the purchase of raw milk

ceased in the Hartford market area, the court cannot find that the Source of Supply asset was abandoned. In the absence of such proof, or of the basis of the asset, taxpayer is not entitled to a refund pursuant to I.R.C. § 165(a).

### Philadelphia

Dr. Knutson set the stage for his analysis of the Philadelphia milk market by informing the court that taxpayer acquired two major dairies in Philadelphia. Each had a primary product line and was dominant in the market. The Breyer Corporation was, and is still well-known for its ice cream. The Breyer Corporation also had a home delivery and wholesale milk business with a significant customer base. The Supplee–Wills Jones Milk Company was a dominant player in the Philadelphia milk market, with an ice cream business. Each complemented the other. According to Dr. Knutson, Supplee–Wills Jones Milk Company made good use of the Breyer Corporation's milk customers and Breyer benefited from Supplee–Wills Jones Milk Company's ice cream consumers. For this reason Dr. Knutson concluded that the Breyer Corporation was a core dairy for ice cream, but not milk. Conversely, Supplee–Wills Jones Milk Company was a core dairy for milk, but not ice cream. The parties did not stipulate to any facts about the Philadelphia market area.

*Supplee–Wills Jones Milk Company.* Dr. Knutson believed that the Supplee–Wills Jones Milk Company was the largest milk processor in Philadelphia and at the time of its acquisition by taxpayer in 1925 operated seven milk processing plants in the market area. It served approximately 800 wholesale dealers and 260,000 retail customers in Philadelphia, surrounding towns, and eastern New Jersey as far south as Ocean City. Taxpayer's Accounting Acquisition Cards indicated that the entire issued and outstanding preferred and common stocks of Supplee were acquired by taxpayer on May 31, 1925 on the basis of one share of taxpayer's preferred stock for each preferred share acquired and 2 and 67/100 shares of taxpayer's common stock for each common share of Supplee's acquired. The specifics of the acquisition are given in NYSE Listing Application A–6883,

November 6, 1925 and indicate that taxpayer issued 196,520 shares of stock upon acquisition of the entire issued and outstanding common stock of Supplee–Wills Jones Milk Company amounting to 67,985 shares of no par value. The total purchase price was $23,088,592.

*Breyer Ice Cream Company.* On June 1, 1926, taxpayer acquired the property and assets of Breyer Ice Cream Company, a Pennsylvania corporation, the Breyer Ice Cream Company, Inc., a New York corporation and the Breyer Corporation (DE), the holding company of the Pennsylvania and New York corporations. Taxpayer incorporated a new Breyer Ice Cream Corporation, Inc. in New York on June 10, 1926, and dissolved the Breyer Corporation (DE) and the Breyer Ice Cream Company, Inc. (NY) the same day. The following day taxpayer transferred the property and assets of the two dissolved corporations to the new Breyer Ice Cream Company, Inc. (NY). At this point the record is blank. It is apparent, however, that taxpayer later resurrected the Breyer Corporation (DE) because taxpayer's Accounting Acquisition Cards show that it merged the new Breyer Ice Cream Company, Inc. (NY) with the new Breyer Corporation (DE) on June 27, 1950. Taxpayer was the sole stockholder of both at the time of merger. Breyer Corporation (DE) was the surviving name. The total purchase price for the Breyer companies was $22,840,865.

On July 1, 1956 the Breyer Corporation (DE) merged with taxpayer to become its Breyer Ice Cream Division. The next entry in the Acquisition Accounting Cards reveals that Sealtest became the owner of Breyer and was preparing to leave the Philadelphia home delivery market because it had become unprofitable. Sealtest entered into a three year agreement with Breuninger Dairies. Under the agreement taxpayer, amongst other matters, was to furnish processed milk to Breuninger using Breuninger's raw milk commingled with its own supply. Breuninger sold the product under its name and the Sealtest name.

*Abandonment*

■ Dr. Knutson's Expert Report addressed the Supplee–Wills Jones Milk Company's milk business and the milk customers obtained from the Breyer Corporation. There was no further reference to the Breyer Corporation as a core dairy, and taxpayer made no claim for the abandonment of any intangible asset values for its ice cream business in the Philadelphia market. Moreover, Dr. Knutson suggested a customer asset value from the Breyer Corporation for application to Supplee–Wills Jones Milk Company as Breyer was a non-core dairy. Taxpayer, in fact, only asked the court to find that it acquired intangible assets allocable to retail and wholesale milk sales. The court can only surmise that the reason taxpayer did not pursue ice cream intangible asset deductions for Breyer was because the ice cream business in Philadelphia was not abandoned. When asked what business taxpayer conducted in the Philadelphia market in the period 1961 through 1971 Mr. Crocker testified only "home delivery and wholesale milk." A short time later Mr. Crocker testified that in 1973 taxpayer operated a milk plant at Tabor Avenue it had built in 1951 and the worlds largest ice cream plant on Woodland Avenue producing Breyer and Sealtest ice cream. Mr. Crocker continued, taxpayer ceased home delivery of milk in 1975 but the plant continued to process milk under an arrangement it had with Breuninger Dairies "for the past two or three years." Breuninger purchased bottled milk from the Tabor Avenue plant and distributed it under its own name. Wholesale delivery ceased in 1976 when the Tabor Avenue milk plant closed. In concluding his testimony on the Philadelphia market Mr. Crocker offered the following:

Q. At the end of 1976 did [taxpayer] have any home delivery milk business left in Philadelphia?

A. No.

Q. Did it have any wholesale milk business left in Philadelphia?

A. No.

Q. Did it have a milk plant operating in Philadelphia?

A. No.

Taxpayer's ninety-nine "Requested Findings of Fact: Philadelphia" make reference only to abandonment of its milk business and

attendant intangible assets. The record is silent as to ice cream. In the five years following acquisition taxpayer purchased the property and assets of several dairies and numerous home delivery routes in and around Philadelphia and southeastern New Jersey, and transferred the property and assets to Supplee–Wills Jones Milk Company. The parties did not stipulate to any facts about the Philadelphia market.

Taxpayer abandoned its home delivery business in the Philadelphia market in 1975 but kept one milk processing plant open to supply Breuninger, and its own routes outside of Philadelphia, in Pennsylvania and New Jersey. However, a year later, on August 14, 1976, taxpayer closed its last milk processing plant and ceased all milk processing in Philadelphia. Its New Jersey and Delaware customers were served from plants in Baltimore, Maryland and Hanover, New York. The Breyer Corporation (DE) apparently never shut its doors, but continued to purchase raw milk for the production of ice cream using the Source of Supply asset advantage.

The value of the Source of Supply asset diminished when taxpayer ceased milk processing in 1976, but the asset is based on the buying advantage that taxpayer acquired when it purchased cumulatively the core and non-core dairies in each market, to become a significantly leveraged buying power for raw milk. Accordingly, the asset continued to be used by taxpayer's Breyer Corporation (DE) to purchase raw milk for the production of ice cream. Whether a property is abandoned is a question of fact that must be determined by the trier of fact from a review of the record to find taxpayer's intent. As is generally the case in tax law, substance governs the ultimate finding, not form and the law requires that taxpayer's intent be evident from all the available facts and circumstances. *Commissioner v. Ashland Oil & Ref. Co.*, 99 F.2d 588 (6th Cir.1938), *cert. denied*, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); *American Potash & Chemical Corp. v. United States*, 399 F.2d 194, 185 Ct.Cl. 161 (1968); *Kimbell–Diamond Milling Co. v. Commissioner*, 14 T.C. 74, 1950 WL 118 (1950), *aff'd*, 187 F.2d 718 (5th Cir.1951),

*cert. denied*, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1957). To take a tax advantage for abandonment, taxpayer must abandon the entire asset. *See also Golden State Towel & Linen Serv., Ltd. v. United States*, 373 F.2d 938, 179 Ct.Cl. 300 (1967). To prove abandonment of the Source of Supply asset taxpayer bears the burden of proving by a preponderance of the evidence that the purchase of raw milk actually and permanently ceased in that market. It is not enough for taxpayer to simply provide evidence that all or part of its Customer Base, or the Distribution System, were abandoned. If raw milk continued to be purchased within a market area otherwise abandoned, taxpayer did not relinquish its Source of Supply advantage, even though it might have diminished in value. So long as the asset reasonably had even "potential value it cannot be said that the taxpayer's investment therein has been lost." *E.B. Elliott Co. v. Commissioner*, 2 T.C.M. (CCH) 444 (1943) (*citing Edward C. Lawson v. Commissioner*, 42 B.T.A. 1103, 1940 WL 144 (1940)); *Golden State Towel & Linen Serv., Ltd. v. United States*, 373 F.2d 938, 179 Ct.Cl. 300 (1967). Taxpayer did not overcome the presumption of correctness of the determination of the Commissioner that it failed to establish that any abandonment occurred, or if an abandonment occurred, the basis of the asset. In the absence of any evidence of when the purchase of raw milk ceased in the Philadelphia market area, the court cannot find that the Source of Supply asset was abandoned. It obviously continued in use by taxpayer until some unknown time. In the absence of such proof, or the basis of the asset, taxpayer is not entitled to a refund pursuant to I.R.C. § 165(a).

### New York City

In his Expert Report Dr. Knutson stated that the New York City milk market was one of the first milk markets entered by taxpayer. It acquired two milk core dairies in that market, Sheffield Farms Company, Inc. and subsidiaries, and Muller Dairies, Inc. There was no evidence that either dairy produced ice cream, however taxpayer's 1973 amended tax return stated that "taxpayer sold all of its wholesale dairy business in New York City, except the ice cream business, to another food com[any]." Unfortu-

nately taxpayer chose to provide no analysis of the assets of either dairy, either in Dr. Knutson's Expert Report or through testimony, nor proof of the existence of any assets acquired from the core dairies. Neither did the parties stipulate to any facts about the acquisitions, the market, or the individual dairies, except the total sales prices from *Kraft I.* Taxpayer did not suggest an adjusted fair market value for any claimed intangible asset. The data and information discussed below is drawn from the documentary evidence of taxpayer, in particular the Price, Waterhouse & Company audit of March 26, 1926; NYSE Listing Applications A–6014, April 18, 1923; A–6904, November 18, 1925; and A–6905, November 19, 1925; and several of taxpayer's contemporaneous Accounting Acquisition Cards.

*Sheffield Farms Company, Inc.* Taxpayer acquired the outstanding shares of stock of Sheffield Farms Company, Inc., several of its wholly-owned subsidiaries, and other affiliated companies. NYSE Listing Application A–6905, November 19, 1925 described the conditions of the purchase as follows:

> [T]he proper officers of [taxpayer] ... are directed to issue 175,000 shares of the common stock of this Corporation without par value, full paid and non-assessable, and $15,000,000 in principal amount of Fifteen–Year 6% Notes hereafter ... upon the receipt of 46,771 shares of the common stock of Sheffield Farms Company, Inc., 3972 (sic) shares of the common stock of Sheffield Condensed Milk Company, Inc., and 2,507 shares of the common stock of Sheffield By–Products Company, Inc....

The sale was consummated December 1, 1925, after the conditions outlined above were met. Three designees of taxpayer were then placed on the five-person board of directors of Sheffield Farm Company, Inc. The relatively few shares not acquired by taxpayer on December 1, 1925 were placed into an escrow account by their holders pursuant to an agreement with taxpayer and purchased by taxpayer on July 1, 1926. The total consideration paid for the Sheffield Farms Company, Inc. and subsidiaries was $37,459,686.

In 1939 Sheffield Farm Company, Inc. sold fifteen of its plants to taxpayer's Purity Creamery, Inc., only to receive them back in 1941. The capital stock of Purity was then cancelled and the company liquidated. On November 1, 1941, Sheffield By–Products Company and Sheffield Condensed Milk Company were merged into Sheffield Farms Company, Inc. Other Sheffield plants, businesses, and assets were sold, purchased, merged, and liquidated over the next few years.

On October 31, 1956, Sheffield Farms Company, Inc. merged with taxpayer "in consideration of the surrender for cancellation of 52,400 shares of common stock, $100 par value, being all the issued and outstanding common stock." At the direction of taxpayer the assets of Sheffield Farm Company, Inc. were transferred to taxpayer's Sealtest Sheffield Farms Division. Then

> [a]s of the close of business on December 31, 1958, the Sealtest Sheffield Farms Division of [taxpayer] was dissolved in accordance with the 'Order Dissolving Divisions' dated December 31, 1958, signed by Mr. E.E. Stewart, President of [taxpayer]. The property, business and affairs of this Division were transferred as of the opening of business on January 1, 1959, to the Sealtest Foods Division (Metropolitan Division) in accordance with the 'Order Regarding Sealtest Foods Division,' dated December 31, 1958, signed by [Mr. Stewart].

*John H. Muller Dairies, Inc. and Fred H. Muller, Inc.* These two relatively small dairies operated in and around New York City and were acquired as a single transaction. John H. Muller Dairies, Inc., a New York corporation, sold milk, cream, and other dairy products, but not ice cream, from its principal office in New York City. Fred H. Muller, Inc., a New York corporation, sold the same product mix from its home in Long Island City, New York. Shortly thereafter taxpayer organized Mullins Dairies, Inc. (DE). Pursuant to a pre-acquisition agreement with taxpayer both Muller companies changed their corporate names on April 23, 1929. Fred H. Muller, Inc. became Sunnyside Dairy, Inc. and John H. Muller, Inc.

became Valley Mills Dairy, Inc. Taxpayer acquired the entire property and assets of both renamed Muller companies in the name of its Muller Dairies, Inc. (DE) on March 31, 1929. Both renamed Muller dairies were dissolved after acquisition.

There was an unidentified audit in the record of Fred H. Muller, Inc. that provided no useful information about the acquisition, or sales volume prior to acquisition. NYSE Listing Application A–8591, March 25, 1929 did provide information about the Muller acquisitions.

> Pursuant to an agreement dated February 20, 1929, between [taxpayer] and Julia Muller and Fred H. Muller, individually and as administrator of the estate of John H. Muller, deceased, [taxpayer] will acquire the entire properties and assets of John H. Muller Dairies, Inc. and Fred H. Muller, Inc. . . . in consideration of (1) the assumption by the [taxpayer] of [liabilities], (2) the issue and delivery of certificates for 6,000 full-paid and non-assessable shares without par value of Common Stock of the [taxpayer], and (3) payment in cash of the milk inventory at the close of business on March 31, 1929.

Both renamed Muller companies were acquired for a total consideration of $812,744. On June 30, 1929 taxpayer sold its investment in Muller Dairies, Inc. (DE) to Sheffield Farms Company, Inc. but reacquired it in 1933. After a number of other sales, purchases, mergers, and dissolutions, all choreographed by taxpayer, Muller Dairies, Inc. (DE) was merged with taxpayer and its assets transferred to the Sealtest Foods Division of taxpayer as of July 1, 1961.

Dr. Knutson did provide some background of the New York market, none of which was applicable to Sheffield Farms Company, Inc., and questionably applicable to the Muller Dairy companies. He reported, for example, that the New York market had been dominated by independent processors from the time of the first cooperative in 1872 through 1933. During that time the market "evidenced a strong tendency towards instability." He stated that the largest cooperative was the Dairymen's League Cooperative Association, Inc. and that the cooperative itself conducted a thriving retail milk business. According to Dr. Knutson only one-half of the producers in the milkshed were effectively organized. Far fewer than half were actually members of the Dairymen's cooperative, and as a result, the processors were in a better bargaining position vis-a-vis the producers. Dr. Clarence Roberts, who joined Sheffield Farms Company, Inc. in 1925 and eventually became president of Sealtest, testified that Sheffield Farms Company, Inc. purchased its raw milk only from the Sheffield Farms Cooperative and paid as much as one cent *more* than other processors paid to members of the Dairymen's League Cooperative Association, Inc. Notwithstanding the corporate link between the cooperative and the dairy Dr. Roberts testified that Sheffield Farm Company, Inc. and Sheffield Farms Cooperative dealt with each other at arm's length, even though he admitted that Sheffield Farm Company, Inc. selected or approved which producers could belong to the Sheffield Farms Cooperative. Each month representatives of the two organizations met to negotiate prices for the following month. Dr. Roberts remembered the bargaining as "tough, and that on at least one occasion negotiations lasted three days."

Dr. Knutson, citing the *Pitcher Report, supra,* also reported that New York City had progressed further than most markets in the proportion of milk sold to wholesale customers and that in 1930 fifty-three percent of sales were to wholesale customers and forty-seven percent to home delivery customers. As the court has discussed above, the *Pitcher Report* is of no value in our inquiry, and taxpayer's analysis of the New York City market here provides a further example of why. The fifty-three to forty-seven percent ratio is derived from Table 37 of the Report. Table No. 58 of the Report, which Dr. Knutson relied upon to support the validity of his assumptions of the relative value of wholesale to retail sales nationwide, shows that retail sales amounted to only six percent of the volume sold, the remaining ninety-four percent going bottled or in bulk to stores, and in bulk to restaurants. Dr. Knutson did not suggest a Source of Supply per cwt. advantage.

An analysis of the record leads the court to find that Sheffield Farm Company, Inc. and Sheffield Farms Cooperative, Inc. clearly had equal bargaining positions and that taxpayer could not have acquired a Source of Supply advantage vis-a-vis the Sheffield Farms Cooperative, Inc. when it purchased the dairy. The exclusive purchasing arrangement between the dairy and the cooperative did not change after taxpayer acquired the Sheffield Farms Company, Inc. Dr. Roberts' testimony indicated that if an advantage existed, it lay with the Sheffield Farms Cooperative, Inc., not the dairy, inasmuch as the dairy paid more for its raw milk than if it had bought it from the Dairymen's League Cooperative Association, Inc.

The source of supply of the Muller Dairy companies raw milk was not identified in the record and the court can only surmise that the companies either purchased the milk on the open market or through the Dairymen's League Cooperative Association, Inc. The record does contain a copy of a 1954 contract between Muller Dairies, Inc. (DE) and the cooperative whereby the dairy purchased four wholesale routes from the Dairymen's League but the court cannot infer from the 1954 contract that Muller Dairies, Inc. (DE) purchased raw milk from the cooperative beginning in 1928. According to Dr. Robert's testimony the Muller Dairy companies could not have bought their milk from the Sheffield Farms Cooperative, Inc. If the Muller Dairy companies purchased raw milk through the Dairymen's League Cooperative, the advantage per cwt. would be lower than if they could use their bargaining positions, singly, or together, to acquire the milk at a better price from an unaffiliated producer. In addition, the court cannot find that taxpayer actually acquired a Source of Supply advantage when it purchased the Muller dairies. Neither Muller dairy was large, and combined their bargaining power over producers, especially the Dairymen's League Cooperative, would have been minimal to nonexistent. In the total absence of proof the court finds that taxpayer did not acquire a Source of Supply advantage when it purchased the Muller Dairy companies.

In view of the court's finding that taxpayer acquired no Source of Supply advantage from its acquisition of the Sheffield Farm Company, Inc. and the Muller Dairies, taxpayer is not entitled to a refund for the alleged abandonment of the asset pursuant to I.R.C. § 165(a). Taxpayer claimed in its 1973 amended tax return that it did not close its New York City ice cream plant, and has provided no evidence to refute its own statements or to overcome the presumption of correctness of the determination of the Commissioner that taxpayer did not establish that an abandonment occurred, or if an abandonment occurred, the basis of the asset.

### New Haven

Taxpayer acquired the Sagal–Lou Products Company and made it the core dairy in the New Haven market. At the time of acquisition the dairy operated a milk and ice cream business from its plant on Chathan Street in New Haven.

The parties stipulated to the facts necessary to permit the court to evaluate the acquisition of the Sagal–Lou Products Company. In consideration for acquisition of the property and assets of the dairy taxpayer assumed the dairy's disclosed liabilities and paid $760,000 in cash. The purchase price was not identified in *Kraft I* but the parties stipulated that the total consideration was $905,538. On May 20, 1929, taxpayer formed Sagal–Lou Products Company in Delaware, for the purpose of receiving the assets of Sagal–Lou Products Company (CT). The dairy was purchased on May 31, 1929, and the assets transferred to Sagal–Lou Products Company (DE) the same day. By December 31, 1929, taxpayer had transferred the property and assets of Sagal–Lou Products Company (DE) to GICC for valuable consideration. In 1932 Sagal–Lou Products Company (DE) repurchased the assets it had transferred to GICC, excluding motor vehicles. In 1943 Sagal–Lou Products Company (DE) merged with GICC. Both GICC and Sagal–Lou Products Company (DE) were wholly owned by taxpayer. In 1956 GICC merged with taxpayer and the assets formerly owned by the Sagal–Lou Products Company (CT) were transferred to taxpayer's General Ice Cream Division.

## Abandonment

Mr. Roger Hove, District Comptroller for Hartford, from 1972 to 1975, with responsibility for New Haven, testified only that taxpayer ceased home delivery in New Haven in 1974. In its Requested Findings of Fact for New Haven taxpayer asked the court to find only that it abandoned its home delivery and associated retail Distribution System and Customer Base intangible assets in 1974. In its Complaint, App. V., taxpayer claimed only that it abandoned its retail and wholesale businesses in 1974. Taxpayer offered no proof that its wholesale milk or ice cream business ever ceased, that the Chathan Street plant closed, or that taxpayer ever stopped purchasing milk in the New Haven market. Taxpayer did not overcome the presumption of correctness of the determination of the Commissioner that it failed to establish that an abandonment occurred, or if an abandonment occurred, the basis of the asset. Taxpayer is not entitled to a refund pursuant to I.R.C. § 165(a).

## *Milwaukee*

Taxpayer acquired four core dairies in the Milwaukee market area: Luick Ice Cream Company; Westphal & Sons Milk Products Company; Trapp Brothers Dairy Company; and Wisconsin Creameries, Inc.

## Abandonment

▇ Taxpayer built new, separate, milk processing and ice cream manufacturing plants in Milwaukee in the early 1950's and the old plants were closed. By mid–1950 taxpayer had merged all of its Milwaukee core and non-core dairy acquisitions into its wholly-owned Luick Ice Cream Company (DE). In 1956 Luick Ice Cream Company (DE) was merged with Sealtest Foods Division of taxpayer. In October 1972 taxpayer undertook several actions to extricate itself from the Milwaukee milk market that had become unprofitable almost overnight.

Taxpayer ceased the home delivery of milk and closed its milk and ice cream plants in 1972. That same year taxpayer entered into a franchise agreement with Hawthorn Melody to continue in the wholesale milk delivery business. Taxpayer also continued to deliver ice cream that was shipped into the Milwaukee market from another market area until 1975.

There is no question but that taxpayer did not simply abandon all of the tangible and intangible assets acquired in 1929. It did sell its wholesale milk business to Hawthorn Melody. However, it is equally clear that taxpayer later abandoned other intangible assets. The question then is whether taxpayer abandoned its Source of Supply asset, and whether the value of the loss of that asset can be taken as a deduction under the tax code.

Taxpayer's franchise contract with Hawthorn Melody, Inc., dated December 15, 1972, stated that taxpayer would cease delivering wholesale milk on December 16, 1972 and that Hawthorn Melody, Inc. would begin distribution to as many former wholesale customers of taxpayer that it could beginning the next day. Taxpayer provided Hawthorn Melody, Inc. with its list of customers, and agreed to make a "good faith attempt" to retain its sales force "engaged in the sale of [p]roducts" for at least 12 days after the transfer date. Taxpayer also agreed to make a "good faith attempt" to divert such portion of its raw milk supply to Hawthorn as might be needed by Hawthorn under the contract.

Notwithstanding the foregoing, the court finds that taxpayer did permanently abandon its Source of Supply asset and, as a severable, identifiable intangible asset, the value of the loss may be deducted in tax year 1972. Taxpayer stopped all processing of milk and ice cream at its two Milwaukee plants in 1972 and sold some tangible assets to Hawthorn Melody, Inc., but it did not sell its Source of Supply intangible asset, nor did it transfer the asset to any other of its divisions, or sell the asset to any other company. It simply abandoned the asset, and the asset had value. The fact that Hawthorn Melody continued to sell Sealtest labeled milk in the market under a franchise arrangement with taxpayer is immaterial because Hawthorn Melody, Inc. used its sources of supply to satisfy its raw milk needs. Hawthorn Melody, Inc. did not take over the operation of taxpayer's milk processing plant, nor was there any consideration paid to taxpayer for the Source of Supply asset; taxpayer only agreed to try to

direct its former producers, with whom it had no contractual relationship, to Hawthorn Melody, Inc. The producers were free to sell to any dairy. Neither does the fact that taxpayer continued to serve the Milwaukee market with ice cream change the outcome because the ice cream was manufactured at taxpayer's Peoria plant, outside of the Milwaukee market area, and the Peoria plant purchased its raw milk from the Illinois Milk Producer's Association.

*Valuation Variable*

■ Dr. Knutson testified that taxpayer's structuring of its Milwaukee holdings was unique in that tangible and intangible assets were transferred between various dairies to create core and non-core dairies over a period of four years from 1926 through 1929. He identified two university studies that were of assistance in his valuation of the intangible assets.[42] The court gave some weight to the 1932 study of the milk industry but not the 1940 book because it was not included in the record. According to Dr. Knutson

> [u]pper Mid-west milk producers have traditionally not been very cohesive in organizing to influence price ... [and] [t]he lack of producer bargaining power was, undoubtedly, attributable, in part, to the plentiful supply of milk in the region. The point is that while producers were not particularly well organized, processors were hardly ever hurting for a milk supply, limiting somewhat the value of the source of supply.

For this reason Dr. Knutson suggested a five cent per cwt. Source of Supply advantage. Based upon its review of the entire record the court, in the circumstances, finds the five cent per cwt. advantage to be reasonable. No facts were stipulated for the Milwaukee market.

*Valuation*

*Luick Ice Cream Company.* Taxpayer's first acquisition in the Milwaukee market was the Luick Ice Cream Company, a large, "highly profitable" ice cream manufacturer that became the ice cream core dairy. The record is not complete but it is known that

Mr. William F. Luick owned either all or most of the stock of Luick Ice Cream Company immediately prior to its acquisition by taxpayer. He also individually owned and operated a trucking company that served only his ice cream company. His wife, Clara B. Luick, individually owned and operated a creamery business in Milwaukee that provided raw milk to the ice cream company. By agreement with taxpayer, of August 13, 1926, Mr. Luick merged the trucking company and Mrs. Luick's creamery into Luick Ice Cream Company. In accordance with the terms of the same agreement Mr. Luick changed the name of Luick Ice Cream Company to the Willclare Company, a Wisconsin corporation. Taxpayer organized the Luick Ice Cream Company (DE) on September 27, 1926, and on September 30, 1926 Mr. Luick transferred the assets and property of the Willclare Company (WI) to the new Delaware corporation. The Willclare Company and Luick Ice Cream Company (WI) were subsequently dissolved. The Accounting Acquisition Cards and NYSE Listing Application A–7254, October 6, 1926, reveal that the Willclare Company (WI) had an authorized capital stock of 22,250 shares, consisting of 6,000 shares of First Preferred Stock of the par value of $100 a share, 6,250 shares of Second Preferred Stock without nominal or par value, and 10,000 shares of Common Stock without nominal or par value. For the total consideration of $1,955,390, taxpayer, in the name of Luick Ice Cream Company (DE), acquired the entire 6,250 shares of Second Preferred Stock and 10,000 shares of Common Stock, and the business and assets, of the Willclare Company (WI) on October 19, 1926.

In December 1944 Luick Ice Cream Company (DE) sold its main plant to a real estate holding company and leased it back for three years. There is no evidence that taxpayer used the plant after 1948. On September 1, 1950 taxpayer merged the assets and property of Wisconsin Creameries, Inc. (DE) (see below) with Luick Ice Cream Company (DE). Taxpayer was the sole stockholder of each

---

**42.** W.P. Mortenson, *An Economic Study of the Milwaukee Milk Market,* University of Wisconsin Agricultural Experiment Station Research Bulletin No. 112 (1932). Mortenson, W.P., *Milk Distribution as a Public Utility,* University of Chicago Press (1940).

company before merger. Luick Ice Cream Company (DE) was the surviving corporation. On December 31, 1956 Luick Ice Cream Company (DE) was merged into taxpayer and the property and assets transferred to taxpayer's Sealtest Central Division–Milwaukee. On December 31, 1958 the Sealtest Central Division–Milwaukee was dissolved and its business, property, and assets transferred to the Sealtest Foods Division (Central Division).

The NYSE Listing Application revealed that Luick Ice Cream Company (WI) sold the following quantities of ice cream in 1925 and 1926:

Volume in Gallons

| | |
|---|---|
| 1925 | 1,646,237 |
| 1926 (Annualized) | 1,517,620 |
| Average | 1,581,929 |

Using the derived volume sales, a five cent per cwt. advantage, and Dr. Knutson's approved methodology, the court finds that the adjusted fair market value of the Luick Ice Cream Company (WI) is $388,865. Dr. Knutson suggested that the fair market value was $404,672 which he derived by using the volume sales for 1925 only. The court believes the volume sales data for 1925 and 1926 (annualized) should be averaged to properly determine the value of the asset, such as Dr. Knutson and the court did in other instances.

*Trapp Brothers Dairy Company.* Dr. Knutson reported that in 1927 taxpayer acquired the Trapp Brothers Dairy Company, "a moderately large and moderately profitable milk processor." The dairy did not manufacture ice cream. By the terms of the July 8, 1927 contract to sell, the Trapp shareholders agreed with taxpayer to reorganize its Wisconsin company under the corporate laws of Delaware and convey all property and assets of the old dairy to the new. The old dairy then gave taxpayer an option to purchase "the entire authorized and issued capital stock" of the Delaware corporation. Upon acceptance of the option by taxpayer the Trapp Brothers Dairy Company (WI) dissolved.

NYSE Listing Application A–7767, November 23, 1927, confirmed that pursuant to the agreement to sell, Trapp Brothers Dairy Company (WI) conveyed all of its property and assets to Trapp Brothers Dairy Company (DE) for valuable consideration. Taxpayer acquired from Trapp Brothers Dairy Company (WI) 1,000 shares of capital stock of the new Delaware company in exchange for 1,630 shares of its common stock without par value and $200,000 cash. The acquisition was considered effective September 30, 1927, for a total consideration of $614,609. Taxpayer's Accounting Acquisition Cards reveal that the Trapp Brothers Dairy Company (DE) changed its name to Luick Dairy Company (DE) on November 8, 1928.[43] The Trapp Brothers Dairy Company (WI) dissolved December 30, 1936 and its assets were transferred to taxpayer that same day "as a distribution in complete liquidation." Exhibit A to the NYSE Listing Application stated that Trapp Brothers Dairy Company (WI) sold the following volume of milk and cream in 1926 and 1927:

Sales in Gallons

| | |
|---|---|
| 1926 | 2,217,825 |
| 1927 Annualized | 2,323,121 |
| Average | 2,270,473 |

Using the derived average volume sales, a five cent per cwt. advantage, and Dr. Knutson's approved methodology, the court finds that the adjusted fair market value of the Trapp Brothers Dairy Company (WI) is $162,717. Dr. Knutson used a volume of 9,284,285 quarts to arrive at a suggested market value of $166,343. The court found no support in the record for Dr. Knutson's volume information and, therefore, ignored his computations in favor of its own.

*Wisconsin Creameries, Inc.* On January 18, 1929 the stockholders of Wisconsin Creameries, Inc., a low profit, but large milk and ice cream processor agreed with taxpayer to exchange outstanding and issued shares of its common stock for shares of common stock of taxpayer. The majority of the stock was acquired April 1, 1929 and taxpayer did

---

43. The record is silent but Trapp Brothers Dairy Company (DE) must have merged with Luick Dairy Company (DE) when it took the name of the latter company.

not purchase the remaining 562½ shares until December 30, 1931. Representatives of taxpayer were elected to the board of directors of Wisconsin Creameries, Inc. May 1, 1929. Taxpayer acquired control of the business and assets of the dairy as of April 1, 1929. Dr. Knutson reported that within two years of the acquisition of Wisconsin Creameries, Inc. taxpayer transferred its milk business to Trapp Brothers Dairy Company (DE). Wisconsin Creameries, Inc. was a non-core milk processor and a core ice cream manufacturer.

NYSE Listing Application A–8516, March 7, 1929, stated that pursuant to the January 18, 1929 Agreement that taxpayer would acquire the entire issue and outstanding common stock of Wisconsin Creameries, Inc., viz, 36,924 shares without par value, in consideration of 14,770 full-paid and non-assessable shares without par value of common stock of taxpayer. Taxpayer's Accounting Acquisition Cards reveal that taxpayer further agreed with Wisconsin Creameries, Inc. that the latter would organize Creameries Investment Company (DE) and acquire under that name not less than 12,000 shares of six percent cumulative preferred stock of Wisconsin Creameries, Inc. on a share for share basis. On May 29, 1929 taxpayer received 12,099½ shares of common stock of Creameries Investment Company (DE) in exchange for 16,939 shares of common stock of taxpayer. Taxpayer subsequently acquired the remaining shares of preferred stock of Wisconsin Creameries, Inc. for cash. Creameries Investment Company (DE) dissolved October 22, 1929. The Acquisition Accounting Cards show that Wisconsin Creameries, Inc. sold its entire milk business, property, and assets to Luick Ice Cream Company (DE) on July 31, 1929 for valuable consideration. Wisconsin Creameries, Inc. remaining assets were merged with Luick Ice Cream Company (DE) on September 1, 1950. Taxpayer was the sole stockholder of Luick Ice Cream Company and Wisconsin Creameries, Inc. at all times during these transactions. Wisconsin Creameries, Inc. was acquired by taxpayer April 1, 1929 for $3,162,616.

The NYSE Listing Application also revealed that Wisconsin Creameries, Inc. sold the following volume of ice cream in 1927 and 1928:

### Ice Cream (Gallons)

| | |
|---|---|
| 1927 | 1,030,000 |
| 1928 (Annualized) | 934,800 |
| Average | 982,000 |

Using the derived average volume of ice cream sales, the five cent per cwt. advantage, and Dr. Knutson's approved formula the court finds the adjusted fair market value of the Source of Supply asset of Wisconsin Creameries, Inc. to be $241,392.

*Westphal & Sons Milk Products Company.* Taxpayer's acquisition of Westphal & Sons Milk Products Company involved a unique set of circumstances relative to taxpayer's other acquisitions in the Milwaukee market area. Mr. August F. Westphal, sole proprietor of the company agreed on August 14, 1929 to sell his business, property, and assets to Luick Ice Cream Company (DE), wholly owned by taxpayer, which, in turn, agreed on November 21, 1929 to assign all of its interest in the August 14, 1929, purchase agreement to taxpayer, for valid consideration. Taxpayer accepted the assignment, and the purchase of Mr. Westphal's business was consummated on December 31, 1929.

NYSE Listing Application A–9142, December 18, 1929 stated that Westphal & Sons Milk Products Company's product mix included concentrated whole milk, ice cream mix, powdered milk, pasteurized cream, and other dairy products, but not milk or ice cream. According to Dr. Knutson "several of these products could be used to produce ice cream," and that the company was acquired as a core dairy, but the only asset it brought to taxpayer was its Source of Supply. There is no information in the record of the volume of product sold. Dr. Knutson stated:

it is general industry knowledge that at least 50 percent of the value of sales for a processor of this size would be the cost of milk. Utilizing this ratio, on 1928 sales of $212,632,077, $106,316,039 would have been the value of milk purchased from producers. In 1928, milk was bringing producers an average of $2.16 per cwt. (Mortenson 32, p. 56) (*sic*), meaning that 492,204 cwt

of milk was under the control of Westphal. At $0.05 per cwt. the intangible value of this source of milk supply to [taxpayer] was $24,610.

Dr. Knutson's valuation methodology, in this instance, cannot pass the test of judicial acceptability. *See Miami Valley Broadcasting Corp. v. United States,* 499 F.2d 677, 204 Ct.Cl. 582 (1974); *Meredith Broadcasting Co. v. United States,* 405 F.2d 1214, 186 Ct.Cl. 1 (1968); *Domestic Management Bureau, Inc. v. Commissioner,* 38 B.T.A. 640, 643, 1938 WL 87 (1938). It may have been that Mr. Westphal "controlled" 492,204 cwt. of milk, but that is in no way determinative of the value of the Source of Supply. By Dr. Knutson's own definition the asset is valued by the price advantage that a processor has over the source, measured by the volume of milk or ice cream sold. Several key factors to the methodology are absent. There is no measurable volume of milk or ice cream sold, and, in fact, Mr. Westphal sold no milk or ice cream. A strained reading of Mortenson's study could conclude that the value of sales for a processor of the "type" and "size" of Westphal & Sons Milk Products Company, could be around fifty percent but in the absence of more particular facts about the company that are not in the record taxpayer failed to prove its case. The nature of the evidence and its relation to any value is far to speculative and tenuous. *See Commissioner v. Ashland Oil & Ref. Co.,* 99 F.2d 588 (6th Cir.1938), *cert. denied,* 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); *Kimbell–Diamond Milling Co. v. Commissioner,* 14 T.C. 74, 1950 WL 118 (1950), *aff'd,* 187 F.2d 718 (5th Cir.1951), *cert. denied,* 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1957).

Moreover, because of the dearth of information in the record the court cannot even find that Westphal & Sons Milk Products Company was a core dairy acquisition. The sole Acquisition Accounting Card reveals that the assets of the company were transferred to Luick Ice Cream Company (DE) in 1929 and that Westphal & Sons Milk Products Company disappeared in 1930, in the same manner that taxpayer treated its non-core dairy acquisitions. The court also notes that Westphal & Sons Milk Products Compa-

ny was not considered a "Principal Acquisition" in *Kraft I,* and that no information appears in Exhibit CV in *Kraft I* (Table II) identifying any stipulated purchase price. Finally, in its "Requested Findings of Fact: Milwaukee" taxpayer made no claim for the value of the Source of Supply intangible asset. It said: "[t]he tax basis of the intangible assets (sic) acquired by [taxpayer] from Westphall was $0.00."

The court therefore finds that taxpayer is not entitled to a refund for the abandonment of a Source of Supply asset allegedly acquired from Westphal & Sons Milk Products Company. Taxpayer did not overcome the presumption of correctness of the determination of the Commissioner that it failed to establish that an abandonment occurred, or if an abandonment occurred, the basis of the asset. Taxpayer is not entitled to a refund pursuant to I.R.C. § 165(a). Even if the Commissioner's presumption of correctness had been overcome to prove entitlement to a refund taxpayer bore the burden of proving by a preponderance of the evidence that the purchase of raw milk actually and permanently ceased in that market. Taxpayer must prove that the intangible asset was actually acquired, abandoned, the adjusted fair market value of the asset, and the deductions were taken in the year of abandonment. *UFE, Inc. v. Commissioner,* 92 T.C. 1314, 1989 WL 66542 (1989). Taxpayer met none of the elements.

### Pittsburgh

Taxpayer acquired only one core dairy in the Pittsburgh market, the Reick–McJunkin Dairy Company, reportedly the largest dairy in the market and a major milk and ice cream producer. The Reick–McJunkin Dairy Company was acquired with several subsidiary companies of which the dairy was the sole stockholder, or held a majority of the stock. The parties stipulated to no facts about the acquisition, and the Complaint, App. V, made no claim for the abandonment of any assets in the Pittsburgh market. The facts and information addressed below come from an analysis of the complete record by the court.

The record revealed that on December 12, 1952, taxpayer incorporated the Reick

Ice Cream Company under the laws of Pennsylvania and on December 31, 1952 the Reick–McJunkin Dairy Company (PA) transferred its ice cream business and assets to the Reick Ice Cream Company (PA) in exchange for all of the stock of Reick Ice Cream Company (PA). The same day the Reick–McJunkin Dairy Company (PA) distributed to taxpayer the Reick Ice Cream Company (PA) capital stock as a dividend in the amount of $1,315,000. The stock was cancelled on November 29, 1955. On November 30, 1955 taxpayer transferred the assets and business of Reick Ice Cream Company (PA) to the Reick Dairy (PA). On December 31, 1955 the business and assets of Reick Ice Cream Company were merged with the Reick Dairy Company. On August 31, 1956 the milk business of Reick–McJunkin Dairy Company (PA) was distributed in a plan of liquidation to taxpayer. The assets received by taxpayer were transferred to the Reick Dairy Division of taxpayer the same day. On May 31, 1957 Reick Dairy Company was merged with taxpayer and all of its assets and business were also transferred to the Reick Dairy Division of taxpayer. The Reick Dairy Division of taxpayer was dissolved on December 31, 1958 and the property, business, and assets transferred to Sealtest Foods Division (Great Lakes Division) of taxpayer.

### Abandonment

The minutes of taxpayer's Administrative Committee Meeting of October 31, 1972 contained a

> [p]roposal that Sealtest Foods abandon 28 home service routes in Pittsburgh, Pennsylvania. These routes are expected to incur a book loss of $358,000 for 1972. There are two potential buyers for these routes but they are so financially distressed that Sealtest believes that it would not recover its receivable if these routes were sold to either.

From 1923 until 1972 taxpayer continuously procured milk for the Pittsburgh market, first from its Forbes Street milk plant, and after 1958 from its new Noblestown milk plant, both located in Pittsburgh. Mr. Crocker testified that Pittsburgh was the largest loss market in taxpayer's organization and that the Noblestown milk and the ice cream plants were closed in 1972. Taxpayer ceased home and wholesale delivery of milk the same year but continued to deliver ice cream manufactured elsewhere.

The court finds that with the closing in 1972 of the Noblestown milk and ice cream plants, from which taxpayer conducted all milk procurement in the Pittsburgh market, taxpayer permanently abandoned the Source of Supply intangible asset that it acquired from its acquisition of the Reick–McJunkin Dairy Company (PA) in 1923, and that the fair market value of the asset was proved through judicially accepted methodology. Taxpayer is therefore entitled to a refund of taxes pursuant to I.R.C. § 165.

### Valuation Variable

■ Dr. Knutson reported that the Pittsburgh market was dominated by a powerful producer's organization, the Dairymen's Cooperative Sales Company. Professor Roland Bartlett of Pennsylvania State College described the market as "a hotbed for cooperative activity." [44] The cooperative had priced milk on the basis of use as early as 1920. As a result the value of the Source of Supply advantage per cwt. was very low. Dr. Knutson suggested a price advantage of two cents per cwt. Based on its own analysis of the market, primarily as described by Bartlett, the court agrees two cents is a proper valuation factor.

### Valuation

By the terms of an Agreement to Sell with taxpayer, dated December 4, 1923, the Reick–McJunkin Dairy Company agreed to form a holding company under the laws of the State of Delaware and to transfer, for valuable consideration, the shares of it and its subsidiary companies stock. Contemporaneously, the Reick–McJunkin Dairy Company agreed to acquire a majority of the stock of the Hydrox Company in the name of

**44.** R. Bartlett, *Milk Marketing in Pennsylvania,* Pennsylvania State College Bulletin 208 (1926). Dr. Knutson reported that much of Professor Bartlett's analysis of the market was repeated in his book, *Cooperation in Marketing Dairy Products* (1931), that was not included in the record.

the Holding Company (DE). Hydrox was a non-core dairy and will not be discussed further in this opinion. Taxpayer then acquired the stock of the Reick–McJunkin Dairy Company (PA) held by the Delaware holding company. The Listing Application described the transaction.

Reick–McJunkin Dairy Company has an authorized Capital Stock consisting of 350,-000 shares of Eight per cent Cumulative Preferred Stock of the par value of $10 each (of which 312,140 shares are outstanding in the hands of the public), and 450,000 shares of Common Stock of the par value of $10 each, of which 230,000 shares have been issued and have been acquired and are now held by [taxpayer].

Taxpayer had an authorized capital stock of 1,000,000 shares without nominal or par value, of which 246,236 were issued in exchange for the aggregate of the entire issued and outstanding common stock of the Reick–McJunkin Dairy Company (PA). The total consideration paid was $11,346,249. For the reasons discussed above taxpayer acquired effective control over the assets and business through its purchase of stock of the Reick–McJunkin Dairy Company (PA).

Dr. Knutson reported that he used audit reports to determine certain key data about the Reick–McJunkin Dairy Company, but there was no audit in the record. However, NYSE Listing Application A–6252, January 30, 1924 did reveal enough information for the court to calculate the value of the Source of Supply asset. The NYSE Listing Application identified volume sales and listed the sales on its fiscal year basis from April 1, 1921 through March 31, 1922 and April 1, 1922 through March 31, 1923. It also listed sales for the nine month period April 1, 1923 through December 31, 1923, the date the Reick–McJunkin Dairy Company (PA) was acquired by taxpayer. Liquid product sales increased by approximately one million gallons a year between fiscal year 1921 and 1923 and ice cream sales almost doubled during the same period. The court therefore annualized the sales for the nine months of fiscal year 1923 and averaged the 1921 through 1923 sales to determine a reasonably objective sales volume.

Sales of Milk, Cream and Ice Cream (Gallons)

| Fiscal Year | Milk | Ice Cream |
|---|---|---|
| 1921 | 10,130,903 | 2,074,323 |
| 1922 | 11,324,508 | 2,542,296 |
| 1923 | 12,608,299 | 3,744,308 |
| Average | 11,354,570 | 2,786,976 |

Using the derived volume sales, the two cent advantage per cwt., and Dr. Knutson's approved methodology, the court finds that the value of the Source of Supply asset acquired from the Reick–McJunkin Dairy Company (PA) is $599,532.

### Cincinnati

Taxpayer acquired one core dairy in the Cincinnati milk market, Mathews Selected Dairy Company, a large profitable milk processor. Mathews Selected Dairy Company (OH) executed an Agreement to sell on August 6, 1929 pursuant to which it agreed, prior to acquisition, to change its corporate name and to dissolve itself following acquisition. Taxpayer's Acquisition Accounting Cards revealed that, in accordance with the terms of the Agreement, Mathews Selected Dairy Company (OH) changed its name to Hooge Dairies Company, (OH) on September 24, 1929. The Hooge Dairies Company (OH) became the intermediary name for the Mathews Selected Dairy Company of Delaware, organized by taxpayer on September 19, 1929. Following acquisition taxpayer conveyed the property and assets of The Hooge Dairies Company (OH) to the Mathews Selected Dairy Company (DE) for valuable consideration. The total consideration paid for the Mathews Selected Dairy Company (OH) was $812,744.

In return for receiving all of the property and assets of Mathews Selected Dairy Company taxpayer agreed to assume the dairy's liabilities, issue certificates for 7,070 shares of common stock, pay $350,000 in cash and meet certain other conditions. The conditions were met and taxpayer acquired the Mathews Selected Dairy Company on September 30, 1929. NYSE Listing Application A–8921, September 3, 1929 described more fully the consideration paid for the property and assets.

Pursuant to an agreement dated August 6, 1929, between [taxpayer] and H.D. Hooge, the entire property and assets of the Mathews Selected Dairy Company will be conveyed to [taxpayer] in consideration of (1) the assumption ... of liabilities, (2) the payment of the sum of $352,625 in cash, being $350,000 plus an additional sum equal to the October 1, 1929 cash dividend of 37½¢ per share on 7,000 shares of Common Stock of [taxpayer], and (3) the issue and delivery of 7,141 full paid and nonassessable shares without par value of the Common Stock of [taxpayer], being 7,070 shares plus an additional number of shares equal to the extra 1% Common Stock dividend on 7,070 shares heretofore declared ... payable on October 1, 1929.

Effective June 1, 1932 the Mathews Selected Dairy Company (DE), wholly owned by taxpayer, acquired the retail milk business of Frechtling Dairy Company, an Ohio corporation. The next day, June 2, 1932, taxpayer merged the Mathews Selected Dairy Company (DE) and Frechtling Dairy Company and changed the name to the Mathews–Frechtling Dairy Company (DE). On December 31, 1956, the Mathews–Frechtling Dairy Company (DE) merged with taxpayer. The assets received by taxpayer were transferred to taxpayer's Sealtest Central Division–Cincinnati the same day.

*Abandonment*

Mr. Harry Dunphey, the general manager of taxpayer's Cincinnati operations from 1964 until at least 1977 testified that taxpayer operated the milk processing plant on Curtis Avenue from the date of the 1929 acquisition of Mathews Selected Dairy Company (OH) until it was closed in 1972. Even though taxpayer claimed only that it abandoned its butter business in 1977, the court was able, from a review of the record in its entirety to determine that taxpayer ceased purchasing raw milk and closed the milk plant in 1972. Home delivery ceased in 1968, but taxpayer retained its wholesale milk business until 1977. After 1972 raw milk for the wholesale business was provided from a plant outside of the Cincinnati market area. Accordingly, the court finds that the acquisition of raw milk ceased in 1972 when the plant was closed. The court further finds that taxpayer permanently abandoned the Source of Supply intangible asset that it acquired from its acquisition of the Mathews Selected Dairy Company and that the fair market value of the asset was proved through judicially accepted methodology. Taxpayer overcame the presumption of correctness of the determination of the Commissioner and is entitled to a refund pursuant to I.R.C. § 165. Taxpayer met the burden of proving by a preponderance of the evidence that the purchase of raw milk actually and permanently ceased in the Cincinnati market in the proper claim year.

*Valuation Variable*

Dr. Knutson reported that two university studies shed significant light on the Cincinnati market in the late 1920's.[45] According to Dr. Knutson both publications characterized the market as being highly concentrated. Metzger's study, for example, estimated that fifty percent of all raw milk sales in the Cincinnati market was supplied by cooperatives. Compared to other markets and cooperatives described in this Opinion the producer's cooperative in the Cincinnati market area was weak. Dr. Knutson suggested a seven cent per cwt. valuation factor. The court disagrees. Dr. Knutson suggested a two cent per cwt. valuation variable in the Detroit and Pittsburgh markets that he described as highly competitive, "almost totally dominated by the producer's cooperative." Dr. Knutson suggested a five cent per cwt. valuation variable in the Milwaukee and NE Ohio markets where cooperatives were weak. For the Omaha market, where there was no strong cooperative, Dr. Knutson suggested a seven-and-a-half cent valuation variable. As can be seen, Dr. Knutson suggested the valuation variable on a "relative" basis: from two cents per cwt. in strong producer markets, to five cents in weak markets, to seven-and-a-half cents where the producer's were "not strong." If, as Dr. Knutson stated, the producers cooperative in the Cincinnati market was weak, a

---

**45.** Hutzell Metzger, *Cooperative Marketing of Milk*, USDA Technical Research Bulletin No. 179 (1930); Roland Bartlett, *Cooperation in the Marketing of Dairy Products* (1931).

seven cent per cwt. valuation variable is too high. Viewed "relatively" with the other markets the valuation variable would be no greater than five-and-a-half cents per cwt., and the court so finds.

*Valuation*

Neither the Price Waterhouse & Company audit nor the NYSE Listing Application stated the volume sales of milk for the Mathews Selected Dairy Company. However, a separate contemporaneous document entitled, "History and Nature of Business," dated August 30, 1929 and written by Mr. H.D. Hooge, Vice President and General Manager of the Mathews Selected Dairy Company, reported the milk volume sales for 1928 and the first six months of 1929. The Mathews Selected Dairy Company did not manufacture ice cream. The court annualized the 1929 data and averaged the two to arrive at a reasonably objective volume factor.

Milk and Cream Sales (Gallons)

| Year | Volume |
|------|--------|
| 1928 | 1,260,821 |
| 1929 | 1,223,410 |
| Average | 1,242,116 |

Using the derived volume of milk and cream sales, a five-and-a-half cent per cwt. advantage, and Dr. Knutson's methodology, the court find that the adjusted fair market value of the Source of Supply asset for the Mathews Selected Dairy Company is $97,920.

**Baltimore**

Taxpayer acquired the dominant milk processor in the Baltimore market, Western Maryland Dairy Corporation, with its two subsidiaries, Fairfield Farms Dairy and Miller's Dairy, Incorporated, effective December 31, 1930. The following discussion includes all three businesses under the name Western Maryland Dairy Corporation. The parties did not stipulate to any facts about the market; the figures discussed below came from the court's analysis of the record as a whole.

Western Maryland Dairy Corporation was purchased through an exchange of stock with taxpayer. The details of the acquisition are complex and best summarized in NYSE Listing Application A–9627, November 26, 1930.

Pursuant to an agreement dated September 25, 1930, as amended on October 28, 1930, between taxpayer and Charles R. Bowman [proprietor of Western Maryland Dairy Corporation], subsequent to the redemption of the entire outstanding 7% prior preferred stock of Western Maryland Dairy Corporation, will acquire not less than 62,000 shares (82⅔%) of the outstanding common stock and 20,127 shares (approximately 50¹⁄₄₀₀%) of the outstanding preferred stock of Western Maryland Dairy Corporation in consideration of the issue and delivery of (1) in respect of the number of shares of common stock of Western Maryland Dairy Corporation delivered under said agreement, certificates for a like number of full-paid and non-assessable shares of Common Stock without par value of [taxpayer], and (2) in respect of the number of shares of $6 preferred stock of Western Maryland Dairy Corporation delivered under said agreement, certificates for full-paid and non-assessable shares of Common Stock of [taxpayer] in the ratio of one and one-half shares of Common Stock of [taxpayer] for each share of $6 preferred stock of Western Maryland Dairy Corporation (with script in lieu of fractional shares of Common Stock of [taxpayer] otherwise deliverable).

The Acquisition Accounting Cards show that the acquisition was accomplished as outlined in the September 25, 1930, agreement to sell. As of December 31, 1936, taxpayer owned 74,384 of the 75,000 authorized and outstanding shares of no par common stock and 20,127 shares of the 40,252 shares of preferred outstanding stock. There were 50,000 shares of preferred shares authorized. Taxpayer controlled the assets and business of Western Maryland Dairy Corporation by its representatives on the board of directors following its acquisition on December 30, 1930. The total consideration was $3,162,-616.

The Acquisition Accounting Cards show that on April 5, 1937 taxpayer changed the name of Western Maryland Dairy Corporation twice, first to Fairfield Western Mary-

land Dairy Corporation (MD), and then, Western Maryland Dairy, Inc. (DE). As of July 5, 1956 taxpayer owned all of the outstanding stock of Western Maryland Dairy, Inc. (DE). On October 1, 1956, taxpayer merged its wholly owned subsidiary, Western Maryland Dairy, Inc., with taxpayer and transferred the assets to its Sealtest Western Maryland Division. On December 31, 1958 taxpayer dissolved the Sealtest Western Maryland Division and transferred the assets and business to Sealtest Foods Division (Eastern Division).

*Abandonment*

Taxpayer alleged that the majority of its sales in the Baltimore market area was home delivery and that it ceased home delivery in 1977 and abandoned the market. The record is devoid of any information of when wholesale delivery ceased and when the milk plant ceased purchasing raw milk, and closed. The fact that wholesale delivery continued after 1977 is significant because, according to Mr. Crocker, the Baltimore City Health Department did not permit the sale of milk not processed in the city. To provide raw milk for the wholesale business, the milk processing plant remained open and continued to purchase raw milk using taxpayer's Source of Supply advantage. There was no evidence that the raw milk was supplied from any other market area.

Whether a property is abandoned is a question of fact that must be determined by the trier of fact from a review of the record to find taxpayer's intent. As is generally the case in tax law, substance governs the ultimate finding, not form. The law requires that taxpayer's intent be evident from all the available facts and circumstances. *Commissioner v. Ashland Oil & Ref. Co.*, 99 F.2d 588 (6th Cir.1938), *cert. denied*, 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); *American Potash & Chemical Corp. v. United States*, 399 F.2d 194, 185 Ct.Cl. 161 (1968); *Kimbell–Diamond Milling Co. v. Commissioner*, 14 T.C. 74, 1950 WL 118 (1950), *aff'd*, 187 F.2d 718 (5th Cir.1951), *cert. denied*, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1957). To prove abandonment of the Source of Supply asset taxpayer bore the burden of proving by a preponderance of the evidence that the pur-

chase of raw milk actually and permanently ceased in that market. It is not enough for taxpayer to simply prove that all or part of the local customers, or the distribution system, were abandoned. If raw milk continued to be purchased within a market otherwise abandoned taxpayer did not relinquish its Source of Supply price advantage, even though it might have diminished in value. Diminishment in value of an intangible asset is not the same as abandonment. So long as the asset reasonably had even "potential value it cannot be said that the taxpayer's investment therein has been lost." *E.B. Elliott Co. v. Commissioner*, 2 T.C.M. (CCH) 444 (1943) (*citing Edward C. Lawson v. Commissioner*, 42 B.T.A. 1103, 1940 WL 144 (1940)); *see also Golden State Towel & Linen Serv., Ltd. v. United States*, 373 F.2d 938, 179 Ct.Cl. 300 (1967).

Taxpayer did not overcome the presumption of correctness of the determination of the Commissioner that it failed to establish that an abandonment occurred, or if an abandonment occurred, the basis of the asset. Taxpayer is not entitled to a refund.

## CAPITAL LOSS CLAIM

██ In each amended tax return at issue here taxpayer "explained" that it abandoned the claimed intangible assets and was entitled to an abandonment loss deduction, or in the alternative if the disposition was found not to be by abandonment it was entitled to an ordinary business loss deduction. In its 1986 complaint taxpayer alternatively requested the court to find it entitled to an abandonment loss deduction, or an "ordinary" business loss deduction pursuant to I.R.C. §§ 162(a) and 165(a), in the event it was found that disposition of the intangible assets was other than by abandonment. Taxpayer averred that it acquired the assets as a necessary and integral act in the conduct of its business, at an identified total cost, and held the assets until their disposal. *See Corn Prods. Ref. Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). Taxpayer's alternative "ordinary" business loss claim was short-lived. In 1988 the Supreme Court, in *Arkansas Best Corp. v. Commissioner*, revisited the issues, and misunder-

standings, that had arisen out of *Corn Products* in the ensuing thirty-three years. *Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988). There is no question that after *Arkansas Best* a loss stemming from the sale of intangible assets is a capital loss, not an ordinary loss. 26 U.S.C. § 1221; 26 C.F.R. § 1.1221–1. Taxpayer accordingly amended its pleadings, to claim a capital loss "if this court determines that plaintiff has not abandoned a particular asset, but instead has sold or disposed of that asset, [thereby entitling plaintiff] to a capital loss equal to its original cost less the fair market value of the consideration received." *See* RCFC 15(b). Taxpayer's alternative capital loss claim is denied for several reasons.

 Taxpayer gave its capital loss claim short shrift; but the court, in any event, found only one instance where taxpayer sold an intangible asset, *i.e.*, the Source of Supply asset acquired from Chapman Dairy Company, in the Kansas City market area, that was sold in 1970, a non-suit year. The sale did not qualify taxpayer for favorable tax treatment for the reasons given in the discussion of that market area. However, neither taxpayer, nor defendant, provided the court with the facts necessary to prove entitlement to a refund based on a capital loss. To value a capital loss taxpayer must prove the original cost of the asset as well as the adjusted fair market value; that the loss was taken in the year of the sale, capital gains for the year, and other years if carryovers and carrybacks are claimed. Title 26 U.S.C. § 1211(a) states that "in the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges." Section 1212(a) establishes rules governing carrybacks and carryovers of capital losses, permitting such losses "to offset capital gains in certain earlier or later years." Losses, to be deductible, must be evidenced by completed transactions and fixed by identifiable events. *First Nat. Corp. v. Commissioner*, 147 F.2d 462 (9th Cir. 1945). Where the court has denied a refund, it was because there was no proof of the existence of the asset separate from generalized goodwill, or if the asset was found severable from goodwill, and abandoned, the value of the asset at acquisition, the year of abandonment, or offsetting capital gains were not proved; thus there was no completed, fixed event. *Id.; see also W.L. Schautz Co. v. United States*, 567 F.2d 373, 215 Ct.Cl. 179 (1977).

Moreover, taxpayer suggested no dollar figure or methodology for determining a capital loss. A capital loss is quite simply valued by subtracting the value of the asset at the time of disposal from the value of the asset at acquisition. At best *Kraft I* provided for a sum allocated to tangible assets for most, but not all, of the acquired dairy companies and left a "residual" that included the cost of all intangible assets acquired from each. In that the court has found that taxpayer did not acquire Trade Names and trademarks, and that the "remaining residual," whatever that sum might be, was allocated to the total values of all five intangible assets, it is impossible to determine the cost paid for each of the other four at acquisition. The circumstances are exactly the opposite of those faced by the Tax Court in *Massey–Ferguson v. United States*, 59 T.C. 220, 1972 WL 2496 (1972), *acq.*, 1973–2 C.B. 2. There, the Tax Court found that the expert witnesses had provided sufficient evidence, using the residual method, to enable the court to determine the value of three of the four disputed intangible assets. The Tax Court simply concluded that it could independently determine the fair market value of the fourth intangible asset by subtracting the sum of the values of the three intangible assets from the total cost paid for all four intangible assets. Here, taxpayer could not identify the capital acquisition cost of each asset; nor could it prove the adjusted fair market values of four of the claimed five assets. There is, thus, no minuend or subtrahend from which to determine the value of each asset, or all, for purposes of finding entitlement to a capital loss.

Taxpayer's alternative claim for a refund based on a capital loss for each of the intangible assets is denied. No assets were sold in the tax years at issue, and even if they had of been, none of the other elements of recov-

ery, including the value of the capital losses, was proved.

 Further, the capital loss claim is not properly before the court. Taxpayer did not present a capital loss deduction in its administrative refund claim prior to filing this suit. Accordingly, by the doctrine of variance this court is without jurisdiction to consider this rationale as a basis for refund. Although defendant did not raise a jurisdictional argument against the capital loss claims, this court has an obligation to address its own subject matter jurisdiction, even if it must do so *sua sponte*. *See CPT Corp. v. United States*, 25 Cl.Ct. 451 (1992). There is a variance between taxpayer's rationale before the IRS and its rationale asserted in the refund claim filed in this court. The general rule of the doctrine of variance is that "a ground for refund neither specifically raised by, nor comprised within the general language of, a timely ... application for refund to the Internal Revenue Service cannot be considered by a court in which suit for refund is subsequently initiated." *Union Pac. R.R. v. United States*, 389 F.2d 437, 442, 182 Ct.Cl. 103 (1968). The *Union Pacific* court found that it lacked jurisdiction to hear the claims because, as here, the taxpayer made no formal or informal claim, nor gave adequate notice of the claim to the Commissioner. The Commissioner was not on notice that taxpayer intended to make a capital loss claim. *Id.* at 442 (*citing United States v. Kales*, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941)). The Commissioner did not consider the capital loss claims in determining that taxpayer failed to prove it abandoned any intangible assets, or if it did, the basis of each. In these circumstances the court is without jurisdiction to address the capital loss claim.

## CONCLUSION

### In the Matter of (804–86T)

It is black letter law that taxpayers who purchase or create intangible assets have a right to deduct the fair market value of those assets under section 165(a) of the Internal Revenue Code of 1954 if the qualifying conditions are met. Generalized goodwill may only be abandoned when the owner leaves the marketplace, but goodwill can be severed into constituent assets, and the assets abandoned piecemeal if the owner can prove their existence, permanent abandonment, no prior favorable tax treatment, their adjusted fair market value, abandonment in the proper tax year, and that they were not acquired as a minor incident in a composite transaction. The existence, abandonment, and value of assets are questions of fact to be decided by the court, based upon the preponderance of the evidence, looking to the substance, not the form, of the transactions at issue.

The burden of establishing that a claimed deductible loss was sustained is on the taxpayer, but the burden of proof is not absolute. In tax refund cases there is a strong presumption that the assessment of taxes by the Commissioner of Internal Revenue was correct. Here the Commissioner determined that taxpayer did not establish that any abandonment of intangible assets occurred, or if an abandonment occurred, the basis of the assets abandoned. The presumption can be overcome but taxpayer must prove the Commissioner's determination incorrect by substantial evidence. If taxpayer meets its burden of proof the presumption disappears and the court is left to independently resolve the question of the tax upon the basis of all of the evidence of record before it.

The culmination of its exhaustive analysis of this very complex case has led the court to the inevitable conclusion that taxpayer failed to overcome the presumption of correctness of the determination of taxes of the Commissioner as to four of the five claimed intangible assets. Taxpayer failed to prove by substantial evidence that it abandoned the asset it called Production Turnkey, as well as the claimed Distribution System, Customer Base, and Trade Name assets. The court also has found that taxpayer proved the abandonment of the Source of Supply asset by substantial evidence but in some instances failed to overcome the Commissioner's determination that it did not establish the basis of the asset. In other instances taxpayer overcame the presumption of correctness of the Commissioner's determinations by substantial evidence, establishing both the act of abandonment and

the basis of the abandoned asset. By applying the necessary and proper presumptions and weights to the entire record the court was able to calculate the adjusted fair market values of the Source of Supply assets acquired from companies purchased nearly ninety years ago and abandoned in the 1970's. In so holding the court recognized the difficulty faced by taxpayer in trying to prove the practical, current effect of ancient transactions. Those same frustrations faced the court in this undertaking. Nevertheless, remedying harshness in the operation of a Revenue Act is for the Congress, not the courts. *Boehm v. Commissioner*, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1945).

## SUMMARY OF REFUNDS ALLOWED AND DENIED IN 804–86T

For the reasons set forth in this Opinion taxpayer is entitled to a refund of taxes in the following amounts in the indicated tax years:

### Table V

| 1972 | $2,029,453 |
| 1973 | 0 |
| 1974 | 0 |
| 1975 | 0 |
| 1976 | 2,261,828 |
| 1977 | 0 |
| 1978 | 0 |
| Total | $4,291,281 |

Taxpayer is entitled to interest on the amount of the above refund pursuant to 28 U.S.C. § 2411. *See Deluxe Check Printers, Inc. v. United States,* 15 Cl.Ct. 175 (1988). *See also Ulmet v. United States,* 19 Cl.Ct. 527, 537 (1990), which held that "Congress ... has provided for interest on claims against the United States from judgments in the Claims Court ... on judgments entered in claimant's favor in suits for refund of federal taxes as permitted pursuant to 28 U.S.C. § 2411 (1982)." Taxpayer's claim for attorneys' fees, if pursued, must be addressed at a later date. *Kansas City S. Transp. Co. v. United States,* 11 Cl.Ct. 484 (1986); *Columbus Fruit & Vegetable Coop. Ass'n v. United States,* 8 Cl.Ct. 525 (1985).

This concludes the court's discussion of Case No. 804–86T.

\* \* \* \* \* \*

### In the Matter of Case No. (1)804–86T

### Investment Tax Credits for Certain Films And Videotapes

These claims are before the court on partial motions for summary judgment.[46] In dispute is whether taxpayer acquired rights in televised shows to qualify for Investment Tax Credits.

### FACTS

■ Before addressing these issues, the court finds it necessary to winnow through the melange of information presented by the parties to identify the relevant facts. In very simple terms, taxpayer acquired a number of rights to certain variety show specials broadcast over network television from 1972 through 1978. Typically, these rights included the exclusive original broadcast display right to telecast a program on U.S. network television; an option to broadcast the program a second time for an additional sum; and an option to expand the broadcast area to include Canada, again at an additional price. Taxpayer also obtained certain authority over the content and presentation of the films. No syndication rights, however, were ever obtained by taxpayer. These and all other rights were reserved by and to the producer. In 1977 and 1986, taxpayer filed amended corporate income tax returns for tax years 1972 through 1978, taking deductions for ITC. The claims were disallowed by the Internal Revenue Service.

### DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). As relating to this motion only, parties stipulated that there were no material facts in dispute and that this portion of the case is ready for disposition. The issue presented by the parties was whether taxpayer qualified for Investment Tax Credit when it ob-

---

46. The cross-motions are styled as "partial" because they were filed before the two actions herein were severed. This Opinion is fully dispositive of the Investment Tax Credit issues.

tained certain rights to films that were subsequently broadcast over the free television medium.

Defendant's motion for summary judgment set forth the simple proposition that since taxpayer did not obtain the syndication rights to the films at hand, it did not become a part-owner of those films as defined in Treas.Reg. § 1.48–8 (1986), and thus did not qualify for ITC treatment. Taxpayer did not contest that it had not received syndication rights, but argued that ownership of those rights had no bearing on its being a part owner of the films. Taxpayer contended that Treas.Reg. § 1.48–8(a)(2) did not require a transfer of network telecast and syndication rights, but only the transfer of commercially and economically viable rights to exploit the films in a medium of exhibition for the entire period of their useful lives and that the mention of "network telecasts and television syndications" within the Treas.Reg. § 1.48–8(a)(2) was only an example of what could constitute a medium of exhibition, and was not exclusive. Taxpayer argued that the type of films in dispute, variety show specials, had no practical value for syndication purposes, and it would have been meaningless to obtain syndication rights that in all actuality did not exist. Since it had acquired all the commercially available rights in existence, taxpayer concluded that it qualified for ITC treatment.

The focus of the court's analysis will center on whether the transfer of syndication rights in this case was a necessary prerequisite to taxpayer's receiving ITC. For clarity's sake, the court finds it necessary to provide background as to the rights involved in this dispute. There are two principle methods for marketing television shows within the United States: network distribution and syndication. Network distribution generally means that a show is marketed by one of the networks and broadcast nationally the same day and usually the same time in all geographic areas. Network distribution provides a single national market. Syndication, on the other hand, provides the availability of a host of smaller markets. When a show is syndicated, a licensed station has the right to broadcast the show in a limited geographic area.

Although some shows are originally produced for syndication purposes the more prevalent form of syndication is "off-network" syndication, which provides a lucrative second chance opportunity for shows previously shown on network television to be rebroadcast in numerous smaller markets.

In this case, the producer granted a license to taxpayer, who in turn contracted with the networks to broadcast the program over network television without considering the possibility of syndication. Traditionally, only two types of programs have been considered candidates for successful runs in off-network syndication; situation comedies and dramatic shows. While other types of programs, such as game shows and variety shows, have been marketed off-network with success, it was reported that only sitcoms and dramas have earned substantial revenues from off-network syndication. The financial rewards of syndication for some shows are so great that they can outstrip the profits from the show's original network run. Since networks are not allowed to maintain a financial interest in off-network syndicated shows, *per* F.C.C. regulation 47 C.F.R. § 73.658(j) (1984), successful off-network syndication provides no benefit to the network unless such benefit can be negotiated for in the original licensing fees. Syndication, however, is a two-edged sword. It is difficult, if not impossible, to predict the ultimate success of a television show when initially broadcast. The most popular and common type of prime-time programs change from year to year, and only a very small percentage of all programming produced for network broadcast ever reaches off-network syndication. Producers and the networks are aware of the potential risks of off-network syndication and negotiate accordingly in defining the price of licensing fees.

The statutory core of this dispute, 26 U.S.C. § 48(k) (1982), allows an entity to claim ITC for certain ownership rights in qualifying films or video tapes. The regulations promulgated to implement section 48 allows credit when a taxpayer owns an interest in "a part" to a film. 26 C.F.R. § 1.48–8(a)(1) (1986). To be eligible for such credit, an entity must obtain the "exclusive right to display a qualified film in one or more medi-

ums of exhibition...." 26 C.F.R. § 1.48–8(a)(2) (1986). The regulation defines the medium of free television to include two components: network telecast and television syndication rights. *Id.* Taxpayer contested the scope of this definition. Taxpayer argued that Treas.Reg. § 1.48–8(a)(2) did not define the term "medium of exhibition," but provided examples of what could constitute such a medium. Taxpayer quoted the exact language of the regulation in support of its view: "[T]he term 'medium of exhibition' includes, for example, free television (network telecasts and television syndication) or movie theaters." Taxpayer argued that the test to determine whether an entity qualifies for ITC is whether it had acquired all the rights that commercially and economically existed in the United States free television medium of exhibition. Taxpayer would have the court direct its attention to the term "medium of exhibition" and not "free television." While it is true that the term "medium of exhibition" was not defined by Treas.Reg. § 1.48–8(a)(2), the term relevant to this dispute, "free television," was given a rather clear meaning, "network telecasts and television syndication." 26 C.F.R. § 1.48–8(a)(2). The regulation avoids ambiguous interpretations of the "free television" definition by providing a concise example:

> [I]f the owner of a film transfers to a television network the right to display the film on network television (but does not transfer to the network syndication rights) the owner is considered to retain the 'exclusive right to display the film.' On the other hand, if the owner transfers to a television network all free television rights (network telecasts and television syndication) to the film before the film or any of its parts have been placed in service, the owner is considered to have sold a part of the film to the network and the network will be entitled to claim investment credit....

26 C.F.R. § 1.48–8(a)(2).

■ Legislative regulations such as Treas.Reg. § 1.48(a)(2) are to be afforded considerable deference, and should be upheld unless they are so arbitrary and capricious as to be plainly inconsistent with the authoriz-ing statute's language and purpose. *Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978); *Batterton v. Francis,* 432 U.S. 416, 425–26, 97 S.Ct. 2399, 2405–06, 53 L.Ed.2d 448 (1977); *RCA Corp. v. United States,* 12 Cl.Ct. 569, 572 (1987), *aff'd in part and rev'd in part sub nom., American Broadcasting Co. v. United States,* 851 F.2d 329 (Fed.Cir.1988). The validity of Treas.Reg. § 1.48–8(a)(2) has been affirmed by this court and the United States Court of Appeals for the Federal Circuit, and is not in question. *See RCA,* 12 Cl.Ct. at 572. The *RCA* plaintiffs argued the same position as did taxpayer in this case, and failed. Indeed, the court sustained the definition of free television as requiring network telecast plus television syndication rights. *Id.* at 571, 578. Treasury Regulation section 1.48–8(a)(2) thus sets out the mechanism to be used in determining whether all the free television rights have been transferred to a party, *i.e.,* to determine whether an entity obtains both network telecast and television syndication rights. It would ill-suit the law for this court to ignore or diminish the effectiveness of this legislative device.

Under the terms of Treas.Reg. § 1.48–8(a)(2) as outlined above, it would be a very simple matter to find that since taxpayer did not acquire syndication rights to the films in question, it did not fulfill the statutory requirements that would allow it to claim ITC. Due to the complexities involved in this case, however, the court finds it prudent to review matters with greater scrutiny.

There is no question that taxpayer did not acquire syndication rights to the films involved in this action—that fact is not in dispute. Taxpayer maintained, however, that the issue of whether it obtained syndication rights should have no bearing on whether it qualified for ITC. Taxpayer's syllogism began with the premise that to qualify for ITC, an entity would only need to acquire all the rights that commercially or economically existed in the free television medium of exhibition over the entire period of substantial exploitation of the film. Taxpayer then assumed that syndication rights to the type of films in dispute, variety show specials, had, by their nature, no commercial or economic

value. Since the syndication rights were valueless, taxpayer concluded that it was not necessary to acquire the rights to qualify for investment tax credit.

 Taxpayer's argument, while seemingly sound, is based upon a flawed premise. The dispositive issue of this case is not whether the syndication rights had any commercial or economic value, but whether syndication rights existed in the films in question and whether taxpayer obtained such rights. Taxpayer initially questioned the existence of syndication rights in this case by focusing on their economic and commercial viability. The crux of taxpayer's argument was that "Kraft's entitlement to the investment tax credit cannot be denied on the basis that it did not acquire a right which, as a commercial or economic matter, did not exist." Taxpayer is mistaken. There is no question that syndication rights to the films in dispute did indeed exist. Taxpayer's own experts and witnesses acknowledged this in addressing the question of commercial valuation. It is true that syndication rights are, by their nature, unpredictable, and thus avoid easy valuation due to their speculative nature, *Cosby v. United States*, 8 Cl.Ct. 428, 434 (1985), but the unpredictable character of syndication rights does not mean that such rights may be ignored, nor assumed to be nonexistent. A right that may bear little weight at the bargaining table never becomes totally irrelevant for ITC purposes. The court thus finds that syndication rights to the films in question did exist, that taxpayer knew or should have known of their viability, and must have acquired those rights in order to qualify for ITC treatment.

Beyond the scope of whether syndication rights exist, the court finds that taxpayer's position, that valueless rights should not be considered for investment tax credit purposes, requires comment. To give taxpayer's view effect, the court would be required to evaluate the worth of a certain right, and grant ITC according to the ascertained value of that right. This analysis would necessarily entail a review of initial valuation, the intention of the parties, and the actual value, by way of hindsight, of the syndication right. It takes little prescience to see that such an analysis would open a Pandora's box of unresolved issues, including, at what time is the right valued; at the bargaining table or after the fact? Should the court give greater weight to the expectations of the parties, to the form of the transaction, or to the substance? Who should qualify for the credit, the one who bargained for the ITC, or the one who, after the fact, emerged with the commercially viable syndication right? To answer these and other questions, the court would be placed in the position of trying to forecast and review the economic values of television rights—akin to peering into a crystal ball. The only appropriate avenue for resolving this problem would be to follow the simple mechanism designed by Congress and award ITC to the party that obtained both the "network telecast and television syndication rights" as set out in the regulations. 26 C.F.R. § 1.48–8(a)(2).

The problems inherent with taxpayer's position, and the reasonableness of a literal reading of Treas.Reg. § 1.48–8, is perhaps best illustrated by way of example. Assume that a party does not obtain syndication rights in a film when bargaining for a lease because that party believes those rights to be of no value. Under the assumption that it had obtained all the commercially and economically viable rights to the film, the party naturally requests ITC. Later on, however, the film proves to be a success, and great profits are derived in off-network syndication. Because the party failed to obtain the syndication rights, which would fall into the class of "rights that commercially and economically existed in the U.S. free television medium," any ITC would have to be negated. Had the party, however, followed the simple rubric set out in Treas.Reg. § 1.48–8, it would have paid no attention to the anticipated value of the syndication rights and acquired them to preserve its right to the credit. The fact situation at hand differs from the example only in that the syndication rights at issue were found to have little commercial value. Taxpayer would have this anomaly change the way Treas.Reg. § 1.48–8 applies to it with the practical result of rewriting the entire regulation. The court is not prepared to take such action. The court is treading on virgin territory, and must look

not only to the potential impact on taxpayer, but to the effect its decision will have on the law. To allow parties to circumscribe the requirements of Treas.Reg. § 1.48–8 when they may be able, after the fact, to demonstrate that syndication rights have no value would wreak havoc on the administration of the ITC for movie and television film, and could involve the IRS and the courts in determinations well outside of their domain. Treasury Regulation § 1.48–8 establishes clear rules for eligibility for ITC and allows the parties to take them into account in determining their contract arrangement, as anticipated by Congress. *RCA*, 12 Cl.Ct. at 578. The court chooses to follow these rules.

Taxpayer, at oral argument, drew the court's attention to *Cosby v. United States*, 8 Cl.Ct. 428 (1985), stating that the case was an example of ITC being granted to a television program that had no network telecast rights since it was created and shown exclusively in the syndication market. Taxpayer argued that requiring parties to obtain both syndication and network telecast rights to qualify for ITC would be inconsistent with *Cosby*. The example referred to by taxpayer, "The Joker's Wild" game show, was first aired on CBS in September, 1972 and ran until its cancellation in 1975. In 1976, the producers of "The Joker's Wild" learned that CBS had kept the tapes to 693 episodes and would be willing to sell the tapes at $100 a piece. This reflected the original cost of the blank tape, since "The Joker's Wild" plaintiff had retained all rights to the show itself. At the time of the sale, few game shows had been syndicated and conventional contemporaneous wisdom suggested that the tapes had no value. The show's producer nevertheless bought the tapes with the hope of finding a market for them. In 1976, KHJ, an independent television station in Los Angeles broadcast the tapes. "The Joker's Wild" became an instant success. Encouraged by this, "The Joker's Wild" plaintiff resumed taping the show with the intention of exclusive syndication. The syndicated version also proved successful and appeared in numerous markets. *See Cosby*, 8 Cl.Ct. at 432. At trial, "The Joker's Wild" plaintiff sought ITC under 26 U.S.C. § 48(k). The credit was grant-

ed by the court after a review of the content of the program.

The court finds *Cosby* distinguishable on the law and supportive of the court's present holding on the facts. *Cosby* dealt exclusively with the "topical or transitory" test of 48 U.S.C. § 48(k)(1)(B) (1986), and whether ITC should be granted according to the content of a show or to its entertainment classification, such as "games show" or "sitcom." *Cosby* did not discuss the necessity of acquiring syndication and network telecast rights to qualify ITC, nor the question of whether either of those rights existed "The Joker's Wild" syndication. These questions were moot. Plaintiff in Cosby had retained all the rights to the show itself. It is "The Joker's Wild" fact situation, however, that has greater import on the court's present holding. In 1976, when "The Joker's Wild" producer bought the old network telecast rights from CBS there was consensus that the tapes had no value for syndication purposes even though that proved not to be the case. *Cosby*, 8 Cl.Ct. at 432. In accordance with taxpayer's arguments here, the syndication rights would have been nonexistent. "The Joker's Wild" was very successful in syndication and those rights, thought to have no value, became the show's most valuable asset. These facts buttress the court's finding in the present action that a right nevertheless exists even if it has little perceived value. There is no question that the syndication rights in this case existed. Since taxpayer failed to obtain those rights, it may not now qualify for ITC treatment.

## CONCLUSION

### In the Matter of (1)804–86T

The court concludes that to become a part owner to a film, per Treas.Reg. § 1.48–8(a)(2), to qualify for ITC treatment, a taxpayer must acquire the free television rights to the film, which entails obtaining both the rights to network telecasts and television syndication. Taxpayer knew or should have known that the syndication rights to the films in question existed, and should have been aware of the regulatory qualifications for ITC. It may have been a very simple matter for taxpayer to have acquired the

requisite rights, but it failed to do so. Though it may seem trivial to have the outcome of this case turn on a right that had little apparent value, that is the clear letter, and spirit, of the law. Because taxpayer failed to obtain such rights in the films in question, taxpayer is barred from obtaining the credit it seeks. Defendant's partial motion for summary judgment is allowed and taxpayer's cross-motion is denied.

## ULTIMATE CONCLUSION

Taxpayer's abandonment loss refund claims addressed in 804–86T for the five alleged intangible assets in tax years 1973–1975 and 1977–1978 are denied and dismissed. It's abandonment loss refund claims for 1972 and 1976 are denied and dismissed, except as allowed herein. Taxpayer's Investment Tax Credit refund claims addressed in (1)804–86T for tax years 1972–1978 are denied and dismissed.

This Opinion disposes of all of taxpayer's claims for the tax years in issue. The clerk shall enter judgment accordingly. Each party shall bear its own costs.